IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 06-0026** |
| | ) | **Electronically Filed** |
| **CYRIL H. WECHT** | ) | |

### Memorandum Opinion and Order of Court Denying Motion to Dismiss (Doc. No. 180)

## I. Introduction

On January 20, 2006, the government brought an 84 count indictment alleging that

defendant, Dr. Cyril Wecht, committed the crimes of theft of honest services - wire fraud and

mail fraud, mail fraud, wire fraud, and theft concerning an organization receiving federal funds,

in violation of 18 U.S.C. §§ 1341 1342, 1343 and 1346, 18 U.S.C. §§ 1341 and 1342, 18 U.S.C.

§§ 1342 and 1343, and 18 U.S.C. § 666, respectively, when he unlawfully used his public office

as the Coroner of Allegheny County, Pennsylvania, for his private financial gain (doc. no. 1).

More specifically, the indictment alleges, among other things, that defendant falsely billed his

clients (through the mail) for services such as limousine rides to the airport and other private

engagements, while using County Coroner's office vehicles and employees to drive him to the

airport and other private engagements; that defendant created false travel agency bills and false

limousine reports and transmitted them via facsimile from the coroner's office to private clients

in other states; and, that defendant otherwise used the Allegheny County Coroner's Office

employees to perform other personal work, including secretarial work, for his own private

financial gain. Defendant categorically denies these allegations. The trial of this case will

commence on October 16, 2006, as agreed to by the parties in the March 1, 2006 Pretrial Order

(doc. no. 42).

Currently pending before this Court is defendant's Motion to Dismiss the Indictment (doc. no. 180). After careful consideration of defendant's motion and supporting brief, the government's response thereto (doc. no. 249), and defendant's reply brief (doc. no. 252) and for the reasons that follow, said motion will be DENIED.

## II.  Standard of Review

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an indictment must contain the provision of law that the defendant is alleged to have violated and "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7©)(1). The indictment must include all of the elements of the crime alleged, *United States v. Spinner*, 180 F.3d 514 (3d Cir. 1999), as well as specific facts that satisfy all those elements; a recitation "in general terms the essential elements of the offense" is not sufficient. *United States v. Panarella*, 277 F.3d 678, 684-85 (3d Cir. 2002). A district court may review the facts in the indictment to see whether, as a matter of law, they reflect a proper interpretation of criminal activity under the relevant criminal statute. 277 F.3d at 684-85. In considering a motion to dismiss an indictment, the district court must accept as true all factual allegations set forth in the indictment. *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). The dismissal of an indictment is authorized only if its allegations are not sufficient to charge an offense, but such dismissals may not be based upon arguments related to the insufficiency of the evidence to prove the charges in the indictment. *United States v. DeLaurentis*, 230 F.3d 659, 660-61 (3d Cir. 2000). To the extent defendant alleges government misconduct in the form of a vindictive prosecution, the defendant must show that there has been misconduct of a nature sufficient to invoke the Court's supervisory powers, and that the

2

defendant was prejudiced by such misconduct.  *Bank of Nova Scotia v. United States*, 487 U.S.

250, 263 (1988); *United States v. Williams*, 504 U.S. 36 (1992).  The defendant has the burden of

proof on a claim of vindictive prosecution, *United States v. Schoolcraft,* 879 F.2d 64, 68 (3d Cir.

1989), and defendant's burden is a rigorous one. *United States v. Jarrett*, 447 F.3d 520 (7th Cir.

2006).

### III.  The Indictment

#### A.  General Allegations and Background

Although there are 70 paragraphs (having numerous subparagraphs) and 84 Counts in the

Indictment, it actually states three fairly simple and straightforward sets of charges, and is not

nearly the complicated and vague charging document the defendant makes out.  The three groups

of charges in the indictment are: A. "Honest Services" mail and wire fraud, also known as

"intangible rights" fraud, wherein the victims are Allegheny County and its citizens, pursuant to

18 U.S.C. §§ 1341, 1343, 1346 and 2; B. Simple mail and wire fraud, wherein the victims are

various private clients and outlying counties which used Dr. Wecht's services, pursuant to 18

U.S.C. §§1341, 1343 and 2; and C. Theft concerning a public entity receiving federal funds,

pursuant to 18 U.S.C. §§  666(a)(1)(A) and 2.  Accepting as true all facts properly pled in the

Indictment for purposes of deciding the legal sufficiency of the Indictment and the merits of this

motion to dismiss, the Indictment avers the following.

From 1996 through 2000, Allegheny County was organized and subject to the provisions

of the Second Class County Code, 16 P.S. §§ 3101-5106-A, and the Coroner of Allegheny

County was an elected "Row Office" official who managed the personnel and resources of the

Allegheny County Coroner's Office ("ACCO").   Indictment, ¶ 2.  In May 1998, the voters of

Allegheny County approved a Home Rule referendum, and effective January 1, 2000, Allegheny County became a Home Rule County. Indictment, ¶ 3. Pursuant to its Home Rule Charter, Allegheny County was organized and governed by the provisions of the Administrative Code that was promulgated pursuant to the Charter, and the Coroner was subject to the Administrative Code. Indictment, ¶ 4.

The Indictment specifically sets forth several state and local laws as the sources of the "Fiduciary and Ethical Duties of the Coroner" of Allegheny County. Indictment, ¶¶ 5-11. From 1996 through 2000, the Second Class County Code required the Coroner to comply with the "Public Official and Employee Ethics Act" of 1998 ("Ethics Act"), Oct. 15, P.L. 729, No. 93, §§1101-1113, effective December 15, 1998, 65 Pa.C.S. §§ 1101.1 - 1113, including its reporting and ethics requirements; additionally, Allegheny County's employment policy as of 2000 required all of its employees to abide by the Ethics Act. Indictment, ¶ 5. Paragraphs 1102 and 1103(a) of the Ethics Act,[1] 65 Pa.C.S. §§ 1102, 1003(a), prohibit an official of a political subdivision, including the Coroner, from using the authority of his office "for his private pecuniary benefit" and from "accepting any honorarium." Indictment, ¶ 6.

Additionally, the Second Class County Code provided that the Allegheny County Coroner could conduct autopsies and other professional services for other counties, but required all fees collected for such services to be accounted for and paid to the Allegheny County

---

[1] Section 1102 defines "Conflict" or "conflict of interest" in relevant part as: "Use by a public official . . . of the authority of his office . . . or any confidential information received through his holding public office . . . for the private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated." 65 Pa.C.S. § 1102, Definitions.

