IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 06-0026** |
| | ) | **Electronically Filed** |
| **CYRIL H. WECHT** | ) | |

**ORDER OF COURT RE: JURY SELECTION,
VOIR DIRE, AND OTHER PRETRIAL ISSUES
(SEE DOC. NOS. 598, 599, 604, AND 607)**


**I.  BACKGROUND**


**A.  Procedure for Previously Scheduled Trial - 2006**


**1.  "Agreed-to" Pretrial Order of March 31, 2006 (doc. no. 42) - Voir Dire Questions**

Paragraphs 7 of said "Agreed-to" Pretrial Order states as follows:

> **Voir Dire**.  Counsel are permitted to supplement the standard questions
> provided that the proposed supplemental voir dire questions are submitted to the
> Court in writing, along with a proposed Jury Questionnaire, on or before **June 15,
> 2006**.  Voir dire questions will be asked by the Court, with as many questions as
> possible asked of the panel en banc <u>unless resolved by the Questionnaire</u>
> (emphasis added).  Individual voir dire will be limited in the interest of conserving
> time.

> The government shall have six (6) peremptory challenges and the defense
> shall have ten (10) peremptory challenges collectively.  Each side shall have one
> challenge for six alternate jurors.

On June 15, 2006, the Government filed a document, entitled "Government's Notice of

Filing Proposed Voir Dire Questions" (doc. no. 234), listing fourteen (14) proposed voir dire

questions.  As will be seen later, many of said proposed voir dire questions were incorporated

into the lengthy Jury Questionnaire.  See doc. nos. 287, 289, and 295 and Text Orders of 7/11/06

and 11/2/07.

Likewise, on the same date, defendant filed a document, entitled "Notice of Filing Defendant's Proposed Voir Dire in Accordance with the Court's March 1, 2006 Pretrial Order (doc. no. 42)" (doc. no. 231). Exhibit A thereto contained 25 proposed voir dire questions. Again, many of said proposed voir dire questions were incorporated into the lengthy Jury Questionnaire. See doc nos. 287, 289, and 295 and Text Orders of 7/11/06 and 11/2/07.

## 2. Proposed Jury Questionnaire

On June 15, 2006, although the parties had not reached agreement on the Jury Questionnaire pursuant to the agreed-to Pretrial Order (doc. no. 42, ¶ 7), defendant filed a document, entitled "Notice of Filing Defendant's Proposed Jury Questionnaire in Accordance with the Court's March 1, 2006 Pretrial Order (doc. no. 42)" (doc. no. 230), which stated in the second paragraph as follows:

> The Government and the defense have been in coordination with Mr. Lydon, law clerk to this Honorable Court. The parties believe that they will be able to reach an agreement in substantial part of the final questionnaire. With the Court's permission, the parties will review the various submissions, formulate their responses, and meet with Mr. Lydon during the week of June 19, 2006 in an effort to craft a joint jury questionnaire.

Attached thereto as Exhibit A was "Defendant's Proposed Jury Questionnaire," consisting of 24 pages and 63 detailed questions, which repeat many of the proposed voir dire questions. See doc. no. 231. Same is true as to the Government's proposed voir dire questions. See doc. no. 234.

## 3. Text Order of Court, dated July 11, 2006 re: Final Jury Questionnaire

On July 11, 2006, the Court basically adopted the defendant's proposed jury questionnaire (doc. no. 230) with minor modifications. The full text of the Order is as follows:

> TEXT ORDER re: Final Jury Questionnaire. After reviewing defendant's proposed jury questionnaire (questions 1-63) (document no. 230) and the

government's proposed jury questionnaire (questions 1-75) (document no. 237), the Court rules that the final jury questionnaire will delete the Instructions because Instructions will accompany the Court's letter to prospective jurors, and will consist of 61 of defendant's 63 questions as follows: 1, 2 (will be moved to end of questionnaire), 3-6, 7 (<u>name of home county only - home address at end of questions</u>), 8-19, 20 (should indicate 5 to 6 weeks), 21-39, 40 (only as to "entities," not as to "individuals," since final witness list does not yet exist), 41 ("entity" # only), 42-57, 58 (delete - duplicative of question 43), 59 (delete - confusing), 60-63, plus government's proposed questions 25, 26, 27, 37, 38, 41, 46, and 56 (unless adequately covered by defendant's questions). <u>The last page of the questionnaire shall be a separate page and contain the prospective juror's name, juror number, home address, and signature</u>. Since the final jury questionnaire is basically defendant's proposed jury questionnaire, counsel for defendant shall prepare the final jury questionnaire in accordance with this Text Order and file same by 3:00 PM today. Objections thereto (if any) shall be placed on the record tomorrow, July 12, 2006, at the second pretrial conference. Counsel shall be aware that the jury questionnaire will accompany a cover letter, summons, standard questionnaire, and other normal juror information. Jury Selection shall commence on October 11, 2006. Text-only entry; no PDF document will issue. This text-only entry constitutes the Court's order or notice on the matter. Signed by Judge Arthur J. Schwab on 7/11/06. (emphasis added.)

On July 11, 2006, pursuant to the above Text Order, defendant filed doc. no. 286, entitled "Notice of Filing Revised Jury Questionnaire Pursuant to Court's July 11, 2006 Order" with attachment thereto as Exhibit A, "Revised Jury Questionnaire Pursuant to Court's July 11, 2006 Order" (doc. no. 286-2) consisting of 24 pages and 70 questions. The juror's full name, home address, and signature were placed on the last page, to provide for its removal by the Jury Administrator pursuant to Text Order of July 11, 2006. See doc. no. 295 at B. 5.

**4. <u>Second Preliminary Pretrial Conference re: Final Jury Questionnaire</u>**

The next day, July 12, 2006, the Court conducted the Second Preliminary Pretrial Conference at which the Jury Questionnaire (see doc. no. 286-2) was considered.

Importantly, no written objections were filed before the conference, nor were any objections placed on the record at the Second Preliminary Pretrial Conference (see doc. no. 290), except by counsel for the Government. The Hearing Memo thereon states as follows:

> Jury Questionnaire: Defendant shall file, by mid-afternoon today [three o'clock anticipated], a second revised jury questionnaire in a form consistent with changes discussed and agreed to today; Court declined government's request for a series of questions as to which defendant objected; otherwise, the revised jury questionnaire was agreed to without objection. (Doc. no. 290, 1st ¶)

No objection was filed by either party to this statement in said Hearing Memo (doc. no. 290) (filed 7/12/06).

That afternoon, at 3:14 PM, defendant filed a document, entitled "Notice of Filing Second Revised Jury Questionnaire Pursuant to Court's July 12, 2006 Order" with attachment thereto as Exhibit A, "Second Revised Jury Questionnaire Pursuant to Court's July 12, 2006 Order" (doc. no. 287-2), consisting of 24 pages and 69 questions with numerous sub-parts. This document is attached hereto as Exhibit A. In this draft, defendant excluded Mr. Thornburgh as trial counsel for the jury trial, since he had never appeared in the courtroom and failed to attend the mandatory conference for trial counsel with the Court.

Again, no objection was filed to the procedure of the removal of the last page of the Jury Questionnaire, containing the juror's name, home address, and signature. And so, the record stood without any objections from defendant, from July 12, 2006, until when defendant for the first time objected to not having access to the juror's name and home address, sixteen (16) months later, on November 28, 2007. See doc. no. 596.

In fact, the Jury Questionnaire was sent out to approximately 300 jurors, prior to defendant's appeal to the United States Court of Appeals for the Third Circuit, without objection

to the anonymity of the jury (i.e., the removal of the last page of the completed Jury

Questionnaire, containing the name and address, before any copies of the Questionnaires would

be given to counsel).

**5. Mailing of the Jury Questionnaire on July 14, 2006**

As stated above, on July 13, 2006, the Court adopted as the Final Jury Questionnaire, in

the form set forth in doc. no. 287, which was basically defendant's proposed Jury Questionnaire.

Compare doc. no. 230 to doc. no. 287. The July 13, 2006 Order (doc. no. 289) stated as follows:

> The Final Jury Questionnaire shall be in the form set forth in doc. no. 287. The
> attached cover letter of this Court and Instructions for Jury Questionnaire shall
> accompany each Jury Questionnaire.

Two documents were attached to said Order of Court. First, the Court's letter to

prospective jurors, dated July 14, 2006, as follows:

> Enclosed is a summons for jury service directing you to appear for
> possible jury duty in a case entitled <u>United States of America v. Cyril H. Wecht</u>,
> 06-cr-026. Please complete and return the attached Jury Information Form and
> Jury Questionnaire in the enclosed postage paid envelope, following the
> instructions provided. Once we have received your questionnaire, you will receive
> further instructions from the Court.

> The purpose of the questionnaire is not to ask unnecessarily personal
> questions, but to determine whether you, as a prospective juror, can decide this
> case fairly and impartially. It is important that you be completely truthful and
> accurate in answering each question as your  answers are made under penalty of
> perjury. Please do not discuss the questionnaire or your answers with anyone at
> any time, as your answers must be yours and yours alone.

> Serving as a juror is one of the most important ways in which you, as a
> citizen, have the opportunity to participate directly in your government. But it is
> not only an opportunity; it is the obligation and duty of every citizen to serve
> when called upon.

> We realize that completing this form and questionnaire may require
> substantial effort on your part, but we also know that obtaining a fair and impartial

jury is the only way that justice can be done. We estimate that this case may last five to six weeks, based on the collective wisdom and experience of the attorneys and the Court.

Thank you for your time and attention to filling out this form and questionnaire. The Court, the parties and the attorneys appreciate your cooperation in performing this essential public service.

Doc. no. 289-2, page 1.

Secondly, and importantly, the Court's Instructions to Prospective Jurors, dated July 14, 2006, states as follows:

A.    Please type or print your answers to each of the following questions by making the appropriate entry on the questionnaire. Your answers will assist the Judge, the parties and the attorneys to select a qualified and impartial jury. There are no right or wrong answers. Answer all questions honestly and to the best of your ability. If you do not understand a question, leave the space for the answer blank.

B.    Do not discuss your answers with anyone else. <u>Your answers to the questionnaire will be treated as confidential and will be seen only by the Court, the parties and the attorneys. They will not be available to the public.</u> (Emphasis added.)

C.    When you finish the questionnaire, please sign on the space provided at the end of the questionnaire, and return the completed questionnaire and your completed Jury Information Form attached to your Summons, and return to the Clerk of Court in the enclosed, stamped envelope within twenty (20) days of receipt.

D.    For your information, barring unexpected circumstances, it is this Court's practice and intention to conduct the jury portion of the trial on Mondays through Thursdays, commencing on October 16, 2006; and jury selection will commence on October 11, 2006.

Doc. no. 289-2, page 2.

In order to promote "completely truthful and accurate" answers to the Jury Questionnaire (see doc. no. 289-2, page 1), which might contain potentially very personal answers and

information, the Court assured prospective jurors in paragraph B, second and third sentences, as follows:

> Your answers to the questionnaire will be treated as confidential and will be seen only by the Court, the parties and the attorneys. They will not be available to the public. (emphasis added.)

This "confidentiality" of the questionnaire is of assistance to the parties and their counsel to increase the quality and quantity of the answers as part of the process of obtaining a fair and impartial jury.

### 6. Nature of Defendant's Limited Objections to Doc. No. 289

The Order of Court (doc. no. 289) re: Final Jury Questionnaire (doc. no. 287), with its two (2) attachments bearing the Court's signature, was filed at 10:15 AM. The same day, at 3:20 PM, defendant filed a document, entitled "Motion to Modify Prospective Juror Letter" (doc. no. 291) seeking the substitution of the name of the Jury Administrator for the Court on the letter and instructions to the prospective jurors, and making only one other objection. The first sentence of paragraph 3 of said Motion states as follows:

> The Defendant's objections are: (i) that the letter should emanate from the jury administrator and not from the Court; and (ii) as a substantive point, the defense objects to the notation that the answers are made under the penalty of perjury.

However, importantly for our current purposes, defendant did not in said Motion of July 13, 2006, nor thereafter, ever take the position that the Jury Questionnaires were "public records" until defendant filed a document, entitled "Defendant's Notice of Issues for Pretrial Conference", (doc. no. 596), on November 27, 2007, sixteen months later, by saying at page 2, item 1.b., "[t]he [jury] questionnaires are part of the public record . . . ," without any citation to case law or statute.

The Court denied said Motion to Modify Prospective Juror Letter (doc. no. 296) by Order of Court (doc. no. 294), and followed by Memorandum Relating to Order of Court (doc. no. 294) Denying Defendant's Motion to Modify Prospective Juror Letter (doc. no. 291). Doc. no. 296, filed July 14, 2006.

