IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA** )
)
**v.** )         **Criminal No. 06-0026**
)         **Electronically Filed**
**CYRIL H. WECHT** )

## ORDER OF COURT DENYING DEFENDANT'S
## RENEWED MOTION FOR RECUSAL (DOC. NO. 918)

## I. INTRODUCTION.

Defendant's Renewed Motion for Recusal (doc. no. 918) marks an unprecedented third attempt to remove this randomly assigned, Article III United States District Judge from presiding over this criminal proceeding. As with defendant's first two unsuccessful attempts, the Renewed Motion for Recusal is premised upon his allegations of bias or partiality by this Court in rulings and statements made during the course of pretrial, trial and post trial proceedings. The Court denies defendant's Renewed Motion for Recusal because a reasonable observer, aware of all of the facts and circumstances of record, could not find an appearance of partiality or bias.

With only rare exceptions, motions to remove a District Judge should be denied when said motion is based on the Judge's rulings or statements made during the course of a judicial proceeding. As the United States Supreme Court stated in <u>Liteky v. United States</u>, 510 U.S. 540 (1994), "judicial rulings alone *almost never* constitute a valid basis for a bias or partiality motion. . . . [They] can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal." 510 U.S. at 555 (emphasis added), quoted in <u>United States</u>

v. Wecht, 484 F.3d 194, 218 (3d Cir. 2007) (finding that this Court's rulings in this proceeding did not present a valid basis for defendant's motion to recuse based on allegations of bias and partiality).

There is nothing about this Court's fair and impartial rulings and statements throughout these proceedings that present, to any reasonable observer who knows all of the facts and circumstances of record, any degree of favoritism or antagonism -- let alone the sort of "deep-seated" or "high degree" of favoritism or antagonism that might qualify as one of the rare exceptions to the general rule that dissatisfaction with a Court's rulings "almost never constitute a valid basis for a bias or partiality motion" to recuse. Quite to the contrary, the record of these lengthy pretrial, trial and post trial proceedings demonstrates the evenhanded and even tempered administration of Justice and this Court's ardent dedication to protecting the constitutional rights of the accused.

Moreover, the record demonstrates that this case is exactly the type of case where the District Judge must remain steadfast and undaunted in his commitment and obligation, under Article III of the Constitution of the United States, to provide fair and impartial adjudication to all litigants who come before the Court, including those seeking to obtain his ouster by repeated recusal motions replete with *ad hominem* attacks.[1] Because granting a motion to recuse

---

[1] One example will suffice to demonstrate the *ad hominem* nature of the attacks upon the integrity of the Court, in conjunction with a skillful publicity campaign, and it is evident in defendant's own words. In his Second Writ of Mandamus to the United States Court of Appeals for the Third Circuit, at docket 07-4794, defendant accused this Court, with an abundance of innuendo and references to published articles but not to actual Court record evidence to support the accusation, of running "the Schwab Squad," i.e., a team consisting of the United States Attorney, her assistants, the FBI, and "virulent" anti-Semites, among other conspirators, in an effort to ensure defendant's conviction. See Emergency Petition for a Writ of Mandamus, docket no. 07-4794, at 2-5, 15-26, 37-47. (A copy of defendant's 59 page Emergency Petition was hand

"necessarily results in a waste of the judicial resources which have already been invested in the proceeding," In re Int'l Business Machines Corp., 618 F.2d 923, 933 (2d Cir. 1980), a District Judge is "as much obliged not to recuse himself when it is not called for as he is obligated to when it is." In re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1312 (2d Cir. 1988), cert. denied sub nom. Milken v. SEC, 490 U.S. 1102 (1989).[2]

---

delivered to chambers.) This claim was based on the Court's disclosure of an unsolicited letter to the Court from a Gerald Schiller to all counsel, which defendant asserted the Court "sat on." Id.

Obviously, the Court of Appeals was neither deterred nor deceived by defendant's false accusations or his dramatic claim that the Court's rulings had "reduc[ed] a trial to a farce unlike any seen in the history of American jurisprudence." Emergency Petition for a Writ of Mandamus, docket no. 07-4794, at 32. This Court's conduct of the proceedings preceding and subsequent to the Court of Appeals' summary remand to this Court demonstrates, to any reasonable observer aware of all of the facts of record, that this Court has not allowed defendant's false claims and inflammatory comments to influence its rulings or prevent the evenhanded dispensation of Justice to defendant or the civil treatment of his attorneys.

[2] Regarding the expenditure of judicial resources, this Court stated in its Order of April 16, 2008 (doc. no. 911), at 6-8, denying defendant's motion to continue as follows:

> Finally, as [to] defendant's threatened, and unprecedented, third motion to recuse, the assignment of a new district court trial judge would be a waste of judicial resources and inconsistent with orderly judicial process. . . .

> *   *   *

> [T]his Court [is compelled] to resist and reject defendant's repeated and improper attempts at judge-shopping and disruption of the proceedings. First, in light of the potential recusals among the other judges in this District for various reasons, a recusal might require the assignment by the Court of Appeals of an out-of-district judge for the retrial, with the related costs thereof.

> Second, the docket now consists of almost 900 docket entries (excluding text orders and notices) [currently, in excess of 950 numbered entries], the highest number of filings in a single defendant case in the history of the United States District Court for the Western District of Pennsylvania. The exhibits database upon which this Court has ruled consists of approximately 260,000 pages, of which approximately 5,000 pages were referred to at trial and approximately 10,600 pages were admitted into evidence and were before the first jury. The granting of the threatened motion to recuse would undoubtedly lead to efforts to revisit the countless rulings of this Court, including on the motions to

## II. PROCEDURAL BACKGROUND.

### A. First Writ of Mandamus at Court of Appeals Docket No. 06-3704.

Much of the procedural background of this criminal prosecution is set forth in United States v. Wecht, 484 F.3d 194, 218 (3d Cir. 2007) and there is no need to repeat it herein. After considering defendant's First Writ of Mandamus, the Court of Appeals held:

> Having considered all of the evidence and arguments that Wecht has presented, we do not agree that the Judge should be disqualified. This case has imposed significant burdens on the District Court Judge, who has pursued the important goal of moving the matter swiftly toward trial. In that effort, the Judge has presided over several lengthy status conferences and has ruled on numerous pre-trial motions in an efficient manner. Whether we agree with aspects of the Judge's management of this case is irrelevant to our present inquiry. Wecht simply has failed to demonstrate the "deep-seated" or "high degree" of "favoritism or antagonism that would make fair judgment impossible." [Liteky], at 555-56, 114 S.Ct. 1147.

484 F.3d at 221.

The Court of Appeals also disapproved of defendant's habit of distorting the record and the law in his motions and briefs in this Court and in the Court of Appeals,[3] a pattern which the pending Renewed Motion to Recuse repeats.

---

suppress, motions to dismiss, evidentiary matters, and preliminary and final jury instructions.

[3] See, e.g., United States v. Wecht, 484 F.3d at 214, 219-20 ("Wecht is correct that, in general, ex parte proceedings are disfavored. However, there are a number of circumstances where ex parte applications to the court are appropriate, and Wecht appears to overlook our previous statements [in prior published opinions] endorsing the *in camera* inspection of materials that may need to be turned over to the defense"; "Wecht's claim that the Judge has 'threaten[ed] counsel with criminal contempt on five occasions' distorts the record. Wecht Pet. at 47"; "The claim that the District Court Judge accused counsel of 'impugning Judge Cohill' represents a skewed and unfair reading of the record"; and, "We also do not credit defense counsel's claim that the Judge 'chastised' counsel for filing dispositive motions earlier than required. Wecht Pet. at 48.")