Section 1103(a) provides, in relevant part: "Conflict of interest.--No public official . . . shall engage in conduct that constitutes a conflict of interest." 65 Pa.C.S. §1103(a).

treasurer. Indictment, ¶ 7.  The Second Class County Code also required that bodies of

unidentified deceased persons be taken to the Allegheny County morgue and, if the Coroner

deems it necessary, embalmed and preserved, and, if the Coroner is unable to otherwise

determine the cause and manner of death, to perform an autopsy; the Second Class County Code

also proscribed the Coroner's removal of unclaimed corpses from the morgue, where they are to

remain "except upon the certificate of the Coroner." Indictment, ¶ 10-11.

The Indictment also identifies Allegheny County laws that governed the ethics and

accountability of officials from 2000 through 2005, namely, the Administrative Code adopted by

Allegheny County under its Home Rule Charter to govern all employees and Independently

Elected Officials, including the Coroner. Indictment, ¶ 8. The Administrative Code required the

Coroner to devote "a full time effort to the duties" of his office, and prohibited officials,

including the Coroner, from using Allegheny County  resources for any non-county purpose, and

from using the office for private financial gain, and required the Coroner to file annual financial

disclosure forms. Indictment, ¶¶ 8-9.

The Indictment recites the following averments about defendant in his capacity as

Coroner at paragraphs 12-23: as Coroner of Allegheny County from 1970 through 1980, and

again from 1996 through 2005, Dr. Wecht was responsible for managing the operations of the

ACCO, was prohibited from using the ACCO resources for private financial gain, and was

required to file truthful annual financial disclosure forms, which he failed to do in 2001, 2002,

and 2003, but belatedly filed, after news of the federal government's investigation became public

in February 2005; Dr. Wecht filed a lawsuit in June 2000, seeking to exempt his office from the

ethics and other provisions of the Administrative Code, which lawsuit was resolved against him

5

by the Pennsylvania courts, which ruled that the Coroner of Allegheny County was covered by the accountability, conduct and ethics provisions of its Administrative Code.[2] Indictment, ¶¶ 12-16.

The "Defendant's Private Business" is described at paragraphs 17-23 of the Indictment. Dr. Wecht is the sole owner and principal officer of Wecht Pathology and Associates, Inc. ("Wecht Pathology"), a domestic, professional for-profit corporation registered in Pennsylvania. The total and yearly incomes of Wecht Pathology, and Dr. Wecht's personally, for the years 1997 through 2004 are stated. Indictment, ¶ 20-21.  The indictment also avers that from 1998 through 2004, Dr. Wecht stated to the IRS that he devoted 100% of his time to the business of Wecht Pathology. Indictment, ¶ 23.  That business is described as providing medical-legal forensic pathology opinions, consultations and expert testimony in civil and criminal litigation throughout the United States and in foreign countries, providing medical-legal pathology opinions, consultations and expert testimony for public entities (e.g., public defender and district attorney offices) in civil and criminal litigation, conducting autopsies for other counties in Western Pennsylvania and private clients, speaking at public and private events for honoraria, authoring publications for royalties, and performing in entertainment venues.

**B. "Honest Services" mail and wire fraud, also known as "intangible rights" fraud, wherein the victims are Allegheny County and its citizens, pursuant to 18 U.S.C. §§ 1341, 1343, 1346 and 2.**

Paragraphs 24 through 35, and Counts 1 through 24, charge defendant with wire fraud -

---

[2] *Wecht v. Roddy*, 815 A.2d 1146 (Pa. Cmwlth. Ct. 2002) (Allegheny County's Home Rule Administrative Code provisions which mandate independently elected officials to work full-time and to abide by the accountability, conduct and ethics code did not conflict with Second Class County Code; Allegheny County Coroner is subject to said provisions).

theft of honest public services from 1996 through 2005, wherein Dr. Wecht "devised and intended to devise a scheme to defraud, for obtaining money and property, and for depriving another of the intangible right of honest services, by means of breaching his fiduciary and ethical duties as Coroner of Allegheny County and making false and fraudulent pretenses and representations, well knowing at the time that he was breaching his fiduciary and ethical duties and that the pretenses and representations were false and fraudulent when made." Indictment, ¶ 25.   The purpose of the scheme was allegedly to obtain money, property and other things of value, to violate the fiduciary and ethical duties owed by the Coroner to Allegheny County and its citizens, and to "deprive Allegheny County and its citizens of the intangible right to the honest service of defendant Cyril H. Wecht as Coroner of Allegheny County and other employees of the Allegheny County Coroner's Office." Indictment, ¶ 26.

The mechanics of the scheme is set forth in some detail, including the following: defendant used his position, authority and the resources of the ACCO to assist Wecht Pathology in generating private income; instructed ACCO employees to perform substantial private work for Wecht Pathology while on duty; used secretarial, computer, facsimile, and other general county resources of the ACCO in his private business; personally examined slide tissues and prepared private consulting reports in private "black lung" cases while at ACCO; used Deputy Coroners as couriers and as a private limousine service for him and his family for his own personal financial gain and for personal matters, and used Deputy Coroners and other ACCO employees to do personal and family matters for defendant; faked bills from a dummy limousine business, charged his clients for the services reflected in the fake bills, while actually using county personnel and vehicles and not limousines, and retained the proceeds generated by the

7

phoney limousine bills for his own benefit; faked receipts from a defunct travel agency for inflated travel expenses in private cases, submitted the receipts to his clients for payment of checks made out to him personally, and kept the proceeds as "pocket money" for his personal use;  and exchanged Allegheny County cadavers to Carlow College for use by its students, in exchange for the use of a laboratory at Carlow for his private work. Indictment, ¶ 28-29.  The Indictment lists numerous ways in which defendant "used the position, authority, and resources of the [ACCO] for the personal and political benefit of himself and his family," including: dog walking, shopping, errands, and driving family members to the airport and other locations and events unrelated to the business of the ACCO; causing ACCO employees to participate while on duty in his unsuccessful campaign for County Executive in 2000, and for his son's efforts to win political office, and expending Allegheny County resources such as secretarial time, paper, computers, etc., on his and his son's campaigns; and using Allegheny County vehicles and gas routinely to perform outside autopsies and consulting work in other counties in Western Pennsylvania, and receiving reimbursement from the other counties for mileage and expenses but retaining said monies for his own benefit without reimbursing the county for use of the vehicles and gas. Indictment, ¶ 30-33.

Paragraph 35 sets forth Counts 1 through 24, alleging instances of wire fraud committed in furtherance of the foregoing scheme, through facsimiles sent from the ACCO to private clients, from February 2002 through February 2005, in violation of 18 U.S.C. §§ 1343, 1346 and 2.  The facsimiles were mostly of invoices for private services.