### 7. Jury Questionnaire and Procedures (doc. no. 295)

The Court thereafter issued an Order of Court Regarding Jury Questionnaire and Procedures (doc. no. 295) (dated July 14, 2006) which summarized some of the history of the development of the Jury Questionnaire, and the procedure by which the Jury Questionnaire would be handled by the Jury Administrator. In paragraph B.5. thereof (doc. no. 295 at 4) (later adopted by this Court for the current jury selection procedure - - see doc. no. 595, first paragraph), the Jury Questionnaire Procedure states:

> . . . Therefore, Jury Administrator Morder is instructed to remove and retain the last page of the Jury Questionnaire setting forth the prospective jurors' names and current addresses.

Counsel never objected to this provision on or about July 14, 2006, nor to the recent Order of Court re: Additional Jury Selection Procedures (doc. no. 595) ("On November 27, 2007, the Jury Administration shall issue 400 summons to potential jurors, following the standard procedure set forth in paragraph B.1 through B.5 of Order of Court Regarding Jury Questionnaire and Procedure."), as stated above, until very recently.

The Jury Questionnaire and related cover letter and other documents were mailed to 300 prospective jurors, on July 14, 2006.

### 8. Appeal to Court of Appeals and Continued Obligation of Trial Counsel to Prepare for Trial

While defendant filed an appeal in this case, on or about June 27, 2006 (see doc. no. 256), the stay issued by the United States Court of Appeals on September 15, 2006, only applied to the trial, as follows: "The trial in the above-captioned matter is stayed pending the opinion of the [C]ourt" - - and not to the pretrial procedures.

After July 27, 2006, the pretrial process continued a pace, including a lengthy opinion on the Motion to Dismiss (doc. no. 180) by Memorandum Opinion and Order Denying Motion to Dismiss (doc. no. 264); the entire Jury Questionnaire process described above in detail; filing and ruling on numerous Motions in Limine throughout August and September, 2006; the issuance of the lengthy Memorandum Opinion and Order of Court Denying Defendant's Motion for Recusal of the Trial Judge (doc. no. 302); and other extensive docket activity.

In fact, from the time of defendant's appeal on June 27, 2006 (see doc. no. 256) to the issuance of the mandate by the Court of Appeals on July 10, 2007 (doc. no. 501), there were almost 250 docket entries in this matter, but not one objection by defendant (nor the media)[1] to the Jury Questionnaire, nor to the process of removing the name and home address of the prospective jurors from the Jury Questionnaire before copies were to be given to counsel, nor to the language of the Order of Court Regarding Jury Questionnaire and Procedure (doc. no. 295, ¶ B.5.), nor to the language of ¶ B.6. (". . . on the completed Jury Questionnaire (excluding names

---

[1]The media intervenors were well aware of the juror selection process and Jury Questionnaire (included the Order of Court Regarding Jury Questionnaire and Procedure, dated July 14, 2006 (doc. no. 295)), having received each and every docket filing and entry, electronically through ECF, from the date of the first Motion to Intervene, filed on behalf of the media (see doc. nos. 130, 131, 134, 136, 137, 141), May 12, 2006 and onward. The Court promptly granted Motion to Intervene on May 17, 2006. See doc. no. 164.

and addresses) . . . .")

### B.  Juror Selection Procedure for Currently Scheduled Trial - 2008

#### 1.  Current Dates for Jury Selection and Commencement of Trial

On November 27, 2007, the Jury Administrator issued 400 summons to potential jurors;

the jurors were ordered to report in groups starting on January 10, 2008; with final selection on

January 23, 2008; and the commencement of trial on January 28, 2008.  See Order of Court Re:

Additional Jury Selection Procedures (doc. no. 595).

#### 2.  Jury Questionnaire - Text Order of 11/2/07

Previously, by Text Order of November 2, 2007, the Court directed that the prior "Final

Jury Questionnaire" (doc. no. 287) would be used in jury selection, but it would be completed at

the Courthouse, instead of using the mail.  The Court consulted with other district judges and the

Jury Administrator on the procedure.  The Court did not consult with counsel (nor the media)

since the Final Jury Questionnaire had already been approved, and the Jury Selection Procedure

in doc. no. 295, had existed, <u>without objection, for more than sixteen (16) months, and over

four (4) months since the remand</u>.  Said Text Order stated as follows:

> ORDER as to CYRIL H. WECHT - Notice Regarding Jury Questionnaire - - The
> Court has reconsidered the matter of the use of a jury questionnaire. (See doc no.
> 502, section E, paragraph one, fourth sentence). Upon reconsideration, the Court
> will not mail written jury questionnaires in advance of trial to prospective jurors,
> as occurred before the originally scheduled trial (see Text Orders of 7/11/06 and
> 7/14/06 and doc. nos. 289 and 295). Instead, the Court will use written jury
> questionnaires in connection with the jury selection for the upcoming January 28,
> 2008 trial, which questionnaire shall be completed by prospective jurors, and
> thereafter reviewed by the Court and counsel, at the United States Courthouse.
> The Court has reviewed the prior questionnaire (doc. no. 287-2) and several other
> jury questionnaires used in this District and other United States District Courts in
> other high profile cases. After significant consideration, the Court continues to

-10-

find doc. no. 287-2 to be fair, adequate, and complete. Therefore, the Court will use doc. no. 287-2 as the jury questionnaire in the upcoming trial, and will follow the jury questionnaire procedure as set forth in Order of Court Regarding Jury Questionnaire and Procedures (doc. no. 295 at B.1-B.5). Additional jury selection procedures will be set forth in future Order(s) of Court. Text-only entry; no PDF document will issue. This text-only entry constitutes the Courts order or notice on the matter. Signed by Judge Arthur J. Schwab on 11/2/07.

No objection was promptly filed by defendant or the media.

### 3. <u>Order of Court Re: Additional Jury Selection Procedures (Doc. No. 595)</u>

On November 26, 2007, the Court entered the Order of Court Re: Additional Jury Selection Procedures (doc. no. 595), which in essence adopted the unobjected to Order of Court Regarding Jury Questionnaire and Procedure (doc. no. 295), dated 7/14/06, and established an orderly juror selection process over numerous dates. The Order of Court (doc. no. 595) in its entirely states as follows:

On November 27, 2007, the Jury Administration shall issue 400 summons to potential jurors, following the standard procedure set forth in paragraph B.1 through B.5 of <u>Order of Court Regarding Jury Questionnaire and Procedure</u>. Doc. No. 295. See also Text Order of 11/2/07 as modified. The jury will be anonymous. This standard pre-screening by the Jury Administrator, including hardship issues, probably will be completed by early January.

The remaining pool of qualified prospective jurors will be instructed to appear in groups of 60 on January 10, 2008, January 14, 2008, and January 16, 2008 (and additional days if necessary). On each such day, a group of 60 will report to the Jury Assembly Area at 8:30 AM for the standard jury orientation and completion of the jury questionnaire. Hopefully, the questionnaire will be completed by noon.

Four copies of all completed jury questionnaires for each day will be provided to the Court by the Jury Administrator in the early afternoon of each day. (The original questionnaire along with the signature page of each questionnaire will be retained by the Jury Administrator.) Counsel will review the questionnaires in the Courtroom in the afternoon, as instructed by the Court, to determine challenges for cause and gather information for future peremptory challenges. (No questionnaire may leave the Courtroom, and all copies thereof

must be returned to the Court by counsel.)  The Court will rule on any challenges for cause in the late afternoon and the morning of the next day (i.e., January 11, 2008, January 15, 2008, and January 17, 2008, etc., as necessary).  Jurors will be available on January 11, 2008, etc., for follow-up questions (if any) by the Court that afternoon, and the next day (if necessary).  The Court's rulings on challenges for cause will be provided to the Jury Administrator.  This process will continue until a sufficient pool of qualified jurors is achieved.  It is tentatively expected that the final selection process will occur on January 23, 2008 (40 qualified jurors before peremptory challenges with a post-peremptory challenge jury of 12 persons with 6 alternates), and trial shall commence on January 28, 2008.

### 4. <u>Objections to Jury Selection Procedure (Doc. Nos. 604 and 607)</u>

Following the above Order, on November 27, 2007, defendant filed a "notice of issues for pretrial conference" and stated therein that he wished to obtain "clarification" on, *inter alia*, the jury selection issues including jury anonymity.  Doc. no. 597.

On November 28, 2007, this Court ordered that "any appropriate matter, not out-of-time, should be raised in a motion(s) with supporting brief on or before December 4, 2007 at Noon, with response by the Government on December 11, 2007 at Noon."  Doc. no. 597.

On December 4, 2007, defendant filed his Motion for Clarification and/or Modification of Trial Procedures and Scope of Exhibit and In Limine Rulings.  Doc. nos. 604 and 608.  Also, on December 4, 2007, the media intervenors also filed the "Petition by WPXI, Inc., Tribune Review Publishing Company and PG Publishing Company D/B/A Pittsburgh Post Gazette that the Potential Jurors and Empanelled Jurors Not Be Anonymous and for In-Person, Public Voir Dire in Open Court" (Doc. no. 607).

On December 11, 2007, the government filed its response thereto. Doc. No. 613.  Additional briefs were filed by the government, defendant, and media, on December 13, 17 and 18, 2007.  See doc. nos. 618, 619, 626.

### C. Pending Motions re: Jury Selection Process (Doc. Nos. 604 and 607)

In defendant's Motion for Clarification and/or Modification of Trial Procedures (doc. no. 604), he seeks the following relief:

- That the jury administrator shall not remove the signature page from the Jury Questionnaires.[2]

- That defense counsel shall be permitted to retain the Jury Questionnaires throughout the trial and until this matter is finally concluded, including any appeals (and again, counsel will not provide the questionnaire or any information contained therein to any third party, including the media).

- That each prospective juror shall be subjected to voir dire in open court (apparently repeating, in open court, the extensive questions and answers in the Jury Questionnaires, in addition to the in-court standard voir dire questions) (as supplemented) and at sidebar before the parties exercise "for cause" challenges.

---

[2]Although defendant in his First Proposed Order of Court (doc. no. 604-5) (filed at 12:05 PM on December 4, 2007) said that he and his counsel would "not provide the names and addresses" of the jurors "to any third party, including the media," defendant on the very same day in his Second Proposed Order of Court deleted that promise. See doc. no. 608-2 at 1 (filed at 6:23 PM). A similar promise of non-disclosure relating to "the questionnaires or information contained therein to any third party, including the media" was likewise withdrawn. See doc. no. 608-2 at 2.

In light of this dramatic change of position, defendant and his counsel went from protector of this personal information of prospective jurors to potential funnel of said information to third parties. Nowhere does defendant explain this dramatic change of position; nor what happened between 12:05 PM and 6:23 PM to cause such a change. Since defendant has withdrawn his consent (i.e., no longer willing to agree to an Order including non-disclosure/confidentiality language re: names and addresses of the jurors and re: the Jury Questionnaire and information contained therein), the Court will so ORDER over defendant's objections.

As a prudent safeguard, the Court will ORDER the Chairman and Global Managing Partner of defense counsel's law firm to file a short certification that the law firm has taken the action necessary to insure that the Orders of non-disclosure/confidentiality set forth in this Order of Court are complied with by the defense side of this case. Likewise, the Court will require a similar certificate to be filed by the U.S. Attorney for the Western District of Pennsylvania as to the prosecution side of the case. Said certificates shall be filed on or before December 31, 2007 at Noon.

- That Judge David Wecht (defendant's son) shall be permitted to assist defendant during the voir dire process (and Judge Wecht will not provide any information regarding this process to any third party, including the media).[3]

Additionally, in the "Petition by WPXI, Inc., Tribune Review Publishing Company and PG Publishing Company D/B/A Pittsburgh Post Gazette that the Potential Jurors and Empanelled Jurors Not Be Anonymous and for In-Person, Public Voir Dire in Open Court" (doc. no. 607), the media intervenors seek the following relief:

- That the jury not be anonymous and that the media be granted access to the names (and addresses) of all potential and empaneled jurors.

- That the Court conduct all aspects of the voir dire in open court. (The requested process, in effect, would bar the use of the Jury Questionnaire, or repeating in open court, the extensive questions and answers in the Jury Questionnaires - - similar to defendant's request - - plus barring the use of side bar for the personal and embarrassing answers.)