**B. Second Writ of Mandamus at Court of Appeals Docket No. 07-4794.**

Following remand by the Court of Appeals to this Court on July 10, 2007 to resume pretrial and trial proceedings, this Court scheduled trial for January 28, 2008, and scheduled jury selection to commence on January 10, 2008. On December 28, 2007, defendant filed his Second Writ of Mandamus to the Court of Appeals ("Emergency Petition for a Writ of Mandamus"), seeking to stop the trial again, based primarily if not exclusively on this Court's pretrial rulings. The Court of Appeals denied this Second Writ of Mandamus on January 2, 2008, without reasoning or explanation. (Ironically, one of defendant's chief complaints therein was the "fundamental refusal of an Article III judge to . . . explain to the parties . . . the legal reasoning . . . ," Emergency Petition for a Writ of Mandamus, at 31, for its text-only denial of defendant's Motion to Reconsider its denial of his Supplemental Suppression Motion for the reasons explained in a sixteen page Memorandum and Order dated October 24, 2007 (doc. no. 553). See generally Emergency Petition for a Writ of Mandamus, at 28-32, 47-52.)

**C. More Recent Events.**

The more recent relevant procedural history, critical to understanding defendant's false allegations that this Court prejudged his pretrial motions, is as follows:

On April 9, 2008, defendant filed a Motion to Continue, Motion for Adjournment of Trial Date and Motion for Scheduling Conference with the Court (doc. no. 865), seeking to delay the retrial that is scheduled to commence with jury selection on May 12, 2008, following this Court's declaration of a mistrial on the basis of an unequivocally deadlocked jury and defendant's two motions to discharge the jury as hopelessly deadlocked. Defendant's motion to continue was predicated in part upon defense counsels' scheduling conflicts, and in very large part upon his

explicitly stated intention to file a variety of pretrial motions with this Court and, thereafter, take interlocutory appeals and file petitions addressed to the original jurisdiction of the Court of Appeals (i.e., a Third Writ of Mandamus to remove this randomly assigned, Article III District Judge).

Defendant advocated for a continuance, therefore, on the basis of the enormous amount of time and resources defense counsel would need to prepare his promised motions and the briefs in support of the various relief he intended to request. Defendant described his future motions as follows:

> 16. The defense respectfully asks for vacation of the Third Pretrial Order at Doc. No. 863 and the Order at Doc. No. 864; a continuance of the trial date; and a conference with the Court to set realistic schedules which take into account the motions to be filed, possible appeals and petitions to the Third Circuit, and the schedules of trial counsel for the defense none of which were given any consideration in the hurried process to retry this case with an urgency unwarranted by the circumstances.

*   *   *

> 19. Thirdly, the defense intends to present, if necessary, substantial motions and briefings to this Court seeking the dismissal of the Indictment on various grounds now that all the evidence has been presented. Those motions and briefs will raise substantial issues which should be decided before a new trial date is even set and juror summons sent out, which quite frankly appear to prejudge the motions under the circumstances existing here. *Among other things, the defense intends to renew its Rule 29 motion based on the Government's closing argument, which clearly failed to even argue necessary elements of the crimes, and also intends to seek dismissal on double jeopardy grounds and for deliberate Brady violations under the authority of <u>Govt. of Virgin Islands v. Fahie</u>, 419 F.3d 249 (3d Cir. 2005).* The prosecution's deliberate Brady violations became manifest shortly prior to trial; permeated the suppression hearings held by the Court; and answer the question as to why Agent Orsini was never permitted to take an oath again by this prosecution team after obtaining the opening search warrants. *Aside from constituting grounds under <u>Fahie</u> to dismiss the Indictment, such evidence will also be argued to be grounds to reopen and redecide the suppression issues. Some or all of these grounds may be immediately appealable, and the defense is*

*diligently researching those issues.*

20. Fourth, in light of the *manner in which the trial was conducted* and the consistent bias against the defense and for the prosecution *displayed throughout the trial*, the defense will be moving this Court to recuse itself from further proceedings and intends to seek review by the Third Circuit Court of Appeals if the Court declines, as expected, to recuse itself.

21. The hasty schedule established by the Court operates to preclude the defense from meaningful judicial review of these and other issues and is reminiscent of the steps taken by the Court in connection with the first recusal petition, where juror summons were sent out knowing that a recusal motion was forthcoming and then used by the Court to advocate to the Third Circuit not to stay the trial until that Court could decide the issues.

22. Accordingly, the defense requests that the Court vacate its Third Pretrial Order at Doc. 863 and Order at Doc. 864. The defense is diligently working to comply with the Court's request to have motions filed by noon next Friday, and will file appropriate requests for a short extension if needed to finalize those motions over that weekend. The Court can then establish a briefing schedule, allowing itself time to deliberate the various motions, and for the defense to pursue appellate remedies if necessary.

23. Thereafter, if anything remains of this case, a reasonable pretrial order can be established.

Motion to Continue, Motion for Adjournment of Trial Date and Motion for Scheduling

Conference with the Court (doc. no. 865), ¶¶ 16, 19-23 (emphasis added).

After carefully considering said motion for continuance and the government's response,

the Court denied defendant's motion for continuance. This decision was based upon this Court's

intimate familiarity with the evidence adduced at the seven week trial, the Court's rulings on a

number of motions filed by the defendant and by the government, rulings on disputed jury

instructions and rulings regarding matters that arose during jury deliberations. See April 16,

2008, Order of Court (doc. no. 911) Denying Defendant's Motion for Continuance, Adjournment

of Trial Date, and Scheduling Conference with Court (Doc. No. 865).

As defendant announced his explicit intention to file a variety of pretrial motions, it became necessary for this Court to consider defendant's promised motions in the context of considering the merits of his pending motion to continue, which the Court proceeded to do. Nevertheless, after inviting this Court's consideration of his promised pretrial motions, the constant refrain of defendant's Renewed Motion for Recusal is that this Court "prejudged" his various motions-to-be even before they were filed. See Brief in Support of Renewed Motion for Recusal (doc. no. 919) at 2-3, 22-25.

This Court did not "prejudge" anything in its Order denying defendant's motion to continue the retrial, but rather, simply assessed defendant's motions-to-be as he had previewed them, based upon similar motions that have been previously filed by defendant and based upon this Court's prior rulings thereon. Even in the limited context of deciding defendant's motion to continue, this Court did not discuss any of the promised motions at length, with one exception regarding the promised motion to recuse.

The April 16, 2008 Order of Court (doc. no. 911) Denying Defendant's Motion for Continuance, Adjournment of Trial Date, and Scheduling Conference with Court (Doc. No. 865) did contain some discussion of defendant's promised third attempt to remove this District Judge by motion to recuse and/or an unprecedented Third Writ of Mandamus. Defendant's Motion for Continuance states that the soon-to-be-filed recusal motion would be based upon the Court's own rulings during the pretrial, trial and jury selection and deliberation processes. See doc. no. 911 at 3, 6-8. Therefore, the matters that defendant announced would be raised in his motion to recuse indicated that said motion intended to relitigate the Court's rulings on issues with which the Court was keenly aware and which the Court had actually adjudicated and previously decided.