Paragraph 36-40 set forth Counts 25 through 32, alleging instances of mail fraud committed in furtherance of the foregoing scheme, averring that defendant had caused to be

mailed packages of "Microscopic Autopsy Tissue Slides" to various private clients, some in

"black lung" cases, from January 29, 2003 through June, 2004, in violation of 18 U.S.C. §§ 1341,

1346 and 2.

**C. Simple mail and wire fraud, wherein the victims are private clients and various outlying counties which used Dr. Wecht's services, pursuant to 18 U.S.C. §§ 1341, 1343 and 2.**

Counts 33 through 42 allege a narrower scheme to defraud private clients, from February

2002 through March 2005, by using fake limousine receipts and reimbursements for expenses he

did not actually incur because he used ACCO Deputy Coroners to provide transportation, at no

cost to him, and for travel expenses based on fake travel agency bills, in violation of 18 U.S.C.

§§ 1343 and 2.  Indictment, ¶¶ 41-51.  These clients were asked to make checks payable to

defendant personally, and he retained the reimbursements for his own use, not as income to

Wecht Pathology, and he testified falsely about his expenses under oath at depositions to conceal

his fraud. Indictment, ¶¶ 50-51.

Counts 43 through 79 charge defendant with specific instances of mail fraud from

January 2001 through June 2005, in violation of 18 U.S.C. §§ 1341 and 2, in furtherance of a

scheme to obtain money by false pretenses, by preparing and having submitted fake and

fraudulent mileage reimbursement invoices to the counties in Western Pennsylvania in

connection with his private autopsy and consulting services.

**D. Theft concerning a public entity receiving federal funds, pursuant to 18 U.S.C. § 666(a)(1)(A) and 2.**

Counts 80 through 84 of the Indictment allege that during the calendar years of 2002,

2003, 2004 and 2005, defendant, being an agent of Allegheny County, a local government

organization that received benefits in excess of $10,000 during each of those calendar years,

embezzled, stole, obtained by fraud and otherwise converted to his own use "property" valued at

$5,000 or more, of Allegheny County; specifically, defendant used the personnel, vehicles,

facilities, resources, equipment, and space of the ACCO, to conduct his private business

activities, in violation of 18 U.S.C. § 666(a)(1)(A) and 2.

## IV.  Discussion[3]

### A.  Theft of Honest Services/Intangible Rights, Mail and Wire Fraud Pursuant to 18 U.S.C. §§  1341, 1342, 1343, 1346

Just as the Court was almost finished gathering, reviewing and synthesizing the law on

honest services or intangible rights fraud in the Third Circuit, but before commencing to draft

this section for this opinion, the United States Court of Appeals for the Third Circuit decided

*United States v. Gordon,* 2006 WL 1558952 (3d Cir. June 8, 2006) (non-precedential), in which

Judge McKee thoroughly and completely summarized the Court's development of honest

services/ intangible rights law.  Since any attempt to improve on this most recent and complete

summary would serve no useful purpose, this Court will rely on Judge McKee's summary of

honest services/ intangible rights law as explained for a unanimous Court in *Gordon*.

Although *Gordon* is non-precedential, its accurate and thorough explanation of honest

services/ intangible rights fraud, 18 U.S.C. § 1346, merely recaps the Court's recent precedent,

upon which both defendant and the government rely, and sets the stage for application of that

_____

[3]The Court does not address each of defendant's points and sub-arguments, many of which are frivolous and repetitive, but instead will discuss only the central arguments raised in the 79 page brief in support of dismissal. Any points or sub-arguments not specifically addressed are deemed to be without merit.

fraud theory in this case.  Accordingly, this Court will repeat the *Gordon* explanation at length, after first placing *Gordon* in context.

Defendant Thomas P. Gordon, the former elected County Executive of New Castle County, and defendant, Sherry L. Freebery, his Chief Administrative Officer ("CAO"), were the subjects of an 18-month federal investigation into the operations of the government of New Castle County, Delaware.  The government indicted defendants on conspiracy, RICO, mail fraud, wire fraud and theft of honest services fraud, alleging five separate "schemes": (1) the "Election Scheme"; (2) the "Fieldstone Scheme"; (3) the "Harassment Scheme"; (4) the "Investigation Scheme"; and (5) the "Personal Benefits Scheme."  The United States District Court for the District of Delaware, *United States v. Gordon*, 380 F.Supp.2d 356 (D.Del. 2005), dismissed Counts V, VI, and VII of the Indictment regarding the "Fieldstone Scheme," and struck from the Indictment prejudicial references to said scheme, because, in the District Court's view, the Indictment did not allege, and the government did not contend, that a $2.3 million transfer from a constituent to Freebery "was made for the purpose of influencing her official actions, or that Freebery was in fact influenced by the financial transaction, and because the indictment failed to allege that Freebery had a financial interest in the Fieldstone Project.

The District Court denied the motion to dismiss other counts of the Indictment, including the Election Scheme and the Personal Benefits Scheme, charging, *inter alia*, that defendants "had caused resources of the County to be improperly diverted for the benefit of particular political candidates," which "clearly could constitute 'honest services' fraud," *Id.* at 362, as well as "relatively trivial" charges that "defendants caused a County employee, during working hours, to spend about 10 days painting Ms. Freebery's house and doing yard work at her premises; that in

2001 Ms. Freebery caused a County employee, during working hours, to decorate her

benefactress's Christmas tree; and that, from time to time, County employees performed personal

errands for Ms. Freebery while being paid by the County." *Id.* at 363.

The government took an immediate appeal from the dismissal of Counts V, VI, and VII

of the Indictment.  Reversing and reinstating the dismissed counts and the stricken language, the

Court of Appeals for the Third Circuit stated as follows:

> The federal mail fraud statute is codified at 18 U.S.C. § 1341, and
> provides, in relevant part:
>
> > Whoever, having devised or intending to devise any scheme or
> > artifice to defraud . . . deposits or causes to be deposited any matter or
> > thing whatever to be sent or delivered by any private or commercial
> > interstate carrier . . . shall be fined under this title or imprisoned not more
> > than 20 years, or both.
>
> The federal wire fraud statute is codified at 18 U.S.C. § 1343, and
> provides, in relevant part:
>
> > Whoever, having devised or intending to devise any scheme or
> > artifice to defraud, . . . transmits or causes to be transmitted by means of
> > wire . . . communication in interstate or foreign commerce, any writings,
> > signs, signals, pictures, or sounds for the purpose of executing such
> > scheme or artifice, shall be fined under this title or imprisoned not more
> > than 20 years, or both.
>
> "The term 'scheme or artifice to defraud,' " as used in Sections 1341 and
> 1343, "includes a scheme or artifice to deprive another of the intangible right of
> honest services." 18 U.S.C. § 1346. Section 1346 was enacted in reaction to the
> Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 360
> (1987), which held that the prior text of the mail and wire fraud statutes did not
> include honest services fraud, but was instead "limited in scope to the protection
> of property rights." Accordingly, "§ 1346 was a clear statement by Congress that
> it wished to criminalize honest services fraud." *United States v. Murphy*, 323
> F.3d 102, 116 (3d Cir. 2002).
>
> The elements of mail or wire fraud are: "(1) the defendant's knowing and
> willful participation in the scheme or artifice to defraud, (2) with the specific

12

intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001). Honest services fraud ***typically*** is found in two situations: "(1) bribery, where a legislator was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain," which, "[i]n the public sector . . . ***is oftentimes prescribed by state and local ethics laws***." *Id.* at 262-63.