## II. BACKGROUND AND ANALYSIS OF THE ORDER OF THE BOARD OF JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA, MISC. 06-211 RE: JUROR'S NAMES AND HOME ADDRESSES; AND ITS RANDOM JURY SELECTION PLAN

### A. Sixth Amendment and 28 U.S.C. § 1861 and § 1863(b)(7)

Section 1861 of Title 28 of the United States Code, which was enacted on June 25, 1948,

---

[3]Defendant now wishes to increase his son's involvement in the case, despite having tried to limit his involvement at trial through a motion in limine. See doc. nos. 323, 350, 395, 422, and 423. Initially, the Court was inclined to grant the request that David Wecht participate in the selection process, especially since the First Proposed Order of Court (doc. no. 204-5) stated "the confidentiality Order stated herein will similarly apply to [David] Wecht if he participates in the jury selection". However, after reviewing defendant's recent Response (doc. no. 618) to the Petition by WPXI, Inc., Tribune Review Publishing Company and PG Publishing Company d/b/a/ Pittsburgh Post-Gazette that the Potential Jurors and Empanelled Jurors not be Anonymous and for In-Person, Public Voir Dire in Open Court, which clarified that defendant had filed a Second Proposed Order of Court (doc. no. 208-2) which fails to include said confidentiality promise, the Court DENIES the request.

provides that it is the policy of the United States that all litigants in federal courts entitled to a jury trial shall have the right to juries (grand and petit) selected at random from "a fair cross section of the community in the district or division wherein the court convenes."

The "fair cross section" requirement of this chapter is the functional equivalent of "reasonably representative" standard of the Sixth Amendment, and the test for showing under-representation under the Constitution and Section 1861 are the same. *United States v. Musto*, 540 F.Supp. 346 (D.C. N.J. 1982), *affirmed* 715 F.2d 822, *cert. denied*, 468 U.S. 1217.

Section 1863(b)(7) of Title 28 of the United States Code provides that the plan for random jury selection shall "fix the time when the names drawn from the qualified jury wheel shall be disclosed to the parties and to the public. If the plan permits these names to be made public, it may nevertheless permit the chief judge of the district court, or **such other district court judge as the plan may provide, to keep these names confidential in any case where the interests of justice so require**." (Emphasis added.)

### B. Random Jury Selection Plan

On March 29, 2001, the Plan for Random Jury Selection of the United States District Court for the Western District of Pennsylvania, as amended, was approved by a Reviewing Panel, consisting of Members of the Judicial Counsel of the Third Circuit and the Board of Judges of the Western District of Pennsylvania. The Plan was approved and signed by D. Brooks Smith, who was the Chief Judge of the United States District Court for the Western District of Pennsylvania at the time, and Edward Becker, who was the Chief Judge of the United States Court of Appeals for the Third Circuit at the time. In its Order, the Reviewing Panel ascertained that the Jury Selection Plan complies in all particulars with 28 U.S.C. § 1863, and the current

Plan for Random Jury Selection went into effect on April 1, 2001.

The Plan for Random Jury Selection divides the Western District of Pennsylvania into divisions. The Pittsburgh Division consists of the counties of Allegheny, Armstrong, Beaver, Butler, Clarion, Fayette, Green, Indiana, Jefferson, Lawrence, Mercer, Washington, and Westmoreland. The Plan for Random Jury Selection uses voter registration lists (which are registration lists for a statewide primary or general elections as maintained by the applicable counties) to represent a fair cross section of the community in the Western District of Pennsylvania.

**C. Board of Judges' Order - - Misc. 06-211 and History of Rules Regarding Confidentiality of Juror Names and Addresses**

In March 2004, the Judicial Conference Committee on Court Administration and Case Management issued a document entitled "Guidance for Implementation of the Judicial Conference Policy on Privacy and Public Access to Electronic Criminal Case Files." That document set forth limitations on remote electronic access to certain sensitive materials in criminal cases. In pertinent part, the "documents containing identifying information about jurors or potential jurors" were no longer included in the public case file and were no longer made available to the public either at the Courthouse or via remote electronic access. Fed. R. Crim. P. Rule 49.1, Advisory Committee Notes.

Starting on July 1, 2005, when this Court "went live" with the CM/ECF system, up until the present time, this Court has abided the above March 2004 policy setting forth, *inter alia*, the limitations on identifying juror names in public.

As the Advisory Committee Notes to Federal Rule of Criminal Procedure 49.1 explain, the Rules addressing privacy concerns resulting from public access to electronic case files were codified and adopted by Fed. R. Crim. P. 49.1 with an effective date of December 1, 2007.

Rule 49.1. states, in pertinent part, as follows:

**Rule 49.1.     Privacy Protection for Filings Made with the Court**

(a)     **Redacted Filings.**  Unless the court orders otherwise, in an electronic or paper filing with the court that contains an individual's social security number, taxpayer-identification number, or birth date, the name of an individual known to be a minor, a financial- account number, or the home address of an individual, a party or nonparty making the filing may include only:
(1) the last four digits of the social security number and taxpayer-identification number;
(2) the year of the individual's birth;
(3) the minor's initials;
(4) the last four digits of the financial account number; and
**(5) the city and state of the home address.**
*          *          *

(d)     **Filings Made Under Seal.**  The court may order that a filing be made under seal without redaction.  The court may later unseal the filing or order the person who made the filing to file a redacted version for the public record.

(e)     **Protective Orders**.  **For good cause, the court may by order in a case:**
(1) require redaction of additional information; or
**(2) limit or prohibit a nonparty's remote electronic access to a document filed with the court.**

Fed. R. Crim. P. 49.1 (emphasis added).

Additionally, as the Advisory Committees Notes indicate, "[t]o the extent that the Rule does not exempt [documents containing identifying information about jurors or potential jurors] from disclosure, the privacy and law enforcement concerns implicated by [these] documents can

be accommodated under the rule through the sealing provision of subdivision (d) or a protective order provision of subdivision (e)."

On June 28, 2006, the Board of Judges of the Western District of Pennsylvania approved the entry of a Miscellaneous Order filed at Misc. 06-211. Misc. 06-211, which was signed by Chief United States District Judge Donetta W. Ambrose, and dated July 13, 2006, provides as follows:

> [T]hat all jurors shall be identified in court during the selection process by his or her assigned juror number ONLY, and prospective jurors shall no longer by identified by his or her name; that juror lists shall be deemed confidential and shall not be removed from the Court at any time and that all lists shall be returned to the Court after jury selection has been completed or at the close of Court for the day, whichever comes first; and, that the prospective juror occupation list, which is available to counsel having a scheduled jury selection within the corresponding trial term and upon execution of a 'Juror List Receipt' shall also be deemed confidential and must be returned to the Court upon completion of the jury selection or returned to the Clerk of Court or his/her designated representative forthwith and at no time shall it be copies or reproduced in any manner.[4]

### D. Analysis of Jury Selection Procedure

Defendant does not need jurors' names and home addresses to "file a motion to challenge the jury selection procedure" (see doc. no. 605 at 11) - - to verify compliance with the 28 U.S.C. § 1861 requirement of "petit juror selected at random from a fair cross section of the community in the district . . . wherein the community convenes." Since the Plan achieves "a fair cross section" by home county (i.e., random selection from voter lists, organized by county), not by

---

[4]The media intervenors challenge Misc. 06-211 as unconstitutional "because it is a blanket order entered without appropriate balancing of interests, nor is it narrowly tailored, nor is it based upon specific findings . . . ." (doc. no. 626 at 10). This Court need not reach the constitutionality of Misc. 06-211 because the Court in this case has made the appropriate balancing of interests with specific findings and reasons and has modified the jury selection procedure to provide additional information and access to the media, as set forth herein.

name and home address, and since defendant will have the home county of each prospective juror on the copies of the completed Jury Questionnaire, defendant's argument is without merit. *See United States v. Lewis,* 472 F.2d 252 (3d Cir. 1973)(use of voter registration lists as sole source of names for jury duty is constitutionally permissible unless system results in systematic exclusion of a cognizable group or class of qualified citizens).

## III. <u>ANALYSIS OF APPLICABLE LAW</u>

### A. <u>Jury Selection in General and the Use of Jury Questionnaires</u>

Although the Sixth Amendment guarantees the "right to . . . trial by an impartial jury . . .", it does not grant either the defendant or the prosecutor the right "to have voir dire conducted in such a way as to mold the jury in a way that the jury will be receptive to counsel's case." *United States v. Serafina*, 57 F.Supp.2d 108, 112 (M.D. Pa. 1999) (quoting *United States v. Padilla-Valenzuela*, 896 F.Supp. 968, 972 (D. Ariz. 1995)).

As stated in *Schlinsky v. United States*, 379 F.2d 735, 738 (1st Cir.), *cert. denied*, 389 U.S. 920 (1967): "[T]he purpose of the voir dire is to ascertain disqualifications, not to afford individual analysis in depth to permit a party to choose a jury that fits into some mold that he believes appropriate for his case."

Rule 24(a) of the Federal Rules of Criminal Procedure vests the trial court with broad discretion to determine the scope and method of voir dire in criminal cases. *United States v. Shannon*, 21 F.3d 77, 82 (5th Cir.), *cert. denied*, 513 U.S. 901 (1994); *United States v. Salamone*, 800 F.2d 1216 (3d Cir. 1986). *See also Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981)(trial court accorded broad discretion in determining best method for conducting voir dire).

The use of jury questionnaires as a means of conducting voir dire is a widely used practice among district courts of this Circuit as well as other circuits. *See United States v. Serafina*, 57 F.Supp.2d 108 (M.D. Pa. 1999); *United States v. Scarfo*, 850 F.2d 1015 (3d Cir. 1988); *United States v. Fastow*, 292 F.Supp. 2d 914 (S.D. Texas 2003); *United States v. King*,1998 WL 50221 (S.D.N.Y. 1998); *United States v. Blanton*, 719 F.2d 815 (6th Cir.1983).

In *United States v. Serafina*, the United States District Court for the Middle District of Pennsylvania used jury questionnaires in a criminal trial involving alleged purgery of a state legislator, and succinctly set forth the discretion afforded a trial court in using questionnaires during the voir dire process:

> Whether to allow written questionnaires to be submitted to prospective jurors in advance of the jury selection date, and the content of any such questionnaire, falls within the wide discretion accorded to the trial court in conducting voir dire. Juror questionnaires may serve as a better vehicle to unearth bias than oral questioning in court and may also expedite the jury selection process. In addition to searching for evidence of actual bias, the trial lawyer may seek to use the questionnaire to obtain information to aid jury consultants to compile profiles on prospective jurors for purposes of identifying those prospective jurors more likely to favor the side of the party retaining the consultant. The questionnaire may thus contain a number of inquiries into intensely personal matters that have nothing to do with discovering actual bias.

57 F.Supp.2d at 111-112.

**B. Empaneling an Innominate Jury**[5]

The empaneling of an anonymous jury, one in which the names and addresses of the jurors are not disclosed during voir dire, may be necessary in certain cases. 1 Fed. Jury. Prac. & Instr. § 4:4 (6th ed.). This Court has discretion to empanel an anonymous jury under certain circumstances and the decision to do so will be reviewed for abuse of discretion. *United States v. Thornton*, 1 F.3d 149, 154 (3d Cir. 1993), *cert. denied*, 510 U.S. 982 (1993). Furthermore, the fact that a district court *sua sponte* empanels an anonymous jury does not change the analysis. *United States v. Branch*, 91 F.3d 699, 723-25 (5th Cir. 1996) (affirming the district court's *sua sponte* order to empanel an anonymous jury); *United States v. Bowman*, 302 F.3d 1228, 1236 (11th Cir. 2002) (per curiam); *United States v. Edmond*, 52 F.3d 1080, 1089-94 (D.C.Cir. 1995) (per curiam). The Court has an independent obligation to protect the jurors and the jury selection process, independent of the interests of the government, defendant, or media.

When determining whether to empanel an anonymous jury, or more accurately an "innominate" jury, the Court may consider a number of factors including:

> (1) whether there had been a substantial degree of pretrial publicity, such as to enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies or harassment by the public. *See United States v. Shyrock*, 342 F.3d 948,9 971 (9th Cir. 2003); *United States v. Brown,* 303 F.3d 582, 602 (5th Cir. 2002).
>
> (2) whether the defendant faces a lengthy prison term and substantial monetary

---

[5]*See United States v. Carpa*, 271 F.3d 962, 963 n.1 (11th Cir. 2001), cert denied, 535 U.S. 946 (2002)(the trial court preferred to describe the jury as "innominate" as opposed to "anonymous" because in its view "anonymous" connoted a "clandestine, forbidden, and obscure" jury panel). Also, in *United States v. Bowman,* 302 F.3d 1228, 1236, the Court referred to the jury as an "innominate jury" rather than an anonymous jury because, "after a thorough voir dire, the parties knew everything about the jurors except their names."

-21-

penalty. *United States v. Bowman,* 302 F.3d 1228, 1238 (11th Cir. 2002); *United States v. Darden*, 70 F.3d 1507, 1532 (8th Cir. 1995).

(3) whether defendant had engaged in past attempts to interfere with the judicial process. *United States v. Carneglia*, 47 Fed. Appx. 27 (2d Cir. 2002).

(4) whether defendant was alleged to have engaged in dangerous and unscrupulous conduct, with particular consideration being given to whether such conduct was part of a large-scale organized criminal enterprise. *United States v. Thomas*, 757 F.2d 1359, 1364-1365 (2d Cir. 1985).