Defendant's announced intent came to fruition when he filed his Renewed Motion for Recusal, which alleges fifteen specific grounds for recusal, fourteen of which are complaints about official rulings or statements of the Court from the bench.[4]  See Defendant's Renewed Motion for Recusal (doc. no. 918).

Therefore, to the extent the Order of Court (doc. no. 911) Denying Defendant's Motion for Continuance, Adjournment of Trial Date, and Scheduling Conference with Court (Doc. No. 865) implied that the motion to recuse would be of dubious persuasion, that implication was based upon this Court's precise knowledge about, and its actual adjudication of, defendant's previous motions and requests for relief containing most of the issues and arguments that were promised to and did form the basis of this current Renewed Motion for Recusal.

Moreover, because there is not and has never been any judicial bias, prejudice or ill-will, actual or apparent, that could be gleaned from any of those rulings or statements, and because two previous attempts to disqualify this Court have been found by the Court of Appeals to be without merit, it seemed unlikely that defendant would raise any ground for recusal of any substance in this third attempt, and indeed, no ground for recusal of arguable merit has been raised.

---

[4] Defendant's Brief in Support of Renewed Motion for Recusal specifically identifies and discusses fifteen grounds for recusal, fourteen of which involve prior rulings or statements of the Court made in open court.  Of the fourteen challenged rulings, only two warrant individual attention in this Order of Court, at Section IV. A 2.b.(i) and (ii).  (Moreover, of the fourteen challenged rulings, three of the Court's rulings were advanced as grounds for disqualification in defendant's Emergency Petition for a Writ of Mandamus, which was denied by the Court of Appeals on January 2, 2008 (doc. no. 853) at its docket no. 07-4794.)  Only one of the fifteen grounds alleged arguably does not involve a prior ruling or statement made in open court, and that ground will be discussed in text, at Section IV. B.

## III.   STANDARDS FOR MOTION FOR RECUSAL

Section 455(a) provides that "any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).  Unlike Section 144, which requires recusal whenever a timely and legally sufficient affidavit is filed demonstrating that the presiding judge subjectively harbors a personal bias or prejudice against or in favor of a party, 28 U.S.C. § 144, the inquiry under section 455(a) is "whether the record, viewed objectively, reasonably supports the appearance of prejudice or bias."  United States v. Pungiatore, 2003 WL 22657087, *4 (E.D.Pa 2003), quoting SEC v. Antar, 71 F.3d 97, 101 (3d. Cir. 1995).

The test is whether a reasonable person, knowing all of the circumstances of record, would harbor doubts about the judge's impartiality.  In re Prudential Ins. Co. of Am. Sales Practice Litig., Agent Actions, 148 F. 3d. 283, 343 (3d Cir. 1998); United States v. Antar, 53 F.3d 568, 574 (3d Cir. 1995);  United States v. DiPasquale, 864 F. 2d 271, 279 (3d Cir. 1988).

As the United States Supreme Court explained, the key to application of the "reasonable observer standard" for judging recusal motions is that the judge's impartiality must not be assessed in disregard of the actual facts of record, but instead must be viewed from the perspective of a reasonable observer having knowledge of all of the facts of record.  Sao Paulo State of Federative Republic of Brazil v. American Tobacco Co., Inc., 535 U.S. 229, 233 (2002).

Where, as here, defendant's motion to recuse the trial judge is based on rulings and statements made during the proceedings, the Court of Appeals for the Third Circuit articulated the appropriate standards when it denied defendant's First Writ of Mandamus, as follows:

> We note at the outset that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. . . . [They] can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal." Liteky, 510 U.S. at 555, 114 S.Ct. 1147. We will not discuss each of the rulings Wecht cites other than to note that they are not grounds for recusal.

Wecht, 484 F.3d at 218.

It is "vital to the integrity of the system of justice that a judge not recuse himself on unsupported, irrational or highly tenuous speculation," McCann v. Commc'n. Design Corp., 775 F.Supp. 1506, 1523 (D. Conn. 1991), citing Hinman v. Rogers, 831 F.2d 937, 939 (10th Cir. 1987), and the judge has an "affirmative duty not to recuse himself if the movant fails to establish a reasonable doubt concerning his impartiality." Grand Entertainment Group Ltd. v. Arazy, 676 F. Supp. 616, 619 (E.D. Pa. 1987). Moreover, recusal motions must not be permitted to be used as "strategic devices to judge shop." United States v. El-Gabrowny, 844 F.Supp. 955, 959 (S.D.N.Y. 1994), quoting Lamborn v. Dittmer, 726 F.Supp. 510, 515 (S.D.N.Y. 1989).

Although Section 455(a) is designed to foster the public's confidence in the integrity of the judiciary which could be irreparably harmed if a case proceeded where there exists a reasonable factual basis for doubting the judge's impartiality, In re School Asbestos Litig., 977 F.2d 764, 776 (3d Cir. 1992), Congress also recognized that the challenged judge "must be alert to avoid the possibility that those who question [the judge's] impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality [therefore] must have a *reasonable* basis." Pungiatore, 2003 WL 22657087 at *4 (emphasis in original), quoting H.R. Rep. No. 93-1453, 93rd Cong., 2d Sess. 5 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6355.

It is crucial to the proper functioning of our justice system for judges to remain upright in the face of political and media clamour that occasionally accompanies high profile cases, and resist the temptation to "capitulate," so as not to encourage such extraneous pressure on judges in the future.  United States v. Bayless, 201 F.3d 116, 129 (2d Cir. 2000).  The United States Court of Appeals for the Second Circuit in the Bayless case canvassed the case law and concluded that many, if not most, courts to have considered the issue "whether media criticism constituted grounds for recusal have found that it was not."  Id., citing, *inter alia*, United States v. Martorano, 866 F.2d 62, 67-68 (3d Cir. 1989) (absent objective facts of record that would suggest to a reasonable observer that the jurist's motives were biased, speculation derived from newspaper article is not grounds for disqualification of presiding judge).  See also In re Aguinda, 241 F.3d 194 (2d Cir. 2001) ("A recusal-causing appearance [of partiality] must be based on the facts of the presentation involved and not on the amount of publicity partisans on the particular issues can muster.  As we noted above, litigants have an incentive to judge-shop, and a judge should not grant a recusal motion simply because a claim of partiality has been given widespread publicity.  . . .  To [grant recusal in such circumstances] would unfairly allow those with access to the media to judge-shop.");  United States v. Bertoli, 40 F.3d 1384 (3d Cir. 1994) (party's own public hostility to judge counseled against recusal "lest we encourage tactics designed to force recusal");  United States v. Eisenberg, 734 F.Supp. 1137, 1166 (D.N.J. 1990) ("The weight of authority is against compelling recusal merely by attacking a judge."), citing, *inter alia*, United States v. Dalfonso, 707 F.2d 757, 761 (3d Cir. 1983).

## IV. DEFENDANT'S MOST RECENT ALLEGED GROUNDS FOR RECUSAL

Except as discussed in Section IV.B, all of defendant's fifteen specific allegations listed in his Renewed Motion for Recusal as grounds to remove this District Judge from presiding over the case (see note 5, *supra*) concern rulings or statements of the Court made during the course of pretrial, trial and post trial criminal proceedings.

### A. Prior Rulings.

**1. Prior rulings that were subjects of defendant's Second Writ of Mandamus summarily rejected by the United States Court of Appeals for the Third Circuit on January 2, 2008.**

The first three rulings challenged by defendant in his Brief in Support of Renewed Motion for Recusal (doc. no. 919), at 5-6, were previously raised as grounds for recusal in the Second Writ of Mandamus to the United States Court of Appeals for the Third Circuit, which was denied by that Court on January 2, 2008 (at the Court of Appeals' docket 07-4794, and at this Court's docket at (doc. no. 653)).