As we noted at the outset, the District Court was troubled because the instant indictment did not allege, and the government did not contend, that the $2.3 million transfer from Moseley to Freebery "was made for the purpose of influencing her official actions, or that Freebery was in fact influenced by the financial transaction[,]" and because the indictment failed to allege that Freebery had a financial interest in the Fieldstone Project. Dist. Ct. Op. at 9, App. A13. Accordingly, the District Court concluded that the allegations based upon the Fieldstone Project were consistent with appropriate constituent service and could not, therefore, support criminal charges. Dist. Ct. Op. at 9-10, App. A13-14. However, that ruling is clearly contrary to the law of this circuit.

We rejected a similar argument in *United States v. Antico*, 275 F.3d 245 (3d Cir. 2001). . . . [wherein we] affirmed Antico's conviction for honest services fraud. In doing so, we accepted "[t]he government's prosecutorial theory [that] . . . by failing to disclose his personal interest in a matter over which he had discretionary decision-making authority," Antico committed honest services fraud by "depriv [ing] the public of its right to disinterested decision-making and of its right to full disclosure of his personal motivation." *Antico*, 275 F.3d at 262. Antico had a duty to disclose information pertaining to a conflict of interest under state and local law, and his failure to do so constituted honest services fraud. *Id*. We explained the violation of his duty as follows:

> Duties to disclose material information affecting an official's impartial decision-making and to recuse himself exist within ***th[e] fiduciary relationship [between a public servant charged with disinterested decision-making and the public he serves] regardless of a state or local law codifying a conflict of interest***. . . . [FN5] ***In the context of honest services fraud, where undisclosed, biased decision making for personal gain, whether or not tangible loss to the public is shown, constitutes a deprivation of honest services, an active fraud or deceit is not necessary***. . . . [T]he prosecution need prove only a recognizable scheme formed with intent to defraud **regardless of how that intent manifests itself in execution**. . . .   The legal meaning of fraud is not limited to deceit or misrepresentation; it includes overreaching, undue influence, and other forms of misconduct. Nor is a showing of public harm

13

required.

―――――――
    FN5. Although this language suggests that honest services fraud
does not require a violation of underlying "state or local law codifying a
conflict of interest," Antico was charged with violations of law and this
portion of our discussion was therefore dicta. *See Murphy*, 323 F.3d at
117; *United States v. Panarella*, 277 F.3d 678, 699 n. 9 (3d Cir. 2002).

―――――――

*Id.* at 264 (internal citations and quotation marks omitted, emphasis added).
Accordingly, we rejected Antico's argument that " 'absent deceit, concealment,
demonstrable public harm or other active fraud,' his conviction . . . cannot
stand." *Id.* at 264. We concluded that "[A]n official's intentional violation of the
duty to disclose provides the requisite 'deceit.' " *Id.* (quoting *United States v.
Sawyer*, 85 F.3d 713, 732 (1st Cir. 1996) (brackets in original). In reaching our
conclusion, we cited *United States v. Woodward*, 149 F.3d 46, 63 (1st Cir. 1998)
(omission in original), wherein the court stated that "[the defendant's] intent is . .
. demonstrated by his failure to disclose his conflict of interest although he was
required to do so."

    We again made this clear in *United States v. Panarella*, 277 F .3d 678
(3d Cir. 2002) [*cert. denied*, 537 U.S. 819 (2002)]. Panarella was convicted for
being an accessory to honest services fraud based upon payments he made to a
state senator, Loeper, who failed to disclose those payments while taking actions
in the state senate that directly benefitted Panarella's delinquent tax collection
business. We had to decide "whether allegations that Loeper unlawfully
concealed [that] income . . . while taking discretionary action that Loeper knew
would directly benefit Panarella amount[ed] to a scheme to deprive the public of
his honest services, or whether an additional allegation that Loeper's
discretionary action was influenced by Panarella's payments [was] necessary."
*Id*. at 691. We concluded that no additional allegation was needed. We held:
"where a public official takes discretionary action that the official knows will
directly benefit a financial interest that the official has concealed in violation of
a state criminal law, that official has deprived the public of his honest services
under 18 U.S.C. § 1346." *Id.*

    In reaching that holding, we rejected Panarella's reliance on *United States
v. Bloom*, 149 F.3d. 649 (7th Cir. 1998). There, the court had reversed the
conviction of a Chicago alderman who had given advice as a private attorney.
The court in *Bloom* held that honest services fraud required misuse of one's
official position "for personal gain." *Panarella*, 277 F.3d at 692. We
distinguished *Bloom*, and rejected its reasoning. The *Bloom* analysis is

analogous to the District Court's concern that the instant indictment did not allege personal gain. *Panarella* establishes that ***an allegation of personal gain is not necessary to establish honest services fraud. Rather, "state law offers a better limiting principle*** for purposes of determining when an official's failure to disclose a conflict of interest amounts to honest services fraud." *Id*. Accordingly, ***we specifically refused to limit the offense to situations in which a public official uses his or her office for personal gain. Id.*** at 694 ("Rather than limiting honest services fraud to misuse of office for personal gain, we hold that a public official who conceals a financial interest in violation of state criminal law while taking discretionary action that the official knows will directly benefit that interest commits honest services fraud.") (citing *Woodward*, 149 F.3d at 62).