However, none of the above factors are dispositive. Rather, the decision to empanel an innominate jury should be made based upon the totality of the circumstances. *Brown,* 303 F.3d 582, 602 n. 104 (citing *United States v. Branch,* 91 F.3d 699, 724 (5th Cir. 1996)).

Furthermore, in making its determination, the Court is not required to conduct an evidentiary hearing and is not required to record its reasons for ordering an innominate jury when the jury is empaneled. *United States v. Stewart*, 325 F.Supp.2d 474, 498 (D. Del. 2004)(citing *United States v. Eufrasio*, 935 F.2d 553, 574 (3d Cir. 1991)).

In *United States v. Scarfo*, 850 F.2d 1015 (3d Cir. 1988), a case of first impression before the United States Court of Appeals for the Third Circuit, our Court of Appeals conducted an extensive review of the body of case law developed from other circuits on the propriety of empaneling an anonymous jury and ultimately held that the district court's decision to use an anonymous jury did not infringe on the presumption of innocence, and it did not deprive defendant of information reasonably necessary to the intelligent exercise of his peremptory challenges. Like this Court, the district court in the *Scarfo* case used a written questionnaire which encompassed a broad range of personal demographics, and it conducted individual voir dire. In explaining its affirmance of the decision of the district court, the Court of Appeals set

forth the following analysis, which this Court finds instructive:

> **There is ample support for the district court's conclusion that "counsel were in a much better position to assess the suitability of prospective jurors in this case than in most other trials, criminal or civil."**
>
> Nor do we quarrel with the court's decision to invoke this unusual procedure . . . **In addition, it was not beyond the range of possibility that persons hostile to defendant might have been inclined to harass the jury**. *See United States v. Borelli*, 336 F.2d 376, 392 (2d Cir. 1964) *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). In circumstances similar to those here, we must be particularly deferential to the trial judge, **familiar as he is with the local ambience**. *See Rosales-Lopez v. United States*, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981)(trial judge accorded broad discretion in determining best method for conducting voir dire). *See also Thomas*, 757 F.2d at 1365 (anonymous jury appropriate where judge believe jurors need protection and where precautions to minimize effect are taken).
>
> . . . The virtue of the jury system lies in the random summoning from the community of twelve "indifferent" persons - "not appointed till the hour of trial"- to decide a dispute, and in their subsequent, unencumbered return to the their normal pursuits. *See* W. Blackstone, *Commentaries* *378. The lack of continuity in their services tends to insulate jurors from recrimination for their decision and to prevent the occasional mistake of one panel from being perpetuated in future deliberations. **Because the system contemplates that jurors will inconspicuously fade back into the community once their tenure is completed, anonymity would seem entirely consistent with, rather than anathema to, the jury concept. In short, we believe that the probable merits of the anonymous jury procedure are worthy, not of a presumption of irregularity, but of disinterested appraisal by the courts**.

*Id.* at 1023 (emphasis added).

In *United States v. Thornton*, 1 F.3d 149, 154 (3d Cir. 1993), the Court of Appeals again noting that review of a district court's decision to use an anonymous jury must be "particularly deferential." The Court of Appeals found that the district court did not abuse its discretion in employing an anonymous, jury, on the basis of the extensive press coverage, and given that the district court was familiar with the "local ambience," among other things.

### C. <u>Media Access to Juror Names and Jury Questionnaires</u>

While defendant has a firmly rooted Sixth Amendment right to a fair trial and an impartial jury, the public also has an important First Amendment right to access to judicial proceedings and that right of access may be denied only if it is "necessitated by a compelling government interest, and is narrowly tailored to serve that interest."  *See In re Globe Newspaper*, 457 U.S. 604, 606 (1982).  The Court therefore must balance and reconcile these competing interests while attempting to guarantee that the parties' corresponding constitutional rights are protected.

In the landmark case of *Press-Enterprise Company v. Superior Court of California*, 464 U.S. 501 (1984)(*Press Enterprise I*), the United States Supreme Court recognized the constitutional right of the public to attend voir dire proceedings.  In *Press Enterprise I*, the Supreme Court vacated the trial court's closing of the six week voir dire process and set forth the following standard upon which voir dire may be closed to the public:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.  The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

464 U.S. at 510.

The Supreme Court in the *Press Enterprise I* case analyzed the reasons given by the trial court for closing the voir dire proceedings and provided the following three justifications for its ultimate vacating of the trial court's order: (1) the trial judge made no findings to support the asserted interests of assuring a fair trial and protecting the privacy of the jurors; (2) the trial judge

had not considered any alternatives to the complete closure of the courtroom proceedings; and (3) the voir dire proceedings were permanently sealed. *Id.* at 513.

While the parties in the instant matter all agree that the public has a constitutional right of access to criminal trials, *In re Globe Newspaper Co.*, 457 U.S. at 603, the question before this Court is whether the public (the media) has an (1) unqualified right to access of the jurors' names and home addresses and (2) to the completed Juror Questionnaires.[6]

### 1. Access to Names of Jurors

Recently, in *United States v. Black*, 483 F.Supp.2d 618 (N.D. Ill. 2007), where a newspaper intervened in a highly publicized criminal fraud trial for the purpose of obtaining juror names, the United States District Court for the Northern District of Illinois held that the newspaper did not have a First Amendment right to obtain the names of the jurors during trial.

The Court in the *Black* case, while noting at 621 that "[n]o right ranks higher than the right of the accused to a fair trial," *quoting Press Enterprise I*, 464 U.S. at 508, summarized the test for determining the right of access as follows:

> To determine whether the First Amendment provides a qualified right of access to a particular aspect of a criminal proceeding, a court must consider (1) whether "the place and process have historically been open to the press and general public" (the "experience test"), and (2) whether public access plays a

---

[6]Media intervenors' position changes throughout their reply brief. Sometime they want "juror names and <u>other information typically revealed during voir dire</u>" (see doc. no. 626 at 1) (emphasis added); then later they say that the media does not "seek the questionnaires, but only the disclosure of the names of the jurors being voir dired and those being empaneled." See doc. no. 626 at 2. But the Jury Questionnaires do provide some "information typically revealed during voir dire." Then in note 4, the media intervenors state "[t]he public (via the media) needs to know this [questionnaire] information to understand and evaluate the voir dire process," presumably eliminating the need for our Court of Appeals. See doc. 626 at 3.

significant positive role in the functioning of a particular process in question"
(the "logic test"). *Press-Enterprise II,* 478 U.S. at 8, 106 S.Ct. At 2740. . . .
The party alleging the existence of the qualified First Amendment right bears
the burden of establishing both parts of this threshold test. *Gannett,* 571 A.2d
at 749; Matter of 2 Sealed Search Warrants, 710 A.2d 202, 207 (Del. Super. Ct.
1997).

*Black* at 622-623.

After conducting an extensive analysis under the "experience" and "logic" prongs of the

*Press Enterprise II* test, the Court in the *Black* case found that the media had failed to

demonstrate that "experience" establishes a constitutional right to access to juror names during

the pendency of trial and that the Courts' prevailing practices have been to the contrary. *Id.* at

625-626. In fact, as the Court in the *Black* case noted, the language of 28 U.S.C. § 1863(b)(7)

(cited by this Court herein above) permits any district court judge to keep these names

confidential "in any case where the interests of justice so require." *Id*. at 626. Further, the Court

found that the media had failed to establish that public access to the jurors' names would play "a

significant positive role in the functioning of the particular process in question." *Id.* (quoting

*North Jersey Media Group, Inc. v. Ashcroft*, 308 F.2d 198, 217 (3d Cir. 2002)).

As the government points out, and this Court agrees, the media relies on state law

precedent (*Commonwealth v. Long*, 922 A.2d 892, 899-906 (Pa. 2007)), which is not binding on

this Court, and cases, including *United States v. Antar*, 38 F.3d 1348 (3d Cir. 1994), where the

issue related to whether the disclosure of jurors' names is appropriate *after* a jury verdict to

support its position that the names of the jurors should be provided in this case.

In short, and as explained more fully below, the Court does not find that the media has a

right to know the names and addresses of the jurors; and further, the Court, after balancing the

competing constitutional interests, will exercise its discretion in this case to protect the privacy

rights of the jurors and insure a fair trial, because as set forth below, the "interests of justice so

require."[7]

## 2. Completed Juror Questionnaires

The media objects to the Court's practice of using Juror Questionnaires during the voir

dire process, because, it alleges this practice amount to a closure of the proceedings.  This

Court's review of the following body of case law involving media access to Juror Questionnaires

reveals that while some Courts prefer to keep the content of the Questionnaires non-public,

others did provide the media access to the Questionnaires at some point in the proceedings.

In *United States v. Taveras*, 436 F.Supp.2d 493, 505 (E.D. N.Y. 2006), the United States

District Court for the Eastern District of New York, limited public access to the Juror

Questionnaires, because "conceivably they could be traced to individual jurors who have

revealed highly personal information on the promise of confidentiality."  However, in that case,

unlike the present case, the jury was not "anonymous."  Furthermore, similar to the present case,

the Court did distribute a blank Jury Questionnaire form to the media.[8]

In *United States v. George*, 1992 WL 233354 (D.C.C. 1992), the United States District

---

[7]The media intervenors argue, in support of their zeal for the jurors' names that "at the start of the trial this Court could sequester the jury and at that time make available the names of the jurors that have been subject to <u>voir dire</u> and those empanelled."  Doc. no. 626 at 2 n. 2. Imagine the cost to the taxpayers of sequestering 18 jurors (12 jurors plus 6 alternates) during an 8 to 10 week trial, coupled with the great inconvenience to the jurors and their families.

[8]All parties, including the media intervenors, have had public access (via the ECF docket) to the Jury Questionnaire in this case (see doc. no. 287-2), for approximately 16 months.  See also n.1 *infra*.

Court for the District of Columbia, after conducting a *Press Enterprise* analysis, released the Jury Questionnaires (which also contained the jurors names) during the proceedings while redacting certain personal information that it found would be inappropriate for public disclosure. The Court, however, cautioned the media not to "abuse" its right of access by improperly contacting the jurors during the proceedings. 1992 WL 233354, *6.

Also, in *United States v. King*, 1998 WL 50221 (S.D.N.Y. 1998), the Southern District of New York also considered the issue of the public disclosure of Juror Questionnaires (which included the jurors names) and determined that the completed questionnaires would be available only to the parties and the Court only *after* the impaneling of the jury.

### D. <u>Reasons for Innominate Jurors in this Case</u>

Given the intense, unprecedented, and relentless media attention to date in this case, the Court, being conscious of the "local ambience," finds that empaneling an innominate jury will provide the prospective jurors a necessary level of security and inconspicuousness that this Court deems warranted.

First, from the prospective of the media, because the media requests the names and addresses of the potential jurors, if those requests were granted, there is certainly a real potential that the media would use those names (and addresses) to develop and publish stories about the prospective jurors, coupled with possible interviews of the potential jurors' family members, co-workers, and friends. The media obviously does not want the jurors' names as an intellectual exercise to file in some reporter's electronic desk drawer. If they want the names, they want to do "reporting." If the numerous excellent "investigatory" reporters in Western Pennsylvania

obtain the names and home address of the jurors, detailed "background" stories, before and

during the trial, are likely. The Court thus has serious concerns that the dissemination of stories

about the prospective jurors (and especially the empaneled jury) would have a real impact on the

jurors' willingness to serve and, if selected, on the jurors' abilities to remain fair, unbiased, and

focused on this case.

Secondly, from the perspective of the defendant, if there is media coverage disseminating

the names (and addresses) of the prospective jurors, that coverage would undoubtedly increase

the risk of intimidation of those jurors as there is a probability that other individuals (not

including the defendant himself) would contact those jurors in an attempt to either hurt or bolster

defendant's case. Just like the district court in the *Scarfo* case had concerns that persons hostile

to defendant might have been inclined to harass the jurors, this Court also has real concerns that

persons who are either hostile to, or enamored with, defendant would attempt to influence the

jurors.

Finally, defendant's own Brief in Support of Motion for Clarification and/or Modification

of Trial Procedures and Scope of Exhibit and In Limine Rulings (doc. no. 605) powerfully

highlights the risk to jurors, in light of defendant's numerous enemies, or as defendant describes

these enemies - - "known adversaries of Dr. Wecht" (doc. no. 605 at 11 n.1), as follows:

> Moreover, as the Coroner of Allegheny County and the forensic pathologist of
> choice for five surrounding counties for long periods of time, <u>he has made
> countless cause and manner-of-death determinations</u>. In sum, he has been and
> continues to be a part of the law enforcement team that prosecutes <u>the most
> serious offenders of society</u> – <u>violent criminals</u>. He has been a critical witness in
> <u>hundreds of homicide and other criminal trials</u> throughout the Western District of
> Pennsylvania. Those cases have involved <u>countless family members that he has
> been adverse to as a witness</u> for the prosecution. In fact, to this day, even under

indictment, he remains the expert witness of choice for five district attorneys and, thus, currently has <u>pending criminal homicide trials</u> under such circumstances. A compelling interference may be drawn that <u>there are many individuals that may harbor ill will toward him for his involvement in the prosecution and incarceration of family members or friends</u>.