In denying several of defendant's motions for reconsideration or for requests for relief that had previously been denied by this Court's rulings, this Court has explained, repeatedly, that in the absence of extraordinary circumstances such as where the Court's initial decision was "clearly erroneous and would work a manifest injustice," the law of the case prevents courts from entertaining "endless appeals on the same issue" and directs courts to "refrain from re-deciding issues that were resolved earlier in the litigation." See, e.g., Memorandum and Order of Court Regarding Pending Motions (Docs. No. 524, 527, 535) Relating to Supplemental Suppression Hearing, September 13, 2007 (doc. no. 537) at 18, quoting P.I.R.G. New Jersey v. Magnesium Elektron, Inc., 123 F.3d 111, 116 (3d Cir. 1997) (additional citations omitted).

Accordingly, defendant knows, or certainly should know by now, because his alleged grounds for recusal claiming that the Court showed bias (1) in denying without explanation his motion to reconsider the Court's ruling on his supplemental suppression motion, (2) in its Pretrial Orders regarding the innominate jury, and (3) in how long it took the Court to disclose to the parties an unsolicited letter sent to the Court which was immaterial to any of the Court's rulings, were all found to be without merit when they were rejected by the Court of Appeals on January 2, 2008, he is precluded from relitigating these matters by the law of the case.

**2. Prior rulings that were not previously raised in defendant's First or Second Writs of Mandamus.**

**a. Rulings and statements in open court meriting no additional discussion.**

All but one of defendant's remaining grounds for disqualification (discussed in Section IV.B) also involve prior rulings of the Court or statements made in open court. This Court's explanations for all of these rulings and statements are on the record, and a reasonable observer reading that record and aware of the facts therein will conclude that this Court's rulings and statements have been fair, evenhanded and reasonable, and are not proper grounds for recusal motions.

**b. Rulings meriting additional discussion.**

The Court will discuss in this subsection two of the challenged rulings, because they are prominently featured in defendant's Brief in Support of Renewed Motion for Recusal and because the Brief in Support contains some misleading statements of the record which merit correction.

In subsection (i), the Court will discuss defendant's frivolous challenge to this Court's

discharge of Juror No. 1 for good cause on April 2, 2008, after he became seriously ill during deliberations, because this allegation is the most vigorously advanced and because defendant attaches "new evidence" in the form of an affidavit executed by the juror.

In subsection (ii), the Court will discuss its Order of April 18, 2008 (doc. no. 917) Denying Defendant's Motion for Disclosure of Manner and Means by Which the FBI Obtained Juror Names (Doc. No. 870), which Order, *inter alia*, directs all counsel to act professionally, mindful of their oaths as officers of the Court, in light of the intense media firestorm that had been brought to the Court's attention through defendant's motions and the parties' briefs.

Otherwise, the Court finds it unnecessary to repeat the reasons for the rulings or further explain its statements made in open court --- the record speaks for itself and, the Court is confident, will reveal defendant's distortion of the record and of the Court's rulings and statements.

**(i)  Excusing Juror No. 1 from deliberations after he became seriously ill.**

On April 1, 2008, the jury was recessed at 1:35 p.m., so that Juror No. 1, Stanley Albright, who was experiencing chest pains and other symptoms which the building nurse and Mr. Albright's doctor were concerned may have been heart-related, could be evaluated at a nearby emergency room.  Mr. Albright  was accompanied by Court staff to an emergency room of a nearby hospital on April 1, 2008, at his doctor's instructions, and was admitted overnight for testing.  (The parties and the Court were aware, from the voir dire proceedings and from Mr. Albright's requests for recesses during the trial, that he had an unrelated, chronic medical condition which required him to take occasional breaks, but which did not prevent him from serving on the jury.)

On the morning of April 2, 2008, the eighth day of jury deliberations, this Court excused Mr. Albright from jury duty, because, after being admitted overnight for testing and monitoring, he was still experiencing chest pains and other symptoms of a possible myocardial infarction or other serious illness. Mr. Albright advised the Court's Deputy Clerk (also one of the two bailiffs) early in the morning of April 2nd that he wished to be excused from jury deliberations under all of the circumstances because, as he told her, continuing to serve on the jury was "too much stress" which was the last thing he needed, and that his doctor agreed with his decision and reasoning. Mr. Albright also indicated to the bailiff that the tests the night before were inconclusive as to whether he had a heart attack, and that his doctor had ordered additional tests.

Later that same day, the Court's Senior Law Clerk (serving as the other bailiff) called Mr. Albright about his condition, and Mr. Albright informed the bailiff that he was still experiencing chest pains, that a heart attack had not been ruled out from the previous day's tests, that he was waiting to undergo a stress test and to see his doctor after that test, and that under the circumstances, it was too stressful to return to jury service, not knowing the cause of his chest pains and other symptoms.

The events leading to and following the discharge of Juror No. 1 are more fully set forth in this Court's Order of April 4, 2008 (doc. no. 854), Order of Court Denying Defendant's Objection and Emergency Motion to Vacate Order Dismissing Juror No. 1 (doc. no. 845), most of which is set forth below.[5]  The Court's Order of April 4, 2008, states:

---

[5] Three Court Exhibits, Items 1, 2 and 3, are attached to said Order under seal, in order to protect the privacy of the excused juror. Even though Mr. Albright is apparently no longer concerned about his privacy, the Court will maintain Mr. Albright's privacy with regard to the three attachments. The sealed exhibits remain available for appellate review, and copies under seal were distributed to all counsel when the Court filed the Order. Said Exhibits confirm the

## ORDER OF COURT DENYING DEFENDANT'S
## OBJECTION AND EMERGENCY MOTION TO VACATE
## ORDER DISMISSING JUROR NO. 1 (DOC. NO. 845)

Defendant objected to this Court's oral Order on April 2, 2008, excusing juror no. 1 for good cause, and directing the remaining eleven jurors to continue their deliberations, pursuant to Fed.R.Crim.P. 23(b)(3), and the Court overruled the objection. Transcript, April 2, 2008, at 8. Defendant has now incorporated his objection in Defendant's Objection and Emergency Motion To Vacate Order Dismissing Juror No. 1 (doc. no. 845).

After careful consideration of defendant's motion and brief in support and the government's response thereto, the Court will deny the motion. Rule 23(b)(3) explicitly expresses a strong preference for continuing on-going jury deliberations with eleven jurors, *with or without* agreement of counsel, where, as here, a juror had to be excused for good cause. *Under all of the circumstances, it is not a close question*.

At about 1:30 pm on April 1, 2008, the Court staff was notified that juror no. 1 had some medical issues, which included chest pains and tingling in his left arm. The transcript of proceedings on the morning of April 2, 2008, the eighth day of jury deliberations following a months long trial that commenced on January 28, 2008, shows that the following events transpired on the preceding day of jury deliberations.

The Nurse who is stationed in this Courthouse immediately came to the jury room, evaluated juror no. 1's condition and, thereafter, juror no. 1"was transported with court staff to the hospital and has been receiving tests throughout that afternoon and into the evening and has a series of tests scheduled for this morning." Transcript, April 2, 2008, at 2. Consistent with his doctor's medical recommendation, juror no. 1 clearly conveyed his and his doctor's wishes to be excused from further deliberations in light of his medical condition, the continued stress of deliberation, and the additional testing that was scheduled for that day. Id. Out of respect for the juror's privacy, the Court did not disclose the exact nature of his medical condition or his exact whereabouts. *Id*. at 3.