We again addressed the scope of honest services fraud in *United States v. Murphy*, 323 F.3d 102 (3d Cir. 2003). There, the defendant was not a public official, but the former chairman of a county political party who was convicted of honest services fraud. The predicate offense for that conviction was a violation of a state bribery statute, N.J.S.A. 2C:27-2(a). We rejected the government's theory that Murphy had become so involved in county government "that he could be considered the equivalent of a publicly elected official." *Id*. at 104. We also rejected the contention that Murphy had a fiduciary relationship with the public. In the District Court, the government had relied upon *United States v. Margiotta*, 688 F.2d 102 (2d Cir. 1982), in an attempt to stretch the offense of honest services fraud to a private citizen who was not a public employee or elected official. In *Margiotta*, the Court of Appeals for the Second Circuit had sustained an honest services mail fraud conviction of the chairman of a county political party under circumstances very similar to the facts surrounding Murphy's conviction. However, we rejected the rationale of *Margiotta* because it extended the mail fraud statute "beyond any reasonable bounds." *Murphy*, 323 F.3d at 104. We explained that, "***[w]ithout the anchor of a fiduciary relationship established by state or federal law***, it was improper for the District Court to allow the jury to create one." *Id*.

We also explained that the *Margiotta* approach was inconsistent with principles of federalism that are preserved when ***federal honest services fraud is tied to a violation of a fiduciary relationship arising under state or local law***. *Id*. at 117. Violation of the bribery statute at issue in *Margiotta* did not, by itself, establish the ***required fiduciary relationship***. Rather, we reiterated our statement in *Panarella* that the fraud or deceit endemic in honest services fraud may arise from "the deliberate concealment of material information in a setting of fiduciary obligation." *Id*. (quoting *Panarella*, 277 F.3d at 695 and *United States v. Holzer*, 816 F.2d 304, 307 (7th Cir.1987)). [FN6]

_____

15

FN6. In deciding *Murphy*, we also endorsed the reasoning of the Court of Appeals for the Fifth Circuit in *United States v. Brumley*, 116 F.3d 728 (5th Cir.1997). There, the court interpreted § 1346 as requiring a state law limiting principle for honest services fraud. *Murphy*, 323 F.3d at 116 & n. 5. The court in *Brumley* stated that an official who does all that is required under state law but who is alleged to have not discharged his or her duties "honestly" cannot be convicted of honest services fraud. *Brumley*, 116 F.3d at 734. Rather, § 1346 "contemplates that there ***must first be a breach of a state-owed duty***." *Id.*

_____

Thus, although a violation of a state criminal law may be sufficient to lay the foundation for honest services fraud, ***it is clear from our analysis of the requisite fiduciary duty that honest services fraud does not require a violation of criminal law, but rather a violation of a state-created fiduciary duty***. At the very least, the ***government must allege a violation of some law -or a recognized fiduciary duty- to adequately charge honest services fraud***. Once again, we are here not required to delineate the parameters of the standard beyond this holding because here the government has alleged that Freebery and Gordon violated Delaware laws.

*Gordon*, 2006 Wl 1558952 at *5-*8 (emphasis added).

*Gordon* (or, more accurately, the recent Court of Appeals' precedent which is accurately summarized in *Gordon*) succinctly addresses and resolves, against defendant, nearly all of his arguments for dismissal of the honest services/ intangible rights counts in the Indictment. *Antico*, *Panarella* and *Murphy* do not, as defendant argues, hold that ***only*** those public officials who conceal a financial interest in violation of a state criminal law while taking discretionary action qualify for honest services/ intangible rights fraud; nor do *Antico*, *Panarella* and *Murphy* stand for the proposition that misuse of public office for personal financial gain can ***never*** qualify for honest services/ intangible rights fraud.

When the Court in *Panarella* "specifically refused to ***limit*** the offense to situations in which a public official uses his or her office for personal gain," 277 F.3d at 694, it implicitly but clearly recognized that "situations in which a public official uses his or her office for personal

gain" qualify for honest services/ intangible rights fraud status.  The question presented on appeal in *Panarella* was "under what circumstances nondisclosure of a conflict of interest rises to the level of honest services fraud."  277 F.3d at 690.  The Court of Appeals answered that question in rejecting Panarella's "argument that an allegation of bribery or other misuse of office is necessary to sustain a conviction for honest services wire fraud. Rather, for the reasons discussed above, we hold that if a public official fails to disclose a financial interest in violation of state criminal law and takes discretionary action that the official knows will directly benefit that interest, then that public official has committed honest services fraud." *Id.* at 697. However, the Court of Appeals took pains to "emphasize the narrowness of our holding." *Id* at 698-99. To say that an allegation of bribery or other misuse of office is ***not necessary*** to sustain an indictment or conviction for honest services/ intangible rights fraud is ***certainly*** not to say that bribery or misuse of office for personal financial gain is ***prohibited***, and *Panarella* did not say that.

Pre *McNally* cases consistently recognized that the mail fraud statute "proscribes schemes to defraud citizens of their rights to honest and impartial government . . . , [and that] a public official owes a fiduciary duty to the public, and misuse of his office for personal gain is a fraud." *McNally*, 483 U.S. at 356.  When Congress restored mail fraud to its pre *McNally* status in enacting section 1346, 18 U.S.C. § 1346, it expressed its intention to criminalize breach of fiduciary duty by misuse of office for personal gain.

As summarized in *Gordon*, therefore, the Court of Appeals' trilogy of honest services/ intangible rights cases stands, in part, for the proposition that the government must allege a violation of a "state-created fiduciary duty" arising from state ethics or criminal laws or from some well recognized common law fiduciary duty. Defendant's brief in support of his motion to

17

dismiss appears to argue that the Coroner of Allegheny County has no fiduciary duty to Allegheny County or its citizens; at a minimum, defendant vigorously asserts that the government has not identified any legitimate source of the Coroner's fiduciary duty. This argument is without merit, as the Indictment **specifically** identifies several state and local ethics and criminal laws as the **anchors** for the government's honest services/ intangible rights charges, namely, the state and local laws relating to the Coroner of Allegheny County's fiduciary duty to Allegheny County and its citizens. Indictment, ¶¶ 5-11.

The Coroner of Allegheny County is a public official.[4]  As such, he was and is subject to, among other things, the "Public Official and Employee Ethics Act" of 1998, Oct. 15, P.L. 729, No. 93, §§1101-1113, effective December 15, 1998, 65 Pa.C.S. §§ 1101.1 - 1113. The Ethics Act opens with the Legislative Declarations that "public office is a public trust and that any effort to realize personal financial gain through public office other than compensation provided by law is a violation of that trust. . . . [T]he people have a right to be assured that the financial interests of holders of or nominees or candidates for public office do not conflict with the public trust."  65 Pa.C.S. § 1101.1(a).