In addition to Dr. Wecht's work in state criminal courts, he is also very active in high-stakes and high-profile civil case. Dr. Wecht has performed numerous autopsies and autopsy file reviews in the Western District of Pennsylvania and nationally, related to wrongful death civil actions. Obviously, as a result of this work, <u>there are a number of individuals that may also bear animus toward Dr. Wecht</u>.

Lastly, Dr. Wecht's son, David, is a sitting family court judge in Allegheny County. As such, he makes judicial decisions that <u>affect people in the most emotional and passionate areas of their lives</u> – child custody, equitable distribution, and child support. As a judicial officer in family court, it is axiomatic that <u>there is a pool of affected individuals who may feel wronged as a result of his judicial decisions</u>. <u>Those individuals may find their way into Dr. Wecht's pool of jurors</u>. In fact, it may be necessary for Judge Wecht to assist in jury selection to assist in identifying such persons.

*Id*. at 5-6 (emphasis added). Defendant acknowledges there are "countless" known enemies, to which must be added to the "unknown" enemies (and presumably "unknown" friends).

For these reasons, this Court finds the use of an innominate jury to be necessary and warranted under the unique circumstances of this case.[9]

---

[9]This Court is aware of the arguments made by the government regarding defendant's alleged witness intimidation (see doc. no. 613 at 7-10), and the Court also received a letter dated 12/5/07 via facsimile, from Gerald and Elise Schiller, to this Court, asking that the jury be anonymous in light of the letters which were exchanged between defendant and the Schillers (a copy of which the Court will file separately). However, the Court relies on the unprecedented media coverage and the other reasons set forth in this Order of Court as the basis for its decision to empanel an innominate jury.

# IV.  RULINGS OF THE COURT

## A.  The Motions (doc. nos. 604 and 607) to Modify Jury Selection Procedure are Untimely

While defendant and the media intervenors would have this Court believe that the issue of jury anonymity was "news" to them on November 26, 2007, the historical record as set forth herein above in this case tells a different story.  As stated above, this Court's decision to empanel a jury, whose names and addresses would not be known to *either* party (and clearly not the media), was made approximately 16 months ago - - before any of the parties (government, defendant, and the media intervenors) pursued their respective appeals to the United States Court of Appeals for the Third Circuit.  No party raised any objection or complaint before this Court about the decision to empanel an anonymous jury.  Furthermore, no party raised an argument on this decision during the appeals before the Court of Appeals.

Therefore, for these reasons, this Court finds that the defendant and the media's motions to modify the jury selection process and the Jury Questionnaire procedure to include the names and addresses of the prospective jurors is belated.  Accordingly, the Court will DENY said Motions as untimely[10].

---

[10]As noted later in this Order of Court, notwithstanding the untimeliness of the requests of defendant and the media, the Court will make certain modifications to its initial jury selection procedures.

**B.  No Reason to Repeat the Questions and Answers of the Juror Questionnaires as Part of the "Open Court" Voir Dire Process**

**1.  Jury Questionnaire Versus In-Court Voir Dire**

**a.  In General**

Defendant and the media intervenors request that this Court include in the in-court voir dire process, the same questions posed to each prospective juror in the Jury Questionnaire, by re-asking the questions (and obtaining answers thereto) in open court.  Since the Jury Administrator issued 400 summons to potential jurors, the time spent in repeating the questions and answers in the Jury Questionnaire in open court would be inordinate.  Obviously, by the Court of Appeals upholding the Jury Questionnaire process in the *Scarfo* case, 850 F.2d at 1023, as stated above, the Court of Appeals was not contemplating that these questions/answers would be repeated in open court.  Such a requirement would eliminate the use of the Jury Questionnaire as a practical matter, since the Jury Questionnaire includes substantial information not necessary for the "for cause" determinations.  *See Serafina*, 57 F.Supp. 2d at 111-112.  This Court thus DENIES said request and will not repeat the questions and answers of the Jury Questionnaires in open court as requested by defendant and media.

**b.  As to Defendant**

Defendant will have access to the completed Jury Questionnaire in an orderly process which will satisfy any legitimate need of defendant for such information.  Defendant's argument that he cannot make any "for cause" decisions without seeing each of the prospective 400 jurors, knowing their names and home addresses, and repeating the questions and answers of the complete Jury Questionnaires in open court, is not credible.

The completed Jury Questionnaires obviously will produce important and detailed information, which should form a basis for counsel for government and defendant to reach agreement on "for cause" dismissals, and absent agreement(s), for verbal motion(s) to dismiss as to most, if not all, of the "for cause" jurors. The Court will be reviewing the Jury Questionnaire in open court at the same time as counsel, so rulings may be made on the record, with media in attendance to hear the reasons(s) for each "for cause" dismissal, by juror number.

Certainly counsel for government and defendant, with their respective small army of assistants, should be able to review 60 completed Jury Questionnaires per the allotted two day cycle, to achieve a sufficient pool of qualified jurors.

And, based upon the modifications to the jury selection process described hereafter, and subject to the filing of the required certification described in footnote 2 herein, if some "for cause" juror(s) slips into the "qualified" pool of 40 jurors, defendant (and the government) at the final jury selection process (on January 23, 2008) will see the jurors, have their names and home addresses,[11] have their completed answers to the questions in their Jury Questionnaires, have heard their answers to the individual voir dire questions; and may then move to disqualify said juror(s) for cause. If one or more jurors of the pool of 40 jurors is removed "for cause" in the final jury selection process, additional jurors will be immediately substituted, to bring the pool of

_____

[11]To the extent defendant argues that not knowing the names and addresses of the jurors operates as a "prior restraint" (see doc. no. 605, at 11, n. 1) on defense counsel's ability to comment on the fairness of the jury selection process to the media, the Court rejects that argument based upon the Court's concerns about tainting the jury pool with the media coverage as more fully explained herein above. Therefore, the Court ORDERED that the parties and counsel may not reveal the names and addresses, nor the completed Jury Questionnaire and the information contained therein, to the media or any other party or person. See n. 2. *infra*.

jurors back up to 40 jurors, for the exercise of the peremptory challenges, after repeating the individual questions for any substitute juror(s).

Although the completed Jury Questionnaires in this case will not give the parties access to 400 prospective jurors' names and street addresses, the Jury Questionnaires will contain an extraordinary amount of information, all of which will assist the parties in selecting a fair, unbiased and impartial jury. The Jury Questionnaire, which is approximately 26 pages in length, and which was originally submitted by defendant and was adopted by the Court (doc. no 287) (the Court used 61 of the original 63 questions submitted by defendant), contains 69 questions that are very detailed and pointed. In addition to the standard questions relating to employment and education and case specific questions (such as whether the parties know the defendant, and the impact of exposure to media coverage), the prospective jurors must list their favorite television programs and movies, their favorite hobbies, and even must identify whether they have bumper stickers on their cars and if so, what those bumper stickers say. Doc. no. 287-2.

Since the goal of the jury selection process is to empanel an impartial and unbiased jury, the use of these detailed Jury Questionnaires advances that objective - - knowing or not knowing the names of the prospective jurors does nothing to accomplish that goal, under the jury selection procedure, as modified herein.

### c.  As to Media

After balancing the right of the public to access to the voir dire process with the corresponding interests of privacy to the prospective jurors, as well as the interests of parties (and the public) in selecting a fair and impartial jury, this Court will allow the media intervenors, at

the conclusion of the trial, to review copies of each completed Juror Questionnaire in the Courtroom. Neither counsel nor the parties (or any other individual) will be permitted to remove the Juror Questionnaires from the Courtroom. The Juror Questionnaires to be viewed by the media, however, will ***not*** include the last page of the Juror Questionnaires where the names and addresses of the jurors are listed. As stated above, after balancing the interests of privacy of the jurors with the right of access to the public, given the intense media interest in this case, the Court will not provide the names and addresses of the jurors in hopes that the "jurors will inconspicuously fade back into the community once their tenure is completed.**"** *Scarfo,* 850 F.2d at 1023.

At the conclusion of the trial and upon their release from jury duty, however, should any juror or alternate juror wish to make statements to the media (including disclosure of their names and addresses), it shall be at their discretion to do so, and the Court will work with the media to provide space in the Courthouse therefor. Additionally, the media will be in the Courtroom during the "for cause" rulings and for the final jury selection process including the open court voir dire questioning of the final qualified pool of jurors, from which the empaneled jurors will be selected .

## C. Order of Court Re: Rulings on Procedure Relating to Access to the Completed Jury Questionnaire

Notwithstanding, the untimeliness of the objections, the Court will make several modifications of its jury selection procedures, as set forth below:

### 1. As to Defendant

For the reasons set forth herein above, the Court orders as follows:

Counsel will review 60 Jury Questionnaires on an every two days cycle, and the parties will not be permitted to remove from the Courtroom or otherwise copy (or transmit) the Jury Questionnaires. The Court will not re-ask the questions set forth in the Jury Questionnaires in open court, because to do so would defeat the purpose of the Jury Questionnaire.

The Jury Administrator will remove the signature page from the completed Jury Questionnaires. However, once the jury selection process results in a pool of 40 jurors, prior to the exercise of peremptory strikes, the Court will return to counsel and the parties the relevant completed Jury Questionnaires and will also provide to counsel and the parties the names and addresses of the 40 jurors (i.e., copies of the last page of the applicable Jury Questionnaires); again subject to filing of the required certifications described in footnote 2 herein.

The Court ORDERS that counsel and the parties shall neither record the juror names or addresses, nor transmit said names electronically or in any other way to any party or person, including the media. The completed Jury Questionnaires, the last pages thereof, and the Jury List, and information therefrom, must be returned immediately to the Deputy Clerk and must never leave the Courtroom.

The Court ORDERS that counsel and parties shall not bring any cell phone, cameras, computers, or any other electronic recording device into the Courtroom during the jury selection process.

The individual voir dire questions to be conducted in open court are set forth below.

### 2. <u>As to Media</u>

Pursuant to the media intervenors' requests, the Court, as it always has done throughout this case, will provide the media access to the Courtroom during the six (6) day initial jury selection process (including all rulings on the record re: "for cause" decisions); and during the voir dire process of the pool of 40 jurors using the individual voir dire questions set forth below; and the Court will provide the media with access to copies of the Jury Questionnaires at the conclusion of the trial (excluding the last page) (as described above). The Court will not repeat the 24 pages of 69 questions, with numerous sub-parts in open court. For the reasons set forth herein above, and in accordance with Misc. Rule 06-211, the Court (and no counsel or party) will neither read nor state the names or addresses of prospective jurors in open court, nor will they provide the media or any other person or party access to the names or addresses of the prospective or empaneled jurors. Except as modified herein, Order of Court re: Additional Jury Selection Procedures (doc. no. 595) remains in effect.

### D. Order of Court Re: Rulings on the Proposed Voir Dire Questions of the Government and Defendant (doc. nos. 599 and 598)

Pending before the Court are the following requests for voir dire questions:

1. Government's Notice of Filing Revised Proposed Voir Dire Questions, filed 12/3/07 (doc. no. 599), and

2.     Defendant's Proposed Voir Dire, filed 12/3/07 (doc. no. 598).

The government's request (doc. no. 599) is the same as its prior request, filed on June 15, 2006 at doc. no. 234, except for the deletion of question 14.  Defendant's request (doc. no. 598) is the same as its prior request, filed June 15, 2006 at doc. no. 231, except for the addition of approximately 19 questions.

Both the requests by the government and defendant repeat questions and areas of inquiry already placed into the Jury Questionnaire sixteen (16) months ago.  Compare doc. nos. 598 and 599 with Jury Questionnaire (doc. no. 287-2).  For example, government request no. 3 is very similar to Jury Question no. 31; government request nos. 4 and 5 are very similar to Jury Question Nos. 45, 53 and 57; the information sought in government request no. 6 is sought in Jury Question Nos. 8, 9, and 13; and Jury Question Nos. 1 and 2 are very similar to Jury Question No. 39.