Rule 23(b)(3) . . . permit[s] a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." Fed.R.Crim.P. 23(b)(3). . . . [and] is the *strongly preferred procedure* for district courts to follow when faced with the situation where a juror becomes seriously incapacitated *or otherwise found to be unable to continue service upon*

---

accuracy of this Court's ruling and the necessity for Mr. Albright's discharge on April 2, 2008.

*the jury*, particularly so "when the trial has been a lengthy one and . . . the remedy of mistrial would necessitate a second expenditure of substantial prosecution . . ." with the attendant expenditure of defense, prosecution and judicial resources. . . . .

Given the *explicit* and *unambiguous* language of Rule 23(b)(3), the Court indicated that it had researched the matter since the problem arose the previous day at 1:30 pm, and that, since it was clear that the recommended procedure is to go with a jury of eleven persons, asked the parties if they would stipulate to continuation of deliberations with eleven jurors. Transcript, April 2, 2008, at 3. The Court then recessed for about five to ten minutes while the parties discussed the Court's request, noting that the jury was obviously not permitted to deliberate while the matter was being discussed and resolved. Transcript, April 2, 2008, at 3-4.

After the brief recess, the parties reconvened and informed the Court of their respective positions. Neither the government nor defense counsel requested additional time to consider the matter or suggested, in any way, that they had insufficient time to consider the matter. Even though all parties and the Court had from early afternoon the previous day to research the law and learn the parameters and options available, the Court would gladly have granted additional time to either party, had any counsel simply requested it, as the Court generally has done throughout trial and jury deliberations. In the absence of such request, the Court presumed that counsel were ready to voice their positions, and they proceeded to do just that.

The government agreed with the Court's proposal to continue with eleven jurors as provided by Rule 23(b)(3), stating that it believed the record was clear there was good cause to excuse the juror, because "[b]oth he and his physician, according to the record before us, have said that continued deliberations endangers his medical condition and his health." *Id*. at 4. The government also correctly noted that excusing an ill juror and continuing with eleven is "actually an encouraged method of proceeding," *id.*, according to *United States v. Gambino*, 788 F.2d 938, (3d Cir. 1986), which held that the district court did not abuse its discretion in opting for an eleven member panel after one juror was excused for cause after jury deliberations had commenced.

The United States Court of Appeals for the Third Circuit explained in *Gambino* that the Supreme Court itself had indicated to the Advisory Committee on the Criminal Rules that it preferred this procedure, and the "Committee concluded that the better alternative was to amend Rule 23(b) to permit the judge, on his own motion, to proceed with a jury of eleven." *Id*. at 949. Moreover, the Court of Appeals found that the district court "was under no obligation to consider

the feasibility of any other options . . . ." *Id.*

Counsel then presented defendant's position. First, he asked whether the juror in question was the foreman, because it might help defendant make an informed decision. Transcript, April 2, 2008, at 5. The Court overruled the government's objection to this request, and informed defendant that, as evidenced by written questions signed by the foreman and the likely secretary, the ill juror was not the foreman or the secretary. *Id.* at 5-6. Defendant then stated his position, and asked the Court to delay making a decision until we had more information about juror no. 1's medical condition, following whatever additional testing was to be done, and juror no. 1's treating physicians had rendered some sort of report or opinion to the Court in a form acceptable to defense counsel. Counsel also minimized the seriousness of juror no. 1's medical condition by speculating that any juror might be "to some degree, stressed by deliberations. I guess that it is probably stressful for everybody in a jury room, as well as everybody involved in a criminal trial like this." *Id.* at 6.

Contrary to counsel's argument that juror no. 1 was simply experiencing the normal stress of deliberations, juror no. 1 had, in fact, been experiencing serious symptoms of potentially life threatening illness. Not " everybody in [the] jury room, [nor] . . everybody involved" in this criminal trial had been experiencing serious medical symptoms the previous day, nor had any other juror been examined by a nurse, advised to go to the hospital for testing by the nurse and his physician, transported to the emergency room by court personnel, kept overnight for testing with more testing scheduled for later that day at some undetermined time, nor advised by his or her doctor that he or she should not return for jury deliberations at least until further testing and evaluation were completed and he or she had been cleared by a physician.

Accordingly, the Court declined counsel's invitation to halt jury deliberations for at least one day, and possibly longer, depending on how long it took to complete testing, receive a physician's and/or the juror's report, place it on the record or possibly conduct a hearing, and confer with counsel and decide about whether juror no. 1 would remain on the jury. See Hearing Memo (doc. no. 847) April 2, 2008. Jury deliberations would have been stalled for at least a day, and quite possibly longer, depending on circumstances beyond the Court's control, as outlined above.

Under all of those circumstances, the Court found no reason to halt on-going deliberations for an indefinite period, given the clear and explicit preferences expressed in Fed.R.Crim.P. 23(b)(3) and *Gambino*. See also *United States v. Smith*, 789 F.2d 196, 204-05 (3d Cir. 1986) . . . .

Later that day, at the time the jury was scheduled to and did cease its deliberations for the day, defendant filed his Objection and Emergency Motion To Vacate Order Dismissing Juror No. 1 (doc. no. 845) and supporting brief (doc. no. 846), neither of which address *Gambino*, *Smith* or any other precedent from the United States Court of Appeals for the Third Circuit. The government filed its Brief in Opposition (doc. no. 848) before 8:00 am the next day, as directed by the Court.

After careful consideration, the Court denies defendant's objections and motion to vacate as without merit, for the reasons stated. [FN 1]

[FN 1] Defendant argues in his motion that because this Court delayed the *trial* for one day because one juror was experiencing flu-like symptoms and had to go see a physician, and that juror returned after the one day hiatus, the Court must follow the same procedure for juror no. 1 at this deliberation stage of proceedings. However, the situations of these two jurors are distinctly different, both in timing and in severity of medical conditions, and defendant's reliance on the juror with flu-like symptoms mid-trial is inapposite, as the following factual summary demonstrates.

On April 1, 2008, seven days into jury deliberations, juror no. 1 began to experience serious symptoms of possibly life threatening illness, and was admitted overnight to a local hospital for testing and evaluation that evening and the following day, April 2, 2008. He was advised at the hospital not to return for deliberations until he had been thoroughly tested. At 7:00 pm on April 2, 2008, after his final test at the hospital, he was released from the hospital with a scheduled appointment the next afternoon with his personal physician on April 3, 2008. Moreover, Fed.R.Crim.P. 23(b)(3) specifically applies to jury deliberations, not to the trial.

The Court will file a separate document, under seal, attaching the following [three items summarized below]:

1.    A Field Report by United States Deputy Marshal Tad Thompson, with Deputy Thompson's narrative description of the events of April 1, 2008, including that he was summoned to Courtroom 7C after being informed that a juror was experiencing serious chest pains, that he was present when the building nurse examined the juror in the closed area outside of the jury room, accompanied by court staff and security personnel and outside of the presence of other jurors, that the nurse advised juror no. 1 to seek immediate medical attention after consulting with the juror's doctor, and that the juror agreed to go to the emergency room. The Deputy and Michael Lydon, this Court's senior law clerk,

accompanied juror no. 1 to a government vehicle, whereupon he was transported to his car; Mr. Lydon accompanied juror no. 1 in the juror's car to the emergency room of a local hospital, followed by the Deputy in the other vehicle, both of whom accompanied juror no. 1 into the hospital emergency room upon arrival and remained until a nurse began triage.