To achieve the Legislative purpose, the Ethics Act requires annual financial disclosures, 65 Pa.C.S. § 1104, and lists "restricted activities," the first of which is: "(a) Conflict of interest.--No public official or public employee shall engage in conduct that constitutes a conflict

---

[4] The Ethics Act defines "public official" as: "Any person elected by the public or elected or appointed by a governmental body, or an appointed official in the executive, legislative or judicial branch of . . . any political subdivision thereof, provided that it shall not include members of advisory boards that have no authority to expend public funds other than reimbursement for personal expense, or to otherwise exercise the power of the State or any political subdivision thereof."  65 Pa.C.S. § 1102.

of interest."  65 Pa.C.S. § 1103(a).  The Ethics Act provides the following definition of "Conflict

of Interest":

> "Conflict" or "conflict of interest." Use by a public official or public employee of
> the authority of his office or employment . . . for the private pecuniary benefit of
> himself, a member of his immediate family or a business with which he or a
> member of his immediate family is associated. The term does not include an
> action having a de minimis economic impact or which affects to the same degree
> a class consisting of the general public or a subclass consisting of an industry,
> occupation or other group which includes the public official or public employee,
> a member of his immediate family or a business with which he or a member of
> his immediate family is associated.

65 Pa.C.S. § 1102.

The Coroner of Allegheny County is also subject to Allegheny County's Administrative

Code enacted in 2000 pursuant to its Home Rule Charter, as is well known to defendant who

brought suit in state court against the Allegheny County Executive and other Allegheny County

officials seeking a declaration that exercise of power and control over him through the

Administrative Code was constitutionally impermissible and in irreconcilable conflict with the

Second Class County Code.  *Wecht v. Roddy*, 815 A.2d 1146 (Pa.Cmwlth. Ct. 2002).  The

Commonwealth Court disagreed, and held that the Coroner was, indeed, bound by Allegheny

County's Administrative Code, including section 601.01, requiring public officials to devote "a

full-time effort" of at least 35 hours a week to the duties of their offices, and section 601.04,

which provides that all Independently Elected Officials (such as the Coroner) "abide by the

accountability, conduct and ethics code set forth under the Administrative Code." *Roddy*, 815

A.2d at 1149.

The Accountability, Conduct and Ethics Code of Allegheny County provides, in relevant

part, as follows:

19

▸   Section 101.02 Purpose. . . . B. Allegheny County's elected and appointed officials set the ethical tone and environment that will prevail in the County. It is the special obligation of these officials to set the example of proper comportment . . . .

▸   Section 101.03 Definitions. . . . "Authority of Office or Employment." The actual power provided by law, the exercise of which is necessary to the performance of duties and responsibilities unique to a particular office or position of employment." . . . "Conflict" or "conflict of interest." Use by a public official or public employee of the authority of his office or employment . . . for the benefit of himself, a member of his immediate family or a business with which he/she or a member of his immediate family is associated. The term does not include an action having a de minimis economic impact or which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

▸   Section 102.01 Initial/ Annual Disclosure of Interest. . . . D.  The requirements set forth in this code do not replace those in the State Elections Law and do not constitute the filing of Financial Interest Forms . . . otherwise required by law.

▸   Section 103.04 Standards of Conduct. . . . F.  Private Business/ Financial Interests; Exerting Improper Influence.  1. No covered person shall engage in any business transaction . . ., or have any financial or other private interest, direct or indirect, which is to the detriment of the proper discharge of his or her official duties.  2. No Covered person shall use, or attempt to use, his or her position to obtain financial gain . . .or other personal advantage, either direct or indirect.

▸   Section J.  Honoraria.  No covered person shall accept an honorarium for any activity related to his or her official capacity. . . .

▸   Section N.  Misuse of County Resources. 1. No Covered Person shall use, request, or permit the use of County resources, including, but not limited to, motor vehicles, equipment, and materials, except for County purposes.  2. No Covered Person shall use County mail to transmit mail that is personal; or political in nature. . . .

▸       Section O.  Political Activity. . .  3. No Covered Person shall solicit, directly or indirectly, any employee . . . to engage in political activity or to suggest that such covered employee engage in such political activity. . . .

From the foregoing list of Pennsylvania and Allegheny County ethics laws, it cannot *seriously* be maintained that the Coroner of Allegheny County has no fiduciary duty to Allegheny County and its citizens to avoid conflict of interests, as those terms are defined and explained in the Public Official and Employee Ethics Act and the Accountability, Conduct and Ethics Code of Allegheny County, nor that the Coroner is exempt from the provisions of those Codes, nor that the Coroner has not been given fair warning of the type of unethical conduct he must avoid.  See *Gordon* (Delaware and local ethics laws created fiduciary duty, and indictment adequately charged a viable mail fraud offense for misuse of office for personal financial gain and for other personal reasons); *Panarella* (Pennsylvania Ethics Act, 65 Pa.C.S. § 1101 et seq., provides the anchor upon which a federal prosecution for honest services/ intangible rights mail and wire fraud may be moored); *Antico* (Pennsylvania's former Ethics Act, 65 Pa.C.S. § 402, and Philadelphia's local ethics code, provide the anchor upon which a federal prosecution for honest services/ intangible rights mail and wire fraud may be moored).

The Court has carefully reviewed the Indictment, and finds that it adequately alleges defendant's knowing and willful participation in a scheme or artifice to defraud Allegheny County and its citizens, that he had the specific intent to defraud, and that the mails and interstate wire communications were used in furtherance of the scheme.

**B. Simple mail and wire fraud pursuant to 18 U.S.C. §§ 1341, 1343 and 2.**

The Court has also carefully examined the Counts of the Indictment charging defendant with mail and wire fraud with regard a scheme to defraud private clients, including various outlying counties which used Dr. Wecht's services, and finds that it adequately alleges defendant's knowing and willful participation in a scheme or artifice to defraud these victims, that he had the specific intent to defraud, and that the mails and interstate wire communications were used in furtherance of the scheme.

**C.  Theft or bribery concerning programs receiving federal funds under 18 U.S.C. § 666**

18 U.S.C. § 666(a)(1)(A) entitled "Theft or bribery concerning programs receiving Federal funds," states in pertinent part, as follows:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists-
> > (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof-
> > > (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that -
> > > (I) is valued at $5000 or more, and
> > > (ii) is owned by, or is under the care, custody, or control of such organization . . . shall be fined under this title, imprisoned not more than 10 years, or both.

As rehearsed, in Counts 80 through 84 of the Indictment, the government alleges that during the calendar years of 2002 through 2005, defendant, being an agent of Allegheny County, a local government organization that received benefits in excess of $10,000 during each of those calendar years, embezzled, stole, obtained by fraud and otherwise converted to his own use "property" valued at $5,000 or more, of Allegheny County, specifically, he used the personnel, vehicles, facilities, resources, equipment, and space of the ACCO, to conduct his private business

activities.