Likewise, and even more so, defendant's requests duplicate the written jury questions.  In fact, some questions are word-for-word the same.  For example, defendant's request no. 1 (a), (b) and (c) is the same as Jury Question No. 41; defendant's request no. 4 is the same as Jury Question No. 43; defendant's request no. 6 is the same as Jury Question No. 44; defendant's request no. 7 is the same as Jury Question No. 45 and defendant's request nos. 9 and 10 are the same as Jury Question Nos. 27 and 28; and others are the same or almost the same questions. Also, as to defendant's request for individual voir dire questions, defendant's request nos. 12 and 13 are the same as Jury Question Nos. 2 and 13; defendant's request no. 15 is the same as Jury Question Nos. 3and 14; defendant's request no. 16 is the same as Jury Question Nos. 4 and 15;

defendant's request no. 17 is the same as Jury Question No. 34; defendant's request no. 18 is the same as Jury Question No. 35; defendant's request no. 37 is the same as Jury Question No. 19[12]; defendant's request nos. 38, 39, and 40 are the same as Jury Question Nos. 36, 37, and 39; defendant's request no. 41 is similar to Jury Question No. 49; defendant's request no. 42 is the same as Jury Question No. 53; defendant's request no. 43 is the same as Jury Question No. 54; defendant's request no. 44 is the same as Jury Question No. 58; defendant's request no. 45 is the same as Jury Question No. 59; defendant's request no. 46 is the same as Jury Question No. 60; defendant's request no. 47 is the same as Jury Question No. 61; defendant's request no. 48 is the same as Jury Question No. 62; and defendant's request no. 49 is the same as Jury Question No. 63.

## 2. Rulings

In general, the Court will not repeat questions already covered by the extensive Jury Questionnaire, consisting of 24 pages and 69 questions with numerous sub-parts, to the qualified pool of 40 jurors. See Exhibit A hereto. To repeat the same question in the Jury Questionnaire in the open-court voir dire process is unnecessary, and defeats the purpose of the Jury Questionnaire which was adopted by this Court, without objections by defendant and with minimal objections by government, over sixteen (16) months ago. See doc. no. 287, dated July 13, 2006 and doc no. 290 (Hearing Memo of July 12, 2006). The Jury Questionnaire actually gives the parties and counsel more information than they ever would receive in the normal in-court voir dire procedure.

---

[12]Jury Question No. 19 will be modified to indicate that the trial may last "eight to ten weeks" instead of "five to six weeks".

The Court rules as follows on defendant's "new" proposed voir dire questions:  Request Nos. 1, 20 and 21 will be covered, at least in part, by additional language in the preliminary jury instructions.  Requests Nos. 22, 23, 24, and 25 (doc. no. 598) seeking political information is not relevant in light of prior court rulings.  Also see Jury Question Nos. 30 and 31, and Jury Question Nos. 26, 29, 62, 63, 64, and 65.  Request Nos. 26 is covered by Jury Question Nos. 13, 14, 15, and 16.  Request Nos. 27 and 28 are denied as not relevant.  The Court will combine parts of request nos. 29-31 as follows:  "Do you have any personal beliefs about autopsies, organ donation, and use of cadavers for educational purposes, that would keep you from being a fair and impartial juror in this case."  Otherwise these requests are denied.  Request Nos. 33 will be granted in part as follows: "Do you have any personal beliefs about people who earn high incomes that would keep you from being a fair and impartial juror in this case."  Request Nos. 34, 35, and 36 are denied as not relevant.  The issue in this case is not personal use of the employer's resources but personal use for personal <u>financial</u> benefit.  Request nos. 37 is denied as covered by Jury Question No. 19.  Thus, the voir dire proposed in doc. no. 298 and 299 are DENIED, except as provided below.[13]

Therefore, the Court will ask the following voir dire questions on January 23, 2008, in open court, of the pool of 40 qualified jurors[14] (which will result from the elimination of prospective jurors "for cause" through the Jury Questionnaire process (by agreement of counsel, or by motion for challenge "for cause," and with "for cause" rulings on the record, in open court,

---

[13]Defendant requests additional voir dire questions in doc. no. 618 at 13.  Said requests are DENIED, as adequately covered in the Jury Questionnaire.

[14]Additional qualified jurors will be available in case the voir dire of the pool of 40 jurors produces additional successful "for cause" challenges.

by juror number, on the schedule as set forth in doc. no. 595, starting on January 10, 2008)):

1. The defendant in this trial is CYRIL H. WECHT.

     (a)     Do you know the defendant or any member of his family?

             If "Yes," who do you know and how do you know them?

     (b)     Have you had any dealings, either directly or indirectly, with the defendant or with any members of his family?

             If "Yes," please identify the person with whom you had dealings and describe those dealings.

     (c)     Do you have any close friend or relative who is acquainted with the defendant or a member of his family?

             If "Yes", who is your close friend or relative and to whom is he/she acquainted?

2. You have previously been introduced to the attorneys in this case.[15] Do you know any of them?

3. Have any of these lawyers or Kirkpatrick & Lockhart Preston Gates Ellis ever represented you or any member of your immediate family?

4. Do you know anything about this case other than what you previously have disclosed on your Jury Questionnaire?

---

[15]Mr. Thornburgh's name is deleted from the list of trial counsel since he has never appeared in the Courtroom relating to this case - - none of eight status conferences ; nor the three pretrial conferences, including the mandatory pretrial conference; nor at the final pretrial conference of 9/18/07 (see doc. no. 422 at 4), and did not appear at the courtroom technology demonstration by trial counsel (see Text Order of 11/14/07). Likewise, the name of Mary Beth Buchanan, U.S. Attorney for the Western District of Pennsylvania, will not appear on the list of trial counsel, for the same reasons.

5.      You have been provided with a list of witnesses who may or may not be called to testify at trial.  Please take a moment and review the names on the list.  Do you know any person on the list?

6.      Do you have any personal beliefs about autopsies, organ donation, or use of cadavers for educational purposes that would keep you from being a fair and impartial juror?  (See Defendant's Request Nos. 29-32 in doc. no. 598.)

7.      Do you have any beliefs about people who earn high incomes that would keep you from being a fair and impartial juror in this case?  (See Defendant's Request No. 33 in doc. no. 598.)

8.      Have you had any personal experiences with the Allegheny County Coroner's Offices, the Allegheny County Medical Examiner's Office, or Allegheny County local government that would keep you from being a fair and impartial juror in this case?  (See Government's Request Nos. 8 and 9 in doc. no. 599.)

9.      Do you know any reason why you would be biased or prejudice in this case?

10.     Have you any preconceived ideas about this case that would affect your judgment as a fair and impartial juror?

A copy of the completed Jury Questionnaire, with juror numbers, for each prospective juror (the panel of 40 jurors) again will be given to counsel, along with separate copies (in order by juror number) of the last page of the Jury Questionnaire containing jurors' names and home addresses solely for use in the open court voir dire process which shall be immediately returned at the end of the day as described more fully above.[16]

In summary, at the time of the final jury selection on January 23, 2008, counsel and the parties will have (i) "open-court" answers to the above individual questions; (ii) the answers to

_____

[16]Jury Administration shall retain the originals of all Jury Questionnaires under seal until the completion of trial and any appeal(s) in this case.

the questions in the 24 pages, 69 questions, with numerous sub-parts, Jury Questionnaire, for each of the pool of 40 qualified jurors; and (iii) the last page of each applicable Jury Questionnaire. Counsel has failed to cite to any case in American jurisprudence where counsel and the parties had more information - - both quantitatively and qualitatively - - in the final jury selection process than in this case.[17]

### E.  <u>Summary of Three Phases of Jury Selection</u>

To summarize the procedure previously set forth in doc. no. 595 (as modified herein), the three phases of the jury selection process are as follows:

First, prior to January 10, 2008, the Jury Administrator will pre-screen the previously summoned prospective jurors based upon hardship and other appropriate criteria, as is done in every case.

Second, beginning on January 10, 2008 at 8:30 a.m. (and again on January 14, 2008, and January 16, 2008), a set of 60 prospective jurors (who were not previously eliminated by the Jury Administrator) will be called in to complete the Jury Questionnaires in the morning (in the Jury Assembly Area) and, in the afternoon, the one set of copies of completed Jury Questionnaires (60 per day) (without the last page) will be provided in the Courtroom by the Jury Administrator to counsel for the government, counsel for defendant, and the Court. A review of 60 Jury Questionnaires per day allots the parties more than adequate time to accomplish that goal. The Court also will review the 60 Jury Questionnaires at the same time. Either before the close of the

---

[17]The Court has reviewed numerous Jury Questionnaires and voir dire questions in some of the most recent high profile cases in the Nation.

day on January 10, 2008 , or at the beginning of the next day on January 11, 2008 (and again on January 15, 2008, and January 17, 2008), the Court then will rule upon challenges "for cause" (either by agreement of counsel or by motion) to the prospective jurors, by making the rulings in open court (with reference to the juror number only). This process of calling 60 prospective jurors to the Jury Assembly Room to complete Jury Questionnaires and ruling upon for cause challenges, will continue until a sufficient pool of qualified jurors is achieved. The media may attend these proceedings, but, for the reasons set forth herein above, will not have access to the completed Jury Questionnaires until the conclusion of the trial. (The media will not, however, have access to the last page of the Questionnaires at any time.)

Third, after ruling upon the challenges for cause, the final jury selection process will commence on January 23, 2008, and copies of the completed Jury Questionnaires of the pool of 40 prospective jurors will be returned only to the counsel, parties, and the Court (with a copy of the last page of the Jury Questionnaire identifying the names and addresses in order by juror number). The Court then will ask the individual voir dire questions outlined above in open court (with possible follow-up at sidebar if necessary), and the parties will exercise their peremptory strikes.

At the conclusion of this process, the Court will seat a 12 person jury, with 6 alternates, and trial will commence on January 28, 2008.[18]

_____

[18]Except as expressly granted in today's Order of Court and the Order of Court re: non-jury selection issues, the relief requested in Defendant's Motion for Clarification and/or Modification of Trial Procedures and Scope of Exhibit and In Limine Rulings (doc. no. 604) is DENIED. Further, except as expressly granted herein, the relief requested in Petition by WPXI, Inc., Tribune Review Publishing Company and PG Publishing Company d/b/a Pittsburgh Post Gazette that the Potential Jurors and Empanelled Jurors not be Anonymous and for In-Person,

**F. Order of Court Re: Rulings on Defendant's Request for Certain Preliminary Jury Instructions - - Given to the Empaneled Jury**

**1. Rulings**

The Court's rulings are as follows: In response to defendant's requests for preliminary jury instructions relating to (1) the existence of 84 counts in the Indictment and the presumption of innocence (see voir dire request of defendant - doc. no. 598, request nos. 19, 20, and 21); and (2) the numerous objections by defendant to practically every trial exhibit proffered by the government (approximately 1433 out of 1461 exhibits), that the Court overruled most of those objections in the pre-trial process, and that the defendant wishes the jury to know of defendant's continued objection thereof, without objecting at trial each time said exhibit(s) are discussed or referenced by a witness, and the request relating to "other compensation," the Court has made the following modifications to its standard preliminary jury instructions which are marked by underlining below. The requests relating to a "de minimus economic impact" instruction in the Preliminary Instructions is DENIED. See Order of Court Re: Defendant's Motion (doc. no. 604) for Clarification and/or Modification, filed today.

The Court will modify the standard Preliminary Jury Instructions it customarily uses in criminal jury trials, in several ways. First, pursuant to defendant's requests, the Court will add his proposed instruction regarding the right of county employees and officials "to engage in other compensated employment" pursuant to the Allegheny County Code, provided the official or employee works at least 35 hours per week. The Court deems such an instruction important,

_____

Public Voir Dire in Open Court (doc. no. 607) is DENIED. The requests of counsel for argument and/or hearing are DENIED in light of the extensive and excellent briefing.

though perhaps not strictly necessary, for the jury to realize at the outset and as the evidence develops, that a county official or employee is not prohibited from having other business interests or professional practices, such as the practice and business of Wecht Pathology.

Second, the Court will also grant defendant's request and include a *preliminary* instruction about the Court's pretrial procedure for admitting or precluding exhibits and ruling on objections to exhibits in advance of trial, and will inform the jury that defendant has objected to substantially all of the government's exhibits, and that the Court overruled most of those objections in that pretrial procedure. However, the Court will not grant defendant's request to repeat such an instruction during trial every time the government introduces one of its exhibits. Such a rote and tedious procedure is unnecessary in light of the preliminary instruction, and would further delay an already lengthy trial through repetition of a preliminary instruction that is neither complicated nor difficult to remember.

The Court will DENY defendant's request for a preliminary jury instruction on "de minimus economic impact," although the Court deems that an appropriate instruction for the final jury charge, which will contain a "de minimus economic impact" instruction.

The Court's standard Preliminary Jury Instructions also have been modified to follow the "Preliminary Jury Instructions Before Opening Statements" at Chapter 1 of the Model Jury Instructions in Criminal Cases, as recently recommended by the Third Circuit Committee on Model Criminal Jury Instructions.

The Court will also DENY the request made, interestingly, by both defendant and the government, to deliver complete final jury instructions to the jury prior to opening statements.