2. A facsimile transmission from juror no. 1 advising the Court of his condition and treatment at the local hospital on April 2 and 3, 2008, and that the emergency room doctor would not release him until he had undergone testing and examination and been released by a physician, unless he signed out against medical advice. Due to a mix- up with his breakfast, the morning stress test was postponed until later in the day. At about 3:30 pm, juror no. 1 took the stress test, and at about 7:00 pm on April 2, 2008, he was released from the hospital with an appointment with his personal physician scheduled for the next day.

3. A facsimile transmission from juror no. 1's personal physician at 14:52 April 3, 2008, after the jury had gone home for the day after its second full day of deliberations following the Court's decision to continue with an eleven person jury. The physician cleared him, at that point, to return to jury duty, and noted that on April 1, 2008, juror no. 1's symptoms were quite serious and potentially a sign of deadly illness.

These items are under seal out of respect for and to protect juror no. 1's privacy, but are made available for appellate review. Items 1, 2 and 3 must be placed under seal because several members of the media somehow managed to obtain the juror's name and cell phone number and contacted him in his hospital bed, some quite persistently, and his name has been involuntarily thrust into the public domain. If the medical information contained in Items 1, 2 and 3 were published on the record, it would also, no doubt, find its way into the public domain without regard for juror no. 1's privacy or appreciation for his dedication and stalwart service to the Court, the parties and the criminal justice system.

Copies of Items 1, 2 and 3 [summarized above] are available for counsel in this case, who may call and make arrangements to retrieve same from chambers on April 7, 2008. The information contained therein shall not be disseminated or conveyed in any manner to any other persons, other than counsel and defendant, and no copies shall be made of these items.

Defendant's Objection and Emergency Motion To Vacate Order Dismissing Juror No. 1 (doc. no. 845) is without merit, and is therefore **DENIED**.

Order of April 4, 2008 (doc. no. 854), Order of Court Denying Defendant's Objection and

Emergency Motion to Vacate Order Dismissing Juror No. 1 (Doc. No. 845) (certain emphasis added).

Defendant's Brief in Support of Renewed Motion for Recusal (doc. no. 919) attaches an affidavit executed by Stanley Albright on April 17, 2008, which defendant contends contradicts this Court's statement in open court on April 2, 2008, that he had requested to be excused. This convoluted ground for recusal suggests, frankly, that this Court lied about Mr. Albright's condition when it discharged him on April 2, 2008 for the purpose of securing an advantage for the government.

The Court's prior Order, with attachments, more than adequately addresses these matters, and shows that if there is any inconsistency between what Mr. Albright told the Court's bailiffs on April 2, 2008 and his affidavit of April 17, 2008, it is immaterial.  Nevertheless, some additional observations are appropriate in order to correct a few of defendant's distortions of the record and dispel his untenable claims that this Court was less than accurate about the reasons it discharged Stanley Albright and that the Court was attempting to help the government obtain a conviction by Mr. Albright's discharge.

First, this Court has never spoken with Mr. Albright.  All communications with the Court were through the Court's bailiffs on April 2 and 3, 2008, and the Court's statements in open court were accurately based on what Mr. Albright told one of the bailiffs the morning of April 3rd (as he later confirmed to the other bailiff).

Second, Mr. Albright's April 17th affidavit is not materially different from the Court's explanation in open court, or the letter he faxed to the Court later on April 3rd.  In his affidavit executed two weeks later and filed by defense counsel with defendant's Renewed Motion for

Recusal, Mr. Albright makes it clear that, even if he wanted to return to jury service as he says in the affidavit, he could not have returned until after all his tests were completed and he had been cleared by his doctor. Mr. Albright completed those tests on April 2nd and was not cleared by his physician to return until after the jury had been recessed on April 3rd, the second full day of deliberations following Mr. Albright's discharge.[6]

Third, there is nothing on the record that indicates which way Mr. Albright might have been leaning before the Court discharged him, and he does not disclose his vote on any count of the indictment in his affidavit. Still, defendant speculates that Mr. Albright would likely have voted to acquit him, and that this Court removed him in order to tip the balance in favor of the government. Defendant's argument is as follows:

> [T]he Court chose to follow the government's preference even though it was diametrically different than what [the Court] had done before. By that point, of course, the jury had already indicated that it was having difficulty reaching a verdict, and it would not be difficult to perceive the importance to each of the parties of having even one juror dismissed. (March 27, 2008, Tr. at 2) Second, Rev. Albright is a cleric who watched during the trial as the prosecution treated Sister Grace Ann Geibel poorly on re-direct examination. [footnote omitted] A reasonable observer could suspect that Rev. Albright was displeased by the government's conduct and would be more likely to be a defense-friendly witness [sic - presumably, defendant means "a defense-friendly juror"].

> Under these circumstances, the Court's strikingly different reactions to the medical situations of Juror No. 7 and Juror No. 1 would cause a reasonable person to question whether the Court was unduly eager to agree with the government's position even though it meant it would treat similar situations inconsistently.

---

[6] To the extent Mr. Albright's affidavit might be viewed as different from what he communicated to the bailiff on the morning of April 2, 2008, the Court notes that Mr. Albright had been admitted to the hospital on April 1, 2008, had undergone testing the evening of April 2d, and at the time he spoke with the bailiffs on April 2, 2008, he was "in pain and under medication," as he stated in his faxed letter to the Court. See Notice of Court (doc. no. 857), Item 2 (under seal).

Defendant's Brief in Support of Renewed Motion for Recusal (doc. no. 919), at 16.

Thus, defendant's argument for recusal is based on the following series of logical fallacies: (a) Mr. Albright is a cleric; (b) Sister Grace Ann Geibel[7] is a cleric; (c) the prosecution treated Sister Grace Ann Geibel "poorly" on re-direct; (d) Mr. Albright must have been displeased with the government's shabby treatment of the Sister; (e) Mr. Albright must therefore have been anti-government in the jury deliberations; (f) Mr. Albright must have been pro-defendant in the jury deliberations; (g) the Court must have known, based upon these many inferences, that Mr. Albright was voting to acquit the defendant; (h) the Court did something different with another juror one month earlier, during the evidentiary phase of the trial (before Fed.R.Crim.P. 23(b) became operational); and finally, (i) the Court deliberately excused Mr. Albright knowing he was voting to acquit defendant, in order to help the government obtain a conviction. This construct has no support in the actual record.

In short, this ground for recusal is without merit. Mr. Albright's discharge on the morning of April 2nd, so as not to disrupt the orderly continuation of the jury deliberations for what would have been two full days of deliberations (but which, as of April 2nd, was indefinite and could have been longer, depending on the results of tests and the physician's evaluation), was an appropriate and judicious exercise of judicial discretion.

Finally, the Court already has expressed its deep appreciation for the service provided by Mr. Albright and his fellow jurors and alternates. See April 8, 2008 Transcript (doc. no. 874).

---

[7] Sister Grace Ann Geibel, former President of Carlow University, was called as a government witness regarding an agreement between Carlow University and Wecht Pathology/ Dr. Wecht, but on cross-examination, her testimony shows that she was a favorable witness for the defense.