In the Indictment Memorandum, the government states that in order for a violation of

section 666 to be established, the government must prove that defendant was an agent of

Allegheny County, that he stole, obtained by fraud and/or without authority converted to the use

of someone other than the rightful owner, or intentionally misapplied some money, property or

employee service, that the money, property or employee service was under the care, custody and

control of the organization, that said money, property or employee service had a value of $5,000

or more, and that Allegheny County, in a one year period, received more than $10,000 of federal

monies/assistance.  (Doc. No. 3).

Defendant argues that the government has failed to allege a violation of 18 U.S.C. § 666

and in support, argues that the meaning of "property" does not include (employee) "services";

and that aggregation is not a proper means to meet the jurisdictional requirements under section

666.  This Court will address defendant's arguments seriatim.

In support of defendant's first argument that the theft of  "property" in section

666(a)(1)(A), does not include theft of "employee services," defendant asks this Court to

compare section 666 with section 641, and he urges this Court to ignore the only case law that is

directly on point.

In the government's response to the motion for bill of particulars and in its response to

the motion to dismiss, the government sets forth its authority on the issue of whether the term

"property" may include "employee services" under section 666(a)(1)(A).  The government cites

to two Sixth Circuit cases as precedential authority for this charging theory.  First, in *United

States v. Sanderson*, 966 F.2d 184 (6th Cir. 1992), and later, in *United States v. Valentine,* 63

23

F.3d 459 (6th Cir. 1995), the United States Court of Appeals for the Sixth Circuit held that the

theft of property included theft of employee services.  Both cases are factually analogous to the

present case because, in both cases, defendants were charged with using employees to perform

private work.[5]

In the *Sanderson* case, the Sixth Circuit addressed the statutory construction of section

666(a)(1)(A), compared it with section 641, and ultimately found that section 666's notion of

property was intended to "dovetail" with the notion of "property" in section 641 and to be

"coextensive in its reach."   The *Sanderson* Court set forth the following analysis which this

Court finds to be instructive:

> We look first to the intent of the statute.  Admittedly, determining what
> facts are necessary to constitute a criminal act is a "value choice more
> appropriately made in the first instance by a legislature rather than by a court."
> The express terms of the section, however, provide no clues as to what forms of
> stolen "property" are prohibited by the statute.  We look next at the legislative
> history of the statute, which unfortunately, is scant.  What little can be gleaned
> from the section's general legislative history is that the section was designed to
> create new offenses to augment the ability of the United States to vindicate
> significant acts of theft, fraud, and bribery involving Federal monies which are
> disbursed to private organizations or State and local governments pursuant to a
> Federal program.  Thus it seems Congress intended this statute to augment the
> prosecutorial powers of 18 U.S.C. § § 641 and 665. . .  Application of section
> 641, which prohibits thefts of a wide variety of federal property, is restricted to
> instances where the property stolen can be shown to be property of the United
> States.  Very often then, prosecution under section 641 "is impossible because
> title has passed to the recipient before the property is stolen, or the funds are so
> commingled that the Federal character of the funds cannot be shown."

---

[5]In its response to the motion to dismiss, the government also cites to two other cases,
without analysis, that allegedly support its proposition that employee services may be defined as
"property" under section 666(a)(1)(A).  *United States v. Genova*, 333 F.3d 750, 755 (7th Cir.
2003).  *United States v. Delano*, 55 F.3d 720, 729 (2nd Cir. 1995).  However, because those
cases do not contain a statutory construction, this Court will confine its analysis to the *Sanderson*
case.

Thus it seems that Congress intended section 666 to augment the general theft statute of section 641.  Accordingly, we look at section 641 and its applicability to prosecutions for multiple actus reus elements.  By its literal terms, section 641's notion of property is broader than section 666. Section 641 provides for prosecution of any one who "knowingly converts . . . any . . . *thing of value*."  We have previously found that the theft prohibition in section 641 applies where both intangible and tangible property has been stolen.  Section 666 does not use the "thing of value" language of 641.  Nonetheless, Congress seems to have intended section 666 to *expand* the ability of prosecutors to prosecute persons who were for technical reasons out of section 641's reach. Consequently, we find section 666's notion of "property" was intended to dovetail with the notion of property in section 641 and to be coextensive in its reach-Sanderson's theft of employee time is as much a theft of property as his theft of paint supplies, for the purposes of his section 666(a)(1)(A) conviction.

*Sanderson,* 966 F.2d 184, 188-189.  We find the above analysis to be compelling.[6]  Therefore, despite defendant's arguments to the contrary, this authority, although not binding on this Court, is persuasive authority to support the government's charging theory under section 666(a)(1)(A), and is not inconsistent with any other precedential authority within this circuit or otherwise.[7]

Further, significantly, while defendant focuses his argument on whether theft of "property" includes "employee services," this Court notes that defendant is not only charged with theft of employee services under section 666, but rather, he is also charged with using "vehicles,

_____

[6]This Court will not further analyze the *Valentine* case because the analysis relies primarily on the *Sanderson* case.

[7]Although defendant argues that counts 80-84 of the Indictment are somehow deficient because they are inconsistent with the analysis of section 666 in *United States v. Zwick*, 199 F.3d 672 (3d Cir. 1999), this Court does not agree.  First of all, the *Zwick* case does not even address section 666(a)(1)(A), but rather, it addresses section 666(a)(1)(B), which relates to bribery.  Second, unlike the *Sanderson* case, the *Zwick* case does not analyze the meaning of "property" under section 666(a)(1)(A), much less does it state that "property" means only "tangible property," as defendant suggests.  Third, the core holding of the *Zwick* case was overruled by the United States Supreme Court in *Sabri v. United States*, 541 U.S. 600 (2004).  While this Court agrees with defendant that *Sabri* did not overrule the analysis of the legislative history of section 666, that analysis is not inconsistent with the well reasoned statutory analysis set forth in the *Sanderson* case.

facilities, resources, equipment, and space of the ACCO to conduct his private business activities," - - none of which can arguably be considered as anything other than "property." Moreover, even if the Court of Appeals for the Third Circuit would decline to follow the Sixth Circuit in finding that theft of employees services is covered under section 666 as theft of "property," counts 80-84 of the Indictment would still survive the motion to dismiss because the government alleges theft of other things, namely, vehicles, facilities, resources, equipment, and space of the ACCO, all of which are commonly considered to be property.