-46-

To the extent the Court suggested at an early status conference[19] that it might be desirable in a long case to give the jury a complete set of final jury instructions before trial commenced, there has been insufficient agreement by the parties with regard to the substantive jury instructions to implement that suggestion.[20]  Moreover, the Court informed counsel at the Final Pretrial Conference on September 18, 2006, relating to the scheduled 2006 trial, that, because three failed attempts at a joint proposed, unified set of final jury instructions had failed, "jury instructions and jury verdict form would be dealt with again only after the Court rules on defendant's Motion to Dismiss at the close of the government's case-in-chief."  Minute Entry (doc. no. 446) at ¶ 3.

However, following the recommendation of the Third Circuit Committee on Model Criminal Jury Instructions, the Court does consider it wise and appropriate to briefly *summarize* in the preliminary jury instructions before opening statements, the elements of the offenses

---

[19] In the third status conference on February 12, 2006, the Court suggested that "in long trials, you almost should read the final jury instructions at the beginning of the trial and at the end . . . ." Transcript of Third Status Conference (doc. no. 39) at 52.

[20] The Committee's Comments to Model Preliminary Jury instruction 1.12 states:

> The trial judge should outline the elements of each offense charged in language that is as plain as possible. . . .  Giving the jury in preliminary instructions at the beginning of the trial a brief outline of the elements of the offense(s) charged will assist the jurors in understanding the evidence as it is presented and also in understanding the judge's final instructions explaining the elements in more detail.  Field studies and experiments suggest that such preliminary instructions ("preinstruction") improve jury performance, especially in more complicated cases.

The Committee also comments that "the trial judge might find it useful to confer with the attorneys before the preliminary instructions to discuss how to formulate the preliminary instruction on the elements of the offenses."  This suggestion assumes a level of cooperation amongst the attorneys that, unfortunately, does not exist in this case.  See Notice of Filing Revised Joint Proposed Jury Instructions (doc. no. 371) and second Notice of Filing Revised Joint Proposed Jury Instructions (doc. no. 372).

charged and, as noted above, the "right to engage in other compensated employment" instruction requested by defendant. Explicit instructions that an indictment is just an accusation and that defendant maintains the presumption of innocence at all times will follow the summary of the elements of the offenses charged in the indictment, as is also recommended by the Third Circuit Committee on Model Criminal Jury Instructions.

With the modifications discussed above incorporated, the Court's Preliminary Jury Instructions Before Opening Statements, given to the empaneled jury, will be in general as follows:

## Role of the Jury

Now that you have been sworn, let me tell you what your role is as jurors in this case.

Jury service is, truly, one of the highest duties a citizen of the United States can be called upon to perform. The system of justice called for by our Constitution is the best one ever devised because it relies on citizens of the United States to become involved in the trial to decide issues of fact in disputes between parties.

The involvement of citizens in this way takes the important fact finding function out of the hands of individual judges so that decisions about factual questions can be made by members of the community having a variety of backgrounds and perspectives rather than by legal professionals.

Notwithstanding the importance of jury service, coming to court and participating in trial procedures does require sacrifice by jury members who must give up other business and personal pursuits, sometimes at considerable inconvenience. The Court is aware of the sacrifice involved as are the parties and their counsel who join me in thanking each of you for being here and for serving as a juror in this case. We hope that the experience will be rewarding to you, despite any inconvenience involved.

Under our system of justice, the role of the jury is to find the facts of the case based on the evidence presented in the trial. You must decide the facts only from the evidence presented to you in this trial. Nothing the Court may say or do during the course of the trial is intended to indicate, or should be taken by you as indicating, what your verdict should be or what facts you should find.

From the evidence that you will hear and see in court, you will decide what the facts are and then apply to those facts the law that I will give to you in my final instructions. That is how you will reach your verdict.

Whatever your verdict, it will have to be unanimous. All of you will have to agree on it or there will be no verdict. In the jury room you will discuss the case among yourselves, but ultimately each of you will have to make up his or her own mind. Therefore, each of you has a responsibility which you cannot avoid and you should do your best throughout the trial to fulfill this responsibility.

I play no part in finding the facts. You should not take anything I may say or do during the trial as indicating what I think of the evidence or about what your verdict should be. My role is to make whatever legal decisions have to be made during the course of the trial and to explain to you the legal principles that must guide you in your decisions.

You must apply my instructions about the law. Each of the instructions is important. You must not substitute your own notion or opinion about what the law is or ought to be. You must follow the law that I give to you, whether you agree with it or not.

Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, gender, profession, occupation, celebrity, economic circumstances, or position in life or in the community.

## Conduct of the Jury

Here are some important rules about your conduct as jurors:

(1) Keep an open mind. Do not make up your mind about the verdict until

you have heard all of the evidence, and I have given final instructions about the law at the end of the trial, and you have discussed the case with your fellow jurors during your deliberations.

(2) Do not discuss the case among yourselves until the end of the trial when you retire to the jury room to deliberate. You need to allow each juror the opportunity to keep an open mind throughout the entire trial. During trial you may talk with your fellow jurors about anything else of a personal nature or of common interest.

(3) During the trial you should not speak to any of the parties, lawyers, or witnesses involved in this case, not even to pass the time of day. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, remember it is because they are not supposed to talk or visit with you, either.

(4) Do not talk with anyone else or listen to others talk about this case until the trial has ended and you have been discharged as jurors. It is important not only that you do justice in this case, but that you give the appearance of justice. If anyone should try to talk to you about the case during the trial, please report that to me, through my courtroom deputy or another member of my staff, immediately. Do not discuss this situation with any other juror.

(5) Do not discuss the case with anyone outside the courtroom or at home, including your family and friends. You may tell your family or friends that you have been selected as a juror in a case and you may tell them how long the trial is expected to last. However, you should also tell them that the judge instructed you not to talk any more about the case and that they should not talk to you about it. The reason for this is that sometimes someone else's thoughts can influence you. Your thinking should be influenced only by what you learn in the courtroom.

(6) Until the trial is over and your verdict is announced, do not watch or listen to any television or radio news programs or reports about the case, or read any news or internet stories or articles about the case, or about anyone involved with it. There is likely to be a great deal of publicity in this case, so you should be extra cautious about avoiding any such media coverage throughout the trial.

(7) Also, do not do any research or make any investigation on your own about any matters relating to this case or this type of case. This means, for example, that you must not visit any of the scenes, conduct experiments, consult reference works or

dictionaries, or search the internet for additional information. You must decide this case based only on the evidence presented in the courtroom and my instructions about the law. It would be improper for you to try to supplement that information on your own.

(8) Finally, you should not concern yourselves with or consider the possible punishment that might be imposed if you return a verdict of guilty.

## Bench (Side-Bar) Conferences

During the trial it may be necessary for me to talk with the lawyers out of your hearing. That is called a bench or side-bar conference. If that happens, please be patient. We also ask that you advise me, through my courtroom deputy, if you are able to hear any of the bench or side-bar conferences, because the purpose is to hold these discussions outside the hearing of the jury, for important reasons. You will hear our static noise system that we use during side-bars to muffle our voices.

I know you may be curious about what we are discussing. We are not trying to keep important information from you. These conferences are necessary for me to discuss with the lawyers objections to evidence and to be sure that evidence is presented to you correctly under the rules of evidence. We will, of course, do what we can to keep the number and length of these conferences to a minimum. If I think the conference will be long, I will call a recess.

I may not always grant a lawyer's request for a conference. Do not consider my granting or denying a request for a conference as suggesting my opinion of the case or of what your verdict should be.

## Note Taking by Jurors

At the end of the trial you must make your decision based on what you remember of the evidence. You will not have a written transcript of the testimony to review. You must pay close attention to the testimony as it is given.

If you wish, you may take notes to help you remember what witnesses said. We have provided you with binders, paper and pens or pencils. If you do take notes, please keep them to yourself until the end of trial when you and your fellow jurors go to the jury room to decide the case. Here are some other specific points to keep in

mind about note taking:

1.   Note-taking is permitted, but it is not required.  You are not required to take notes.  How many notes you want to take, if any, is entirely up to you.

2.   Please make sure that note-taking does not distract you from your tasks as jurors.  You must listen to all the testimony of each witness.  You also need to decide whether and how much to believe each witness.  That will require you to watch the appearance, behavior, and manner of each witness while he or she is testifying.  You cannot write down everything that is said and there is always a fear that a juror will focus so much on note-taking that he or she will miss the opportunity to make important observations.

3.   Your notes are memory aids; they are not evidence.  Notes are not a record or written transcript of the trial.  Whether or not you take notes, you will need to rely on your own memory of what was said.  Notes are only to assist your memory; you should not be overly influenced by notes.

4.   In your deliberations, do not give any more or less weight to the views of a fellow juror just because that juror did or did not take notes.  Do not assume that just because something is in someone's notes that it necessarily took place in court.  It is just as easy to write something down incorrectly as it is to hear or remember it incorrectly.  Notes are not entitled to any greater weight than each juror's independent memory of the evidence.  You should rely on your individual and collective memories when you deliberate and reach your verdict.

5.   You should not take your notes away from court.  At the end of each court day, you should take your notebooks with you to the jury room and leave them at your place at the conference table.  The jury room will be closed and no one other than my staff will have access to that room.

My staff is responsible for making sure that no one looks at your notes.  Immediately after you have finished your deliberations and I have accepted your verdict, my staff will collect and destroy your notes, to protect the secrecy of your deliberations.

## Questions by Jurors of Witnesses

Only the lawyers and I are allowed to ask questions of witnesses. You are not permitted to ask questions of witnesses.

If, however, you are unable to hear a witness or a lawyer, please raise your hand and I will correct the situation.

## Description of Trial Proceedings

The trial will proceed in the following manner:

First: The lawyers will have an opportunity to make opening statements to you. The prosecutor may make an opening statement at the beginning of the case. The defendant's lawyers may make an opening statements after the prosecutor's opening statement or the defendant may postpone the making of an opening statement until after the government finishes presenting its evidence. The defendant is not required to make an opening statement.

The opening statements are simply an outline to help you understand what each party expects the evidence to show. What is said in the opening statements is not itself evidence.

Second: After opening statements, the government will introduce the evidence that it thinks proves the charges stated in the indictment. The government will present witnesses and the defendant's lawyers may cross-examine those witnesses. The government may also offer documents and other exhibits into evidence.

Third: After the government has presented its evidence, the defendant may present evidence, but he is not required to do so. As I will tell you many times during this trial, the government always has the burden or obligation to prove each and every element of the offenses charged beyond a reasonable doubt. The defendant is presumed to be innocent of the charges. The law never imposes on a defendant in a criminal case the burden of proving his innocence by calling any witnesses, producing any exhibits, or introducing any evidence.

Fourth: After all of the evidence has been presented, the lawyers will have the opportunity to present closing arguments. Closing arguments are designed to present to you the parties' theories about what the evidence has shown and what conclusions may be drawn from the evidence. What is said in closing arguments is not evidence, just as what is said in the opening statements is not evidence.

Fifth: After you have heard the closing arguments, I will give you orally and in writing the final instructions concerning the law that you must apply to the evidence presented during the trial. As I am doing now, I may also give you instructions on certain aspects of the law throughout the trial, as well as at the end of the trial.

Sixth: After my final instructions on the law, you will retire to consider your verdict. Your deliberations are secret. You will not be required to explain your verdict to anyone. Your verdict must be unanimous; all twelve of you must agree to it.

You must keep your minds open during this trial. Do not make up your mind about any of the questions in this case until you have heard each piece of evidence and all of the law which you must apply to that evidence – in other words, until you begin your deliberations.

## Evidence (What is; is Not)

You must make your decision in this case based only on the evidence that you see and hear in the courtroom. Do not let rumors, suspicions, or anything else that you may see or hear outside of court influence your decision in any way.

The evidence from which you are to find the facts consists of the following:

(1) The testimony of the witnesses;

(2) Documents and other things received as exhibits; and

(3) Any fact or testimony that is stipulated; that is, formally agreed to by the parties.

The following are <u>not</u> evidence:

(1) Statements and arguments of the lawyers for the parties in this case;

(2) Questions by the lawyers and questions that I might ask. You must not assume that a fact is true just because one of the lawyers or I ask a question about it. It is the witness' answers that are evidence. Of course, you may need to consider the question to know what a witness means by his or her answer. For example, if a witness answers yes to a question, you will have to consider the question to understand what the witness is saying.

(3) Objections by lawyers, including objections in which the lawyers state facts;

(4) Any testimony I strike or tell you to disregard; and

(5) Anything you may see or hear about this case outside the courtroom.

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience and common sense tell you that certain evidence reasonably leads to a conclusion, you may reach that conclusion.

The rules of evidence control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. An objection simply means that the lawyer is asking me to decide whether the evidence should be allowed under the rules. Lawyers have a responsibility to their clients to make objections when they think evidence being offered is improper under the rules of evidence. You should not be influenced by the fact that an objection is made.