The Court also shares Mr. Albright's regret that he was unable to remain with the jury through its final day of service, when the Court declared a mistrial and discharged the jury on April 8, 2008. However, there is no doubt on the record before the Court, including Mr. Albright's affidavit of April 17th, that he was unavailable for jury deliberations on April 2nd and 3rd, and that the Court exercised sound discretion in discharging him for good cause and directing the jury to continue with 11 jurors. See Fed.R.Crim.P. 23(b)(3).

**(ii) Wielding the "Club of Contempt."**

Defendant's fifteenth ground for recusal complains about this Court's Order of April 18, 2008 (doc. no. 917), and its alleged *sua sponte* references to the intense media firestorm that immediately followed the mistrial, with defendant and his attorneys in the eye of the storm. Defendant argues that by this Order, "the Court has once again wielded the club of contempt over counsel's head for addressing publicly the problems with a retrial and done so *sua sponte* after being told the defense would move to recuse this Court." Defendant's Brief in Support of Renewed Motion for Recusal (doc. no. 919), at 2-3, 22-23.

The Order of April 18, 2008 states:

### ORDER DENYING DEFENDANT'S MOTION FOR DISCLOSURE OF MANNER AND MEANS BY WHICH THE FBI OBTAINED JUROR NAMES (DOC. NO. 870)

In light of the government's providing all of the information requested by defendant in his discovery motion, Defendant's Motion for Disclosure of Manner and Means by Which the FBI Obtained Juror Names (doc. no. 870), said motion is DENIED as moot.

To the extent said motion demands that the Court direct the government to disclose the requested information in the form of a "certified statement," said motion is DENIED as moot, given that the government's response is signed by the Assistant United States Attorney assigned to the case, who is an Officer of the

Court, as all attorneys who practice before the Court are deemed to be. As such, his signature operates as his certification that the averments set forth therein are true and accurate, just as defense counsels' signatures affixed to motions, responses and briefs they file with the Court certify the truthfulness and accuracy of their averments.

Additionally, the Court finds, based on defendant's motion for disclosure, the government's response thereto, and all of the numerous filings by both parties since April 8, 2008, which are *replete with references to and attachments of articles in local print and electronic media*, [8] that an intensive media firestorm has ensued since this Court declared a mistrial and discharged the jury on that day. Further, the Court finds that this firestorm was carelessly (if not deliberately) set and subsequently fanned, in large part, by the frequent incendiary appearances and comments of defense counsel in public fora, and that, from this Court's first hand knowledge of facts and events that are of record, many of the media accounts generated from those comments have been inaccurate and misleading, to say the least.

Accordingly, the Court hereby *reminds all counsel of record that they are Officers of the Court, and as such, they should conduct themselves professionally* and are bound by this Court's Pretrial Orders and by Local Rule 83.1, as modified by the United States Court of Appeals for the Third Circuit in this very case, United States v. Wecht, 484 F.3d 194 (3d Cir. 2007). A little more than one year ago, on April 12, 2007, the United States Court of Appeals affirmed the authority and obligation of district courts, in no uncertain terms, to impose limits on attorney extrajudicial speech made before and during the pendency of criminal proceedings, where such speech is "*substantially likely to have a materially prejudicial effect" on the integrity of the judicial process*. This salutary rule balances the interests of the defendant, the government and the public's right to know, and prevents "prejudice to an adjudicative proceeding by those who have a duty to protect its integrity." Id. at 205.

The greatest threats to the integrity of the judicial system in this context are the "two principal evils" at which the rule aims: "(1) *comments that are likely*

---

8 For example, defendant's Motion for a Continuance (doc. no. 865) relies on published newspaper reports to support his request for continuance, and the government's Brief in Response (Doc. No. 873) to Defendant's Motion for Continuance at Docket No. 865 references and attaches a host of items from the media blitz featuring defendant and his attorneys in the week following this Court's declaration of a mistrial. Defendant continues to rely on media stories to advance his positions. See, e.g., Defendant's Reply Brief (doc. no. 943) to Government's Brief in Opposition to Defendant's Motion for Dismissal and Renewed Motion for Suppression.

*to influence the actual outcome of the trial*, and (2) *comments that are likely to prejudice the jury venire*, even if an untainted panel can ultimately be found." <u>Wecht</u>, 484 F.3d at 205, quoting <u>Gentile v. State Bar of Nevada</u>, 501 U.S. 1030, 1075 (1991). See also <u>United States v. Scarfo</u>, 263 F.3d 80, 93 (3d Cir. 2001) ("Lawyers should not be surprised when they learn that their chosen professional status, as in the cases of judges, restricts their conduct and speech at times. Gentile held that the 'substantial likelihood of material prejudice' standard is constitutionally permissible to balance the attorney's interest in free speech against the state's interest in fair judicial determinations.

Extrajudicial statements by attorneys pose a threat to a pending proceeding's fairness because attorneys have access to information through discovery and client communication, and because their statements are likely to be received as especially authoritative. The 'substantial likelihood of material prejudice' standard fairly balances the integrity of the justice system with attorneys' constitutional rights. . . . The 'evils' . . . are those generally associated with risk of prejudice to the jury pool. . . . [as well as] any other form of prejudice to the actual outcome of a trial. . . . [such as] [p]reventing a 'carnival atmosphere' in a high profile case . . . .").

Both of these "two principle evils" are evidenced in the intensive media firestorm that now threatens to engulf the judicial proceedings, make it exceedingly difficult to pick a neutral and unbiased jury for the retrial, and degrade what should be a solemn and sober judicial proceeding into an all-out media circus. The public comments of the attorneys made since April 8, 2008 are substantially likely to influence the actual outcome of the retrial, and substantially likely to prejudice the jury venire, even if an untainted panel can ultimately be found. This Court cannot and will not stand idly by and permit this to continue.

Accordingly, *all government and defense counsel are reminded of their oaths, as Officers of the Court, to abide by prior rulings and the rules of court that govern this criminal proceeding, and by appropriate judicial decorum and professionalism*, as this case moves forward to a speedy, fair and just conclusion.

SO ORDERED this 18th day of April, 2008.

Order of April 18, 2008 (doc. no. 917), Denying Defendant's Motion for Disclosure of Manner

and Means by Which the FBI Obtained Juror Names (Doc. No. 870) (emphasis added).

Defendant asserts that this Order was entered *sua sponte* and gratuitously, that it exhibits

some sort of bias toward defense counsel, and suggests that this Court has no authority to protect

the integrity of the jury pool or to remind attorneys who practice before it of their Oaths as

Officers of the Court who are duty bound to act professionally and conform their behavior to the

local and case specific Rules of Court. Specifically, defendant states that this Court "has injected

itself in substantial part into the important public discourse about the wisdom and fairness of a

second trial," that the Order somehow shows "the personal interest the Court must not have,"

and, as noted above, that the Court is wielding the "club of contempt" against counsel.

Defendant's Brief in Support of Renewed Motion for Recusal (doc. no. 919), at 22-23.

The Court's Order of April 18, 2008 speaks for itself, and nothing therein supports

defendant's fifteenth ground for recusal. One knowing all of the facts of record could not

possibly infer that this Court "wielded the club of contempt" when it directly issued a much

needed (and probably overdue) reminder to counsel for both parties to conduct themselves

professionally, as Officers of the Court, so as to protect the integrity of the jury pool from the

possibility of contamination by the media maelstrom. Cases and controversies before a federal

district or appellate court must not be adjudicated in the court of public opinion, but by the actual

Article III Court, with reference to the actual facts of record, the Constitution, laws of Congress,

Federal Rules of Procedure and Evidence, and governing precedent.