Defendant next argues that the government may not aggregate "insignificant" acts of alleged theft to meet the jurisdictional minimum of $5,000, under section 666.  In support thereof, defendant contends that the plain language of section 666(a)(1)(A) and the rules of statutory construction prohibit aggregation of multiple alleged thefts to satisfy the statutory minimum of $5,000; that if Congress had intended to criminalize multiple acts as a single offense, it would have explicitly used language authorizing aggregation; and, any claim that aggregation is proper where separate act of thefts are alleged to be part of a "common scheme" should be rejected because Congress did not define section 666(a)(1)(A) to include "common scheme" offenses.

In its response to the motion for bill of particulars and in its response to the motion to dismiss, the government avers that the aggregation of alleged thefts of property is permissible in order to meet the $5000 jurisdictional threshold under the above cited *Sanderson* and *Valentine* cases, as well as a host of other cases from district courts of Illinois, West Virginia and Wisconsin, and the United States Court of Appeals for the First and Fifth Circuits.   The source of the case law on this subject, again, although not binding, is still persuasive to this Court.

26

In the *Sanderson* case, the Sixth Circuit held that "under section 666, where multiple conversions are part of a single scheme, it seems appropriate to aggregate the value of property stolen in order to reach the $5,000 minimum required for prosecution."  966 F.2d at 189.  In that case, the indictment aggregated paint and supplies with the actions of employees who were ordered by defendant to these materials in private contract work, and the Court in *Sanderson* held that both actions were correctly considered as components of a larger, single fraudulent action of theft from the local government.  *See also, United States v. Cruzado-Laureano*, 404 F.3d 470, 484 (1st Cir. 2005), citing *Sanderson* at 189.  ("The total value of funds stolen can be aggregated to satisfy the $5,000.00 minimum that triggers criminal liability under § 666.")  While defendant makes numerous arguments in support of his theory that aggregation is not an acceptable means to meet the jurisdictional requirements, this Court finds none of them convincing, and finds that the plain meaning of the statute does not require that the $5,000.00 jurisdictional requirements be satisfied as a result of one theft totaling $5,000.00 or more.  Rather, where, as here, the government alleges a common scheme or plan for theft of services and other property that took place over the course of a calendar year in an amount equal or greater to $5000.00, this Court declines defendant's invitation to dismiss the Indictment.[8]

### D.  Vindictive Prosecution

Throughout defendant's motion and supporting brief, defendant urges this Court to exercise its supervisory authority to dismiss this Indictment on the basis that this prosecution was brought by the Federal government merely because of Dr. Wecht's unharmonious relationship

---

[8]The Court recognizes defendant's argument that a determination of whether the $5000.00 jurisdictional requirement was met should be a jury question.  The Court will resolve that issue in due course.

with the Allegheny County District Attorney Stephen Zappala.  According to defendant, the United States Attorney's Office vindictive prosecution stemmed from some "ill will and animosity toward Dr. Wecht." Doc. No. 207, at 76, fn 35. Defendant alleges only conclusory speculation in support of his claim of vindictive prosecution.

As the government emphasizes, and this Court agrees, throughout its motion and accompanying brief, defendant repeatedly refers to allegations of misconduct as if they were facts of record.  However, the only record supporting these allegations are defendant's own prior motions and supporting memoranda.  Simply because defendant repeats the same allegations (that District Attorney Zappala had a vendetta against Wecht and that vendetta somehow transferred to the United States Attorney's Office) does not suffice to state a claim for vindictive prosecution.  Further, such unfounded allegations do nothing to advance defendant's burden of proof, which this Court has already described as a rigorous one.  *See United States v. Schoolcraft,* 879 F.2d 64, 68 (3d Cir. 1989) ("In this kind of case, our focus is not on the district attorney's actions, but rather on the actions of the United States attorney who prosecuted this case. We note that the role of a separate sovereign in bringing charges against a defendant minimizes the likelihood of prosecutorial abuse."); *United States v. Jarrett*, 447 F.3d 520 (7th Cir. 2006).

As this Court stated in denying defendant's motion to suppress (doc. no. 55), provocative speculation and conclusory proclamations about "local public officials who might have gotten the United States Attorneys Office interested in how Dr. Wecht conducts his private autopsy practice and other private business affairs may make interesting reading and attract much publicity, but it does not satisfy the *legal* threshold, i.e., the substantial preliminary showing, that a defendant must make before the Court will grant a request for a *Franks* hearing." Memorandum

Order (doc. no. 193) Re: Motion to Suppress (Doc. No. 55), at 11.  Defendant has repackaged those conclusory speculations in the pending motion to dismiss, and they are no more impressive in the context of a motion to dismiss than they were in the context of the motion to suppress.

###   E.   Constitutionality of Honest Services/ Intangible Rights Theft Counts As Applied

While the United States Court of Appeals for the Third Circuit has not explicitly addressed defendant's various constitutional challenges (i.e., vagueness/ failure to give adequate warning of conduct proscribed) to these charges, most Courts examining such challenges have routinely found that 18 U.S.C. § 1346 is not unconstitutionally void for vagueness and/or unconstitutionally overbroad and that, as applied to the particular facts and circumstances of the case, it gave the defendant sufficient notice that the conduct in question was unlawful.  *See, e.g.*, *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003); *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997); *United States v. Bryan*, 58 F.3d 933 (4th Cir. 1995) (abrogated on other grounds *sub nom*, *United States v. O'Hagan*, 521 U.S. 642 (1997); *United States v. Gray*, 96 F.3d 769 (5th Cir. 1996); *United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997), *reh'g denied*, (1997) (not specifically addressing constitutionality but related question whether Congress intended section 1346 to extend to ethical misconduct by state officials and, if so, whether it did so with the clarity required whenever Congress extends a federal statute to cover state officials); *United States v. Waymer*, 55 F.3d 564 (11th Cir. 1995). Defendant's constitutional challenges in this case are without merit.

## V.  Conclusion

For the reasons set forth above, defendant's Motion to Dismiss the Indictment (doc. no. 180) will be DENIED in its entirety. An appropriate order follows.


s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge


Date: June 29, 2006

cc: All counsel of record

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Criminal No. 06-0026** |
| | **)** | **Electronically Filed** |
| **CYRIL H. WECHT** | **)** | |

## Order of Court

    **And now, this 29th day of June, 2006**, upon consideration of defendant's Motion to

Dismiss the Indictment (doc. no. 180) and supporting brief, the government's brief in opposition

thereto, and defendant's reply thereto, **IT IS HEREBY ORDERED** that said motion (doc. no.

180) is **DENIED** in its entirety.

                          **SO ORDERED** this 29th day of June, 2006.

                          s/Arthur J. Schwab_____
                          Arthur J. Schwab
                          United States District Judge

cc:    All counsel of record