You should also not be influenced by my rulings on objections to evidence. If I overrule an objection, the question may be answered or the exhibit may be received as evidence, and you should treat the testimony or exhibit like any other. I may allow evidence (testimony or exhibits) only for a limited purpose. If I do that, I will instruct you to consider the evidence only for that limited purpose, and you must follow that instruction.

If I sustain an objection, the question will not be answered or the exhibit will not be received as evidence. Whenever I sustain an objection, you must disregard the question or the exhibit entirely. Do not think about or guess what the witness might have said in answer to the question; do not think about or guess what the exhibit might have shown. Sometimes a witness may have already answered before a lawyer objects or before I rule on the objection. If that happens and if I sustain the objection, you should disregard the answer that was given.

Also, I may order that some testimony or other evidence be stricken or removed from the record. If I do that, I will instruct you to disregard that evidence. That means, when you are deciding the case, you must not consider or be influenced in any way by the testimony or other evidence that I told you to disregard.

Although the lawyers may call your attention to certain facts or factual conclusions that they think are important, what the lawyers say is not evidence and is not binding on you. It is your own recollection and interpretation of the evidence that controls your decision. Also, do not assume from anything I do or say during the trial that I have any opinion about the evidence or about any of the issues in this case or about what your verdict should be.

### Objections at Trial

During the course of the trial, the Government will offer many exhibits, such as documents or other items into evidence. The Court made rulings prior to the trial about objections to the exhibits and decided whether those exhibits would be admissible or not; the exhibits you will see were generally admitted before trial in this manner.

Therefore, because of my pretrial procedure, counsel for the Defendant may not object to a Government exhibit when offered. You are not to infer that defense counsel does not object. Defendant objected to substantially all of the government's trial exhibits and the Court has overruled most of his objections. Since defendant will not be objecting to those government trial exhibits during the trial, because the Court has already admitted them into evidence, defendant wants you to be aware that he has objected to substantially all of the Government's trial exhibits.

## Direct and Circumstantial Evidence

Two types of evidence may be used in this trial, "direct evidence" and "circumstantial (or indirect) evidence." You may use both types of evidence in reaching your verdict.

"Direct evidence" is simply evidence which, if believed, directly proves a fact. An example of "direct evidence" occurs when a witness testifies about something the witness knows from his or her own senses — something the witness has seen, touched, heard, or smelled.

"Circumstantial evidence" is evidence which, if believed, indirectly proves a fact. It is evidence that proves one or more facts from which you could find or infer the existence of some other fact or facts. An inference is simply a deduction or conclusion that reason, experience, and common sense lead you to make from the evidence. An inference is not a suspicion or a guess. It is a reasoned, logical decision to find that a disputed fact exists on the basis of another fact.

For example, if someone walked into the courtroom wearing a wet raincoat and carrying a wet umbrella, that would be circumstantial or indirect evidence from which you could find or conclude that it was raining. You would not have to find that it was raining, but you could.

Sometimes different inferences may be drawn from the same set of facts. The government may ask you to draw one inference, and the defense may ask you to draw another. You, and you alone, must decide what inferences you will draw based on all the evidence.

You should consider all the evidence that is presented in this trial, direct and circumstantial. The law makes no distinction between the weight that you should give to either direct or circumstantial evidence. It is for you are to decide how much weight to give any evidence.

## Credibility of Witnesses

In deciding what the facts are, you must decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. Credibility refers to whether a witness is worthy of belief: Is the

witness truthful?  Is the witness' testimony accurate?  You may believe everything a witness says, or only part of it, or none of it.

You may decide whether to believe a witness based on his or her behavior and manner of testifying, the explanations the witness gives, and all the other evidence in the case, just as you would in any important matter where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection.  In deciding the question of credibility, remember to use your common sense, your good judgment, and your experience.

In deciding what to believe, you may consider a number of factors:

(1) The opportunity and ability of the witness to see or hear or know the things about which the witness testifies;

(2) The quality of the witness' knowledge, understanding, and memory;

(3) The witness' appearance, behavior, and manner while testifying;

(4) Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice;

(5) Any relation the witness may have with a party in the case and any effect that the verdict may have on the witness;

(6) Whether the witness said or wrote anything before trial that is different from the witness' testimony in court;

(7) Whether the witness' testimony is consistent or inconsistent with other evidence that you believe; and

(8) Any other factors that bear on whether the witness should be believed.

Inconsistencies or discrepancies in a witness' testimony or between the testimony of different witnesses may or may not cause you to disbelieve that witness' testimony.  Two or more persons witnessing an event may simply see or hear it

differently. Mistaken recollection, like failure to recall, is a common human experience. In weighing the effect of an inconsistency, you should consider whether it is about a matter of importance or an insignificant detail. You should also consider whether the inconsistency is innocent or intentional.

You are not required to accept testimony even if the testimony is not contradicted and the witness is not impeached. You may decide that the testimony is not worthy of belief because of the witness' bearing and demeanor, or because of the inherent improbability of the testimony, or for other reasons that are sufficient to you.

After you make your own judgment about the believability of a witness, you can then attach to that witness' testimony the importance or weight that you think it deserves.

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What is more important than numbers is how believable the witnesses are, and how much weight you think their testimony deserves.

## **Nature of the Indictment**

The government has charged the defendant, Dr. Cyril Wecht, with violating federal law. Specifically, the 84 count indictment charges the defendant with 24 counts of wire fraud and 8 counts of mail fraud involving the alleged theft of honest services from the taxpayers and citizens of Allegheny County; 10 counts of simple wire fraud; 37 counts of simple mail fraud; and 5 counts of theft concerning a public entity receiving federal funds.

These charges against Dr. Wecht are contained in the indictment. An indictment is just the formal way of specifying the exact crimes the defendant is accused of committing, and is simply a description of the charges against a defendant. It is an accusation only. An indictment is not evidence of anything, and you should not give any weight to the fact that Dr. Wecht has been indicted in making your decision in this case.

## **Elements of the Offense Charged**

To help you follow the evidence, I will now give you a brief summary of the

elements of that offense, each of which the government must prove beyond a reasonable doubt in order to convict of the offense charged. I will give you more complete instructions explaining these elements at the conclusion of the evidence. for now, in summary, the elements of the offenses are as follows:

## Mail Fraud – Elements of the Offense

The indictment charges the defendant with 42 counts of simple mail fraud, and 8 counts of "theft of honest services" mail fraud, in violation of title 18 United States Code section 1341 and section 2.

In order to find the defendant guilty of these offenses, you must find that the government proved each of the following three elements beyond a reasonable doubt:

First: That defendant knowingly devised a scheme to defraud or to obtain money or property, or the intangible right of honest services, by materially false or fraudulent pretenses, representations or promises, or that he wilfully participated in such a scheme with knowledge of its fraudulent nature;

Second: That defendant acted with the intent to defraud; and

Third: That in advancing, furthering, or carrying out the scheme, defendant used the mails or caused the mails to be used.

## Wire Fraud – Elements of the Offense

The indictment also charges Dr. Wecht with 10 counts of simple wire fraud and 24 counts of "theft of honest services" wire fraud, in violation of title 18 United States Code section 1343 and section 2. The elements of wire fraud are similar to the elements of mail fraud.

In order to find the defendant guilty of this offense, you must find that the government proved each of the following three elements beyond a reasonable doubt:

First: That Dr. Wecht devised a scheme to defraud or to obtain money or property, or the intangible right of honest services, by materially false or fraudulent

pretenses, representations or promises or wilfully participated in such a scheme with knowledge of its fraudulent nature;

Second: That he acted with the intent to defraud; and

Third: That in advancing, furthering, or carrying out the scheme, defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

## Mail and Wire Fraud – Protected Interests: Honest Services

A public official or employee owes a duty of honest, faithful and disinterested service to the public and to the government that he serves. The public relies on officials of the government to act for the public interest, not for their own enrichment. A government official who misuses his public position for self-enrichment breaches the duty of honest service owed to the public and the government. Thus, the public is not receiving the public official's honest and faithful service to which it is entitled.

In a prosecution of a local public official in Allegheny County, Pennsylvania, the official also owes a duty to refrain from conflicts of interest and to make financial disclosures as defined and required by the Allegheny County Code and Pennsylvania ethics laws.

For example, in Pennsylvania and Allegheny County, a public official cannot conceal from the public a conflict of interest that results in personal gain. If you find that the defendant engaged in undisclosed or biased decision-making for personal gain, that constitutes a deprivation of honest services even if the public suffered no tangible harm. Active fraud or deceit is not necessary. The intentional violation of the duty to disclose material information provides the requisite deceit.

Accordingly, if a public official engages in a conflict of interests that is prohibited by county and state ethics laws or fails to disclose material information regarding a conflict of interest and benefits financially, then that official has deprived the public of its right to his honest services.

If you find beyond a reasonable doubt that Dr. Wecht has violated the duty to provide honest services as defined here and as I will more fully explain to you after the trial, alone or with the help of others, then you may find the first element of the particular mail and wire fraud counts satisfied.

## County Official's Legal Right to Engage in Other Compensated Employment

In deciding whether Dr. Wecht has deprived the public of honest services by mail and wire fraud, as I have just explained, you should keep in mind that the law governing Dr. Wecht, as an elected official, provided that he was to work at least 35 hours a week in his capacity as Allegheny County Coroner, and that he was not precluded from engaging in other compensated employment or professional occupation. The indictment against Dr. Wecht does not charge him with failing to work 35 hours a week as Coroner.

## Theft Concerning a Public Entity Receiving Federal Funds

Counts 80 through 84 of the indictment charge Dr. Wecht with theft concerning an organization receiving public funds, in violation of title 18 United States Code section 666. In order to prove these charges, the government must prove the following elements beyond a reasonable doubt:

First, that the defendant was an agent of Allegheny County;

Second, that during each of the time periods alleged in counts 80 through 84, the defendant embezzled, stole, obtained by fraud, converted to the use of another without authority, or intentionally misapplied property of a value of $5,000 or more as part of a single scheme or plan;

Third, that the property was owned by, or was under the care, custody, or control of Allegheny County; and

Fourth, that Allegheny County received benefits in excess of $10,000 in each of the one-year periods alleged in counts 80 through 84, pursuant to a federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other form of federal assistance.

What I have just told you is only a preliminary outline of the elements of the offenses charged.  At the end of trial, I will give you final instructions on the elements of the offenses charged and on other matters of law.  Those final instructions will be more detailed; they will guide you in reaching your verdict in this case.

## **Presumption of Innocence; Burden of Proof; Reasonable Doubt**

Dr. Wecht has pleaded not guilty to each of the offenses charged. Defendant is presumed to be innocent.  He starts the trial with a clean slate, with no evidence against him.  The presumption of innocence stays with Dr. Wecht unless and until the government presents evidence that overcomes that presumption by convincing you that he is guilty of the offenses charged beyond a reasonable doubt.  The presumption of innocence requires that you find defendant not guilty, unless you are satisfied that the government has proved guilt beyond a reasonable doubt.

The presumption of innocence means that the defendant has no burden or obligation to present any evidence at all or to prove that he is not guilty, although in this case, Dr. Wecht will present a defense to all of the charges.  The burden or obligation of proof is on the government to prove that he is guilty, and this burden stays with the government throughout the trial.

In order for you to find Dr. Wecht guilty of any of the offenses charged, the government must convince you that he is guilty of such offense beyond a reasonable doubt.  That means that the government must prove each and every element of the offenses charged beyond a reasonable doubt.  A defendant may not be convicted based on suspicion or conjecture, but only on evidence proving guilt beyond a reasonable doubt.

Proof beyond a reasonable doubt does not mean proof beyond all possible doubt or to a mathematical certainty.  Possible doubts or doubts based on conjecture or speculation are not reasonable doubts.  A reasonable doubt is a fair doubt based on reason, logic, common sense, or experience.  A reasonable doubt means a doubt that would cause an ordinary reasonable person to hesitate to act in matters of importance in his or her own life.  It may arise from the evidence, or from the lack of evidence, or from the nature of the evidence.

If, after hearing all the evidence, you are convinced that the government has proved Dr. Wecht guilty beyond a reasonable doubt, you should return a verdict of

guilty.  However, if you have a reasonable doubt as to an element of an offense, then you must return a verdict of not guilty.

## **Separate Consideration – Single Defendant Charged with Multiple Offenses**

The defendant is charged with 84 offenses; each offense is charged in a separate count of the indictment.

The number of offenses charged is not evidence of guilt, and this should not influence your decision in any way.  You must separately consider the evidence that relates to each offense, and you must return a separate verdict for each offense.  For each offense charged, you must decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of that particular offense.

Your decision on one offense, whether guilty or not guilty, should not influence your decision on any of the other offenses charged.  Each offense should be considered separately.

SO ORDERED this 21st day of December, 2007.

 s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:     All counsel of record