     **B.**     **Ground for recusal not constituting a prior ruling or statement by the Court – the "Blessed Ellen M. Rice" letter.**

The record shows that throughout this proceeding, even the most innocuous and

insignificant events takes on sinister meaning to defendant and that such insignificant events find

their way into a motion to recuse. Thus, in December 2007, defendant filed his Second Writ of

Mandamus in which he found evidence of conspiracy and judicial bias in the way this Court "sat

on" an immaterial, unsolicited letter mailed to it by one Gerald Schiller. The Court disclosed said letter to all counsel 16 days later in its Order at doc. no. 629, Order of Court Re: Jury Selection, Voir Dire, and Other Pretrial Issues (See Doc. Nos. 598, 599, 604, and 607), at 30, n.9, and its Notice (doc. no. 630) of December 21, 2007. See note 1, *supra*. As this Court stated at that time, the Schiller letter had no bearing on the Court's ruling with regard to the innominate jury selection, as defendant contended, but defendant nevertheless perceived some plot at work, and made this "failure to disclose the letter" incident into the leading accusation of his Second Writ of Mandamus in the Court of Appeals. Brief in Support of Emergency Motion for a Writ of Mandamus at Court of Appeals docket no. 07-4794, at 15-28, 37-47.

Despite his lack of success before the Court of Appeals regarding the Schiller letter, defendant again finds evidence of bias and partiality in another unsolicited letter mailed to all counsel shortly after it was delivered to chambers. This latest complaint is based upon the Court's prompt forwarding of three unsolicited letters sent to the Court after they were placed in this chambers' designated mailbox, including a letter from a "Blessed Ellen M. Rice." For some reason, this letter was addressed to the defendant in the criminal prosecution before the Court, "c/o" the United States Courthouse. Defendant now injects this insignificant event into the current Renewed Motion for Recusal.

This letter was mailed to the United States Courthouse in Pittsburgh, Pennsylvania, and delivered by the Postal Service to the mailbox of the Court in a secure location in the United States Courthouse, along with all of the other mail for this chambers, and thereafter opened by Court staff pursuant to standard security procedures implemented in the aftermath of the "9/11" terrorist attack and the Oklahoma City Courthouse bombing. The Court's Senior Law Clerk

mailed copies of all three letters to all counsel with a cover letter stating, *inter alia*, that the "Blessed Ellen M. Rice" letter addressed to Dr. Wecht had been "opened pursuant to standard operating and safety procedures implemented post 9/11."

In light of defendant's complaints about the Court's "delay" in disclosing the Schiller letter, the Court implemented a protocol of promptly forwarding unsolicited correspondence arguably concerning the case or defendant to all counsel, and followed this protocol with regard to the three letters, including the "Blessed Ellen M. Rice" letter. Defendant find evidence of bias and partiality in this insignificant incident, and makes the following argument:

> • On April 16, 2007 [sic], the Court's senior law clerk sent a letter to counsel for both the government and Dr. Wecht referring to three letters received by the Court and "opened pursuant to standard operating and safety procedures implemented post 9/11." One of the letters was unambiguously addressed to Dr. Wecht "care of" the federal courthouse. (A copy of the envelope in which the letter was delivered is attached to this brief at Tab "B." ) The envelope made clear that it was intended only for Dr. Wecht as it was addressed to him and included the words "In support of you and extremely grateful to you" on the envelope. Yet *the Court actually opened the letter* and then sent copies not only to counsel for Dr. Wecht but also to counsel for the government. The letter from the law clerk suggests that the letter was opened because of security requirements imposed after September 11, 2001. Respectfully, that does not make sense. If a letter arrived addressed to someone in the courthouse, it would make sense to open it before forwarding it to someone within the courthouse that would address the security of the building and its occupants. But this was a letter addressed only to Dr. Wecht, and one would expect that respect for privacy, adherence to federal law and concern for security would have suggested simply forwarding the letter unopened to Dr. Wecht or his lawyers not opening and reading the letter and then sharing a copy with the government. [FN12]

> [FN12] There are federal statutes that prohibit opening mail addressed to another. See 18 U.S.C. § 1702.

Defendant's Brief in Support of Renewed Motion for Recusal (doc. no. 919), at 16-17 (emphasis added).

Without having any idea about the security procedures actually in place for the opening of mail as mandated by those responsible for protecting the lives and safety of those who use, work and serve in this Courthouse, defendant claims that this innocuous mailing of a copy of a letter to all counsel by the Court's Senior Law Clerk is part of a "pattern of judicial conduct that strongly suggests actual bias and that unquestionably would cause a reasonable person to conclude that the Court is not impartial." Id. at 17. In support of his ongoing efforts to portray this Court's handling of his case as biased and partial, defendant now recklessly accuses this Court and its staff of violating 18 U.S.C. § 1702, based on the most mundane and ministerial of acts.

Moreover, although defendant cannot claim a legitimate privacy interest in a letter sent by a third person to a United States District Court, he apparently believes that his interests in an unsolicited letter are superior to the security and safety of all those who visit, labor in, and use our public federal courthouses, because he opines that the mail security procedure adopted and implemented by the United States Marshals Service and the Administrative Office of the United States Courts in the aftermath of such tragedies as 9/11 and the Oklahoma City bombing "does not make sense." Defendant's Brief in Support of Renewed Motion for Recusal (doc. no. 919), at 17. Punctuating the need for implementation of strict security measures in the United States Courthouses, pipe bombs exploded on May 4, 2008, at the Edward J. Schwartz Federal Courthouse in San Diego, California. The explosion at the federal courthouse in San Diego is being investigated by an FBI-Joint Terrorism Task Force and the United States Marshals Service. Regarding the security and safety of the many people who enter, use and work in this United States Courthouse, this Court will continue to defer to actual experts in the field. Defendant's accusation of wrongdoing with regard to the handling of the "Blessed Ellen M. Rice" letter by

31

this Court's staff is wholly unfounded and without merit.

## V.  CONCLUSION.

Applying the appropriate standards to defendant's Renewed Motion for Recusal, the reasonable observer, aware of all of the facts of record -- i.e., the opinions, orders and documents filed on the record and the transcript of the proceedings -- will find some rulings that favor the government, and some that favor defendant.  The record also shows that many significant rulings on motions and on disputes as to jury instructions favored the defendant, and that the unhurried, non-coercive jury deliberations were beneficial to him as well.  The record contains no hint of bias, prejudice or ill-will toward the defendant or his attorneys.

Despite defendant's continued threats and filings of recusal motions and his abuse of the writ of mandamus, this Court will, as it always has done, faithfully endeavor to follow its constitutional obligations and continue to provide defendant with a fair trial before an impartial jury of his peers.  Accordingly, the Court will continue to carefully consider all of defendant's motions and arguments, along with the government's responses, and to scrupulously safeguard all of defendant's constitutional rights.

Defendant has every right to appeal any and all of the rulings and decisions of this Court in the event of an adverse jury verdict upon retrial, at the proper time, following the Rules of Appellate Procedure and the normal appellate process.  Defendant has no right, however, to disrupt ongoing criminal proceedings by engaging in repeated, frivolous attempts to judge-shop

by removing the presiding District Judge based solely on defendant's disagreement with some of the Court's rulings.

For all of the foregoing reasons, defendant's Renewed Motion for Recusal is DENIED.

**SO ORDERED** this 8th day of May, 2008.

 s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:    All counsel of record