**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA      )
                              )
            v.                )        No. 2:06-cr-26
                              )
CYRIL H. WECHT,               )
                              )
            Defendant         )


## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.

Presently pending before me in the above-captioned case is the Defendant's motion seeking reconsideration of the denial of his Rule 29 motions, the denial of his motion to dismiss charges brought under 18 U.S.C. § 666, and the denial of certain suppression motions.  For the reasons set forth below, the Defendant's motion for reconsideration is granted and his requests for substantive relief are granted in part.


## I. BACKGROUND[1]

The Defendant, Dr. Cyril Wecht, is a renowned forensic pathologist and former Coroner of Allegheny County.  On January 20, 2006, he was indicted on eighty-four counts of theft of honest services, mail fraud, wire fraud, and theft from an organization receiving federal funds in connection with his tenure as Allegheny County Coroner,

---

[1] The background to this case, both procedural and factual, has been extensively discussed in previous district and appellate court decisions.  *See generally U.S. v. Wecht*, 541 F.3d 493 (3d Cir. 2008) (*Wecht III*); *United States v. Wecht*, 537 F.3d 222 (3d Cir.2008) (*Wecht II* ); *United States v. Wecht*, 484 F.3d 194 (3d Cir.2007) (*Wecht I*); *United States v. Wecht*, Criminal No. 06-0026, slip op. [591] (W.D. Pa. Nov. 26, 2007); *U.S. v. Wecht*, Criminal No. 06-0026, 2006 WL 1835818 (W.D. Pa. June 29, 2006); *U.S. v. Wecht*, Criminal No. 06-0026, 2006 WL 1669879 (W.D. Pa. June 13, 2006). Accordingly, this memorandum opinion will assume the reader's familiarity with the procedural and factual history of this case and will discuss only those aspects relevant to my disposition of the pending motion.

which commenced in 1996.[2]  The case was initially assigned to the Hon. Arthur J. Schwab of the U.S. District Court for the Western District of Pennsylvania, Pittsburgh Division.

The indictment has since been redacted and reformulated but, as originally drafted, it alleged that the Defendant, in his capacity as Allegheny County Coroner, had engaged in a scheme to misuse the personnel and resources of the Allegheny County Coroner's Office ("ACCO") toward his own personal and private gain and thus deprive Allegheny County and its citizens of the intangible right to the honest services of the Defendant and other ACCO employees.  According to the indictment, this scheme involved the Defendant's use of county employees and resources to conduct his own private pathology business, which operated under the name Cyril H. Wecht and Pathology Associates, Inc. ("Wecht Pathology"), and to obtain services which benefitted the Defendant and his family members both personally and politically.  Among other things, it was claimed that the Defendant had caused ACCO employees, while on duty, to perform private work on behalf of Wecht Pathology, to run personal errands for the Defendant and his family members, to act as chauffeurs for the Defendant and/or his family members on matters unrelated to ACCO business, and to participate in campaign efforts on behalf of the Defendant and/or his son.  The indictment also alleged that the Defendant had engaged in numerous acts of wire fraud by generating fraudulent limousine charges and substantially inflated airfare expenses in connection with his private business and then transmitting the fraudulent bills by facsimile to his private clients.  It alleged that the Defendant had committed mail fraud by causing fraudulent mileage reimbursement invoices to be prepared and mailed to various counties in Western Pennsylvania in connection with services rendered by Wecht Pathology.  In actuality, it was charged, the Defendant had used county-owned vehicles

[2] The Defendant had also served as Allegheny County Coroner from 1970 through 1980, but that tenure is not relevant to the indictment.

2

for his private transportation needs but kept the reimbursement monies, even though ACCO (not the Defendant) had paid for the gas and maintenance on the vehicles used. Finally, the indictment alleged that, in each of the calendar years 2001 through 2005, the Defendant, acting in his capacity as Allegheny Coroner, had embezzled, stolen, obtained by fraud and otherwise converted without authority ACCO "property" (i.e., the use of ACCO personnel, vehicles, facilities, resources, equipment and space) valued at $5,000 or more, in violation of 18 U.S.C. § 666(a)(1)(A).[3].

It appears that much of the evidence utilized by the Government in support of these charges was obtained, either directly or indirectly, through the execution of two separate search warrants, both of which were presented to a United States Magistrate Judge on April 7, 2005. One of the warrants sought the seizure of approximately twenty boxes of private autopsy files from the offices of Wecht Pathology. The other sought the seizure of a laptop computer utilized by the Defendant's executive assistant, Eileen

---

[3] In relevant part, the statute provides:

**§ 666. Theft or bribery concerning programs receiving Federal funds**

(a) Whoever, if the circumstance described in subsection (b) of this section exists--

  (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof--

    (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that--

      (i) is valued at $5,000 or more, and

      (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency;

                    ***

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666.

Young, and all of the information and data stored within the laptop.  Through a number of pretrial proceedings, the defense sought unsuccessfully to suppress the evidence obtained from these searches.[4]

Prior to trial, the defense also sought, unsuccessfully, to obtain a dismissal of the Government's § 666(a)(1)(A) theft charges.  (*See* Def.'s Mot. to Dismiss the Indictment [180] at Br. in Supp. [207].)  In relevant part, the defense argued that the Government's charging theory misapplied the statute in several respects by (i) erroneously expanding the statute's reach to cover the theft of intangibles such as employee services; (ii) impermissibly and arbitrarily aggregating multiple alleged thefts occurring during the course of a given calendar year in order to satisfy the statute's $5,000 threshold; and (iii) applying the statute in a manner that resulted in duplicitous and unconstitutionally vague charges.  This motion was denied by Judge Schwab in a memorandum opinion and order dated June 29, 2006 [264].

On January 7, 2008, the Government filed a Redacted Indictment [656-2], which paired its case down from eighty-four charges to forty-one charges.  These redacted charges were comprised of:  twenty-four counts of theft of honest services- wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 and 2 (Counts 1-24); three counts of theft of honest services - mail fraud, in violation of 18 U.S.C. §§ 1341, 1346 and 2 (Counts 25-27); five counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (Counts 28-32); four counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2 (Counts 33-36); and five counts of theft of property from an organization receiving federal funds, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2 (Counts 37-41).

The case proceeded to a lengthy trial which occurred over the course of several weeks in early 2008.  The evidence closed on March 11, 2008 with the conclusion of

---

[4] A third search warrant authorized the seizure of a desktop computer maintained in the ACCO office of Kathy McCabe, along with all information and data contained therein or stored in associated storage devices.  However, this warrant is not presently at issue.

the Government's case-in-chief.

In accordance with the trial court's directive, the defense filed a Rule 29 motion for a judgment of acquittal within hours after the close of the prosecution's case. (*See* Motion for Judgment of Acquittal and supporting brief (Docs. [815] and [816]). In relevant part,[5] the Defendant challenged the legal sufficiency of the Government's proof as it pertained to the mail fraud, wire fraud, and § 666(a)(1)(A) counts. With respect to the wire fraud charges at Counts 28 through 32, the defense argued that the Government had failed to establish that the alleged acts of fraud were material. The defense asserted a similar challenge with respect to the mail fraud charges at Counts 33 to 36, and further argued that the Government had failed to prove, as a factual matter, that the Defendant had driven a county vehicle on the days for which fake limousine charges had been generated. With regard to the § 666(a)(1)(A) charges at Counts 37 to 41, the defense argued that the Government's evidence was insufficient in at least two respects: it failed to establish that the Defendant knowingly embezzled, stole, obtained by fraud, or converted "property" within the meaning of the statute, and it further failed to place a value on the items alleged to be "property."

The Government filed its response to the Defendant's motion [818] later that same day. On the following day, Judge Schwab issued an order [822] denying the motion.

Jury deliberations ensued but, after approximately ten days of deliberations, the jury was unable to reach a unanimous verdict on any of the Government's forty-one counts. Consequently, on April 8, 2008, Judge Schwab declared a mistrial.

Thereafter, the defense filed a renewed motion for judgment of acquittal (*see* Docs. [912] and [913]) in which it reasserted the Defendant's insufficiency-of-proof arguments relative to the issues of materiality, the Defendant's alleged use of a county

---

[5] The Government subsequently abandoned the theft-of-honest-services charges, and we therefore need not discuss those aspects of the Defendant's motion which relate to those counts.

vehicle, and the valuation of items allegedly stolen in violation of § 666(a)(1)(A). The Government responded on April 23, 2008 (Doc. [925]) and the defense filed its reply on May 13, 2008 [926]. The renewed motion was denied in a 24-page order entered by Judge Schwab on May 23, 2008 [976].

In the meantime, the Defendant had moved for an order dismissing the indictment and barring a retrial on double jeopardy grounds. (*See* Docs. Nos. [868] and [869].) Judge Schwab denied this motion on April 27, 2008 [933], and the Defendant took an appeal.

On September 5, 2008, the Third Circuit Court of Appeals affirmed Judge Schwab's April 27, 2008 ruling and remanded the matter for further proceedings. Pertinently for our purposes, the Court of Appeals concluded its opinion with the following directive:

> Our holding today that there is no constitutional bar to retrying Dr. Wecht does not stand for the proposition that he must be retried. That is a decision that rests with the Government. Indeed, Wecht's prosecution is one that already has spanned more than thirty months. It has resulted in numerous appeals and emergency motions to this Court and, with the filing of this opinion, three lengthy precedential opinions.
>
> If the Government chooses to proceed with a retrial, our view is that both sides and the interest of justice would benefit from a reduced level of rancor in the courtroom, fresh eyes on the case, and fewer forays to this Court by the parties, including intervening parties. This has been a highly charged, lengthy, and complex case involving serious criminal charges brought against a prominent public figure. The trial judge has been the referee in a heavyweight fight, and, as we have ruled, has generally made the correct calls, with some exceptions. *Wecht II*, for example, noted that the District Court initially failed to follow our mandate from an earlier order. *See* 537 F.3d 222, 224 n. 1. And in today's decision, even though there was manifest necessity to declare a mistrial in satisfaction of the Fifth Amendment, the District Court reached that conclusion through a highly flawed set of procedures. *See* III.B, *supra*.
>
> Therefore, in the exercise of our supervisory powers under 28 U.S.C. § 2106, *see, e.g., Gov't of the Virgin Islands v. Walker*, 261 F.3d 370, 376 (3d Cir.2001), *see also Liteky v. United States*, 510 U.S. 540, 554, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), we will direct that Judge Schwab be relieved of further duties on this case and that the Chief Judge of the District Court assign a new judge to handle any future matters in the case including any retrial. Although we tread cautiously because "[t]he decision to remove a judge from an ongoing trial should be considered seriously and made only rarely," *Huber v. Taylor*, 532 F.3d 237, 251 (3d Cir.2008), this case has progressed so unusually as to become sui

generis. *See, e.g., Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 372-73 (9th Cir.2005) (concluding under 28 U.S.C. § 2106 that, even absent allegations of bias, because of the highly unusual procedures the trial judge employed, "the appearance of justice requires reassignment on remand"); *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 37 (2d Cir.1988) (concluding "that it is necessary to remand the case to a different district judge" because court of appeals was "disturbed by the manner in which the district court treated this case on our initial remand").

> We thus end this chapter in the Wecht appellate saga by coming full circle. In *Wecht I*, the issue of whether Judge Schwab should be recused for bias figured prominently in the appeal. In that opinion our dissenting colleague concluded under 28 U.S.C. § 455 "that another judge should preside over the trial of Wecht." 484 F.3d at 236 (Bright, J., dissenting). [ ] As we have just described, the problem today is not so much the appearance of bias as it is the appearance of litigation at a combative tenor that likely will not abate were Judge Schwab to stay on the case. We therefore direct that a less invested adjudicator take over from here.

*United States v. Wecht*, 541 F.3d at 511-12 (3d Cir. 2008) (internal footnote omitted).

In accordance with the appellate court's instruction, this case was assigned to me on October 31, 2008. Following an initial status conference, the Defendant filed the pending motion seeking reconsideration of several adverse rulings previously entered by Judge Schwab.

For one, the Defendant has asked that I reconsider the denial of his motion for judgment of acquittal relative to the wire and mail fraud counts. Here, as before, the Defendant contends that the evidence was legally insufficient to support a conviction for wire fraud because, as to certain counts, the Government failed to establish that the allegedly fraudulent invoices were material and, as to other counts, the evidence specifically disproved any claim of materiality. Once again, with respect to the mail fraud counts, the Defendant challenges the sufficiency of the evidence as it relates to both the materiality of the alleged fraudulent statements and the factual predicate that he had driven a county vehicle on each of the dates identified in the indictment.

Second, the Defendant requests that I reconsider the denial of his motion for judgment of acquittal relative to the § 666(a)(1)(A) charges. This aspect of the motion involves issues of statutory construction which, in turn, entail reconsideration of the denial of the Defendant's antecedent motion to dismiss the § 666(a)(1)(A) charges.

Succinctly stated, the Defendant argues that both the trial court and the Government have misconstrued the statute insofar as the trial court permitted the Government to: (a) interpret the statute's reference to theft of "property" to include intangibles such as, e.g., the use of county personnel, and (b) aggregate multiple acts of alleged theft occurring in any one calendar year in order to establish that the stolen "property" was valued at $5,000 or more. The Defendant maintains that, when the statute is properly construed, the Government's evidence patently failed to provide a legally sufficient basis for a conviction. Even accepting the Government's construction of § 666(a)(1)(A), however, the Defendant insists that the Government failed to establish adequate proof relative to the valuation of the alleged acts of theft for any given year. The Defendant also objects that the Government's charging theory under § 666(a)(1)(A), as applied in this case, has resulted in duplicitous and unconstitutionally vague charges.

Finally, the Defendant has asked, as an alternative basis for relief, that I reconsider the denial of his motions to suppress the search of his private offices and the seizure of the laptop computer utilized by Eileen Young. In both instances, the Defendant challenges the validity of the warrants on their face, claiming that each one fails to adequately particularize the items to be seized. In addition, however, the Defendant poses numerous challenges to the sufficiency of the supporting affidavits and also challenges the manner in which one of the warrants was executed.

The Government has filed its brief in opposition, and this Court has now had the opportunity to review each sides' papers as well as the relevant law and those portions of the record which are germane to the foregoing issues. In addition, the Court has held two separate arguments on the issues raised in the parties' briefs. In sum, the Defendant's motion is now ripe for disposition.

## II. DISCUSSION

### A. LAW-OF-THE-CASE CONSIDERATIONS

The first issue which I must address is the very propriety *vel non* of reconsidering prior rulings by my colleague, Judge Schwab. Specifically, I must address how, if at all, the law-of-the-case doctrine impacts my ability to reconsider his prior rulings.

The rules pertaining to law-of-the-case, as applied in this circuit, are fairly well-established. "As most commonly defined, the doctrine ... posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618 (1983) (dictum)). The rule has developed "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing [case]." C*asey v. Planned Parenthood of Southeastern Pennsylvania*, 14 F.3d 848, 856 (3d Cir. 1994) (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478 (2d ed. 1981)). It has been applied not only to judges being asked to reconsider their own rulings but also to successor judges who are asked to reconsider the rulings of their predecessors. *See, e.g., Christianson*, 486 U.S. at 816 ("[T]he doctrine applies as much to the decision of a coordinate court in the same case as to a court's own decisions."); *TCF Film Corp. v. Gourley*, 240 F.2d 711, 713 (3d Cir. 1957) ("judges of coordinate jurisdiction sitting in the same court and in the same case should not overrule the decisions of each other.")

The law-of-the-case doctrine does not limit the jurisdictional power of trial judges from reconsidering issues previously decided by a predecessor judge from the same court, but it does recognize, as a matter of comity, that a successor judge should not lightly overturn the decision of his predecessor in a given case. *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994) (citations omitted). Accordingly, it has been said that a matter previously ruled upon should be revisited only in "extraordinary circumstances," as where, e.g.: 1) the predecessor judge is unavailable; 2) new

evidence becomes available; 3) a supervening new law has been announced; or 4) the earlier decision was clearly erroneous and would create manifest injustice. *Tse v. Ventana Medical Systems, Inc.*, 123 F. Supp.2d 213, 221 (D. Del. 2000) (citing *Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3d Cir.1984)). *See also Al Tech Specialty Steel Corp. v. Allegheny Internat'l Credit Corp.*, 104 F.3d 601, 605 (3d Cir. 1997) (discussing "exceptional circumstances" which may justify a court's reconsideration of a prior ruling); *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (discussing circumstances under which a judgment may be altered or amended on reconsideration).

Giving these principles due consideration, I conclude that the law-of-the-case doctrine does not preclude me from adjudicating the matters set forth in the Defendant's motion for reconsideration. As noted, the doctrine is not a rule of jurisdictional limitation but of comity. *Fagan*, 22 F.3d at 1290. *See Ferrara & Hantman v. Alvarez*, 124 F.3d 567, 583 (3d Cir.1997) ("[T]he law of the case does not impose a strait-jacket on the court's ability to reconsider issues previously decided. The doctrine simply 'directs a court's discretion, it does not limit the tribunal's power.'") (quoting *Arizona v. California*, 460 U.S. at 618). As Justice Holmes once wrote, "the phrase 'law of the case' ... merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messenger v. Anderson* , 225 U.S. 436, 444 (1912) (quoted in *In re Engel*, 124 F.3d 567, 583 (3d Cir. 1997)). *See also In re Engel*, 124 F.3d at 583 ("Although courts are reluctant to reconsider questions of law that have already been decided in the same proceeding, 'it is clear that all federal courts retain power to reconsider if they wish.'") (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478 (2d ed. 1981)). Thus, the law-of-the-case doctrine is not uniformly rigid in its application but rather permits a measure of flexibility and discretion on the part of the successor judge.

Furthermore, while principles of comity provide prudent limitations on a successor judge's discretion to reconsider prior rulings in the ordinary run-of-the-mill

situation, those principles must give way in extraordinary circumstances, as the law-of-the-case doctrine itself recognizes.  I believe that such circumstances exist here. Indeed, the Circuit Court of Appeals, now well familiar with this case, has described this litigation as "so unusual" as to have become "sui generis."  The intense public scrutiny given to these proceedings, the emotionally-charged atmosphere surrounding them, and the sheer prodigiousness of filings and rulings have all combined such that this case has now taken on a life of its own.  Without going into detail, it will suffice merely to note that the degree of rancor generated in the course of this case had reached such a level that the Court of Appeals ultimately determined that the best interests of justice would benefit from "fresh eyes on the case."  I therefore grant the Defendant's request to reconsider the matters raised in his motion.  I consider my willingness to do so consistent not only with the best interests of justice but also with the Third Circuit's directive that the case be henceforth viewed with "fresh eyes."  In sum, I find that these proceedings are so exceptional as to allow reconsideration of the Defendant's legal arguments without offense to the law-of-the-case doctrine.

Finally, as will become apparent upon a reading of this Memorandum Opinion, this Court is of the view that the two search warrants issued relative to the search of the Defendant's private offices and a laptop computer utilized by one of the Defendant's administrative assistants were constitutionally infirm.  The law-of-the-case doctrine recognizes that a court may depart from the prior ruling of a coordinate court when necessary to avoid an unjust result.  *See Arizona v. California*, 460 U.S. at 619 n. 8. For this reason as well, I conclude that the law-of-the-case doctrine poses no impediment to my ruling today.

On the other hand, while I do not believe that law-of-the-case principles prevent me from revisiting any of the issues presented by the defense, it will be noted that this opinion addresses only two specific aspects of the Defendant's motion for

reconsideration.[6]  Some commentary is warranted in this regard.

The Defendant's pending motion was styled foremost as a request for a judgment of acquittal relative to all of the remaining counts.[7]  The request for reconsideration of the suppression issues was styled as a secondary, albeit an independently dispositive, basis for relief.  Initially, and in a somewhat holistic fashion, this Court focused substantially on the Rule 29 arguments as well as certain peripheral aspects of the suppression arguments.[8]  However, as my review of these issues progressed to the point where the proverbial "wheat" became separated from the "chaff," it became apparent to me that the Defendant's facial challenges to the two search warrants were both meritorious and dispositive of all other issues.  Thus, while this Court has effectively granted the Defendant's request to reconsider with "fresh eyes" all aspects of his motion, I decline – for reasons that are both practical and rooted in concerns for comity – to render any substantive opinion on the Defendant's legal challenges beyond those expressly set forth in this opinion.

For one thing, because the search warrant issues appear to independently resolve all pending matters, there is no practical need for me to address the remaining Rule 29 issues.  For another matter, the possibility exists, at least in theory, that disposition of the Rule 29 arguments might jeopardize the Government's ability to obtain appellate review of the suppression rulings being rendered today.  Without

---

[6] It will be noted that the matters decided in this Memorandum Opinion involve issues that are purely legal.  Issues of law are not accorded any particular deference by appellate courts and are, instead, reviewed on a *de novo* basis.

[7] The Government has since abandoned all of the counts alleging theft of honest services and has reformulated the indictment such that the remaining counts of wire fraud, mail fraud and theft under § 666(a)(1)(A) are now renumbered as Counts 1-14.

[8] The Court notes that both the Defendant's brief and the Government's brief were, of necessity, very lengthy and complex.  The issues were multifaceted, with potentially dispositive arguments recurring throughout, and informed consideration of these issues necessarily entailed a substantial amount of legal research as well as a working familiarity with large portions of the record.

expressing any opinion as to the merits of the Defendant's Rule 29 arguments, I merely note that, if the Defendant were to prevail on any aspect of his request for Rule 29 relief, then (as he maintains) jeopardy would attach to those charges and they would terminate without any further right of appeal.[9]  It could well be the case that this might moot any aspect of the suppression rulings relating to those counts, thereby foreclosing the Government's ability to exercise its right to appellate review on the suppression issues – a result which I consider to be both undesirable and unfair.

Accordingly, my discussion of the merits will focus on the two searches which are the subjects of the Defendant's suppression arguments:  (1) the FBI's search of the Defendant's private business offices located at 1119 Penn Avenue in Pittsburgh (the "Penn Avenue Warrant") for the purpose of seizing boxes of private autopsy files and (2) the search of Eileen Young's home for the purpose of seizing a laptop computer utilized by Ms. Young in the course of performing work for Wecht Pathology (the "Laptop Warrant").  The factual and procedural history underlying the Defendant's multiple challenges to these two warrants is extremely protracted, and I will limit my discussion to those historical facts which are relevant to the present procedural context. Thus, I turn to the merits of the Defendant's suppression arguments.

### B.  THE MERITS OF THE DEFENDANT'S SUPPRESSION MOTIONS

1.    The Penn Avenue Warrant

On April 7, 2005, Special Agent Bradley Orsini of the FBI sought a warrant to search the offices of Wecht Pathology for boxes of private autopsy files which had recently been removed from the ACCO.  In support of the warrant, Special Agent Bradley Orsini submitted a sworn, 10-page "Application and Affidavit for Search Warrant," which laid out his case as to why there was probable cause to believe that the designated boxes of private autopsy files would be found at the Defendant's Penn

---

[9] To my knowledge, the Government has not disputed this legal proposition.

Avenue office and why they could be considered the fruits, instrumentalities, and evidence of the criminal activity. Having alleged the Defendant's knowing and willful use of ACCO resources and personnel for his own private financial gain, and having also alleged, more specifically, that the Defendant's abuses included the attempted concealment and removal of evidence, Agent Orsini's affidavit then went on to assert the following:

> 19. In early February of 2005, a criminal probe of WECHT's use of county resources for private work became public. According to ACCO 11, sometime during the week of February 6, 2005, [Eileen] Young asked ACCO 11 to obtain boxes for the purpose of moving large numbers of files from her office at the ACCO. ACCO 11 provided Young with boxes into which Young loaded files reflecting WECHT's private autopsy work. ACCO 11 moved those boxes from the ACCO to WECHT's private pathology office at 1119 Penn Avenue; Suite 4001, Pittsburgh, Pennsylvania after business hours. Flo Johnson provided the key to the space at 1119 Penn Avenue into which ACCO 11 helped move the boxes. WECHT's wife told ACCO 11 where the boxes were to be placed within the office space at 1119 Penn Avenue. According to ACCO 11, the boxes were placed in a records room on the right-hand side of the office suite's hallway. According to ACCO Deputy Coroners, the private autopsy files contain information showing, among other things, (1) use of the ACCO specialty labs for the private autopsies, (2) the identity of the preparer of reports used in the private autopsy cases, including Eileen Young, (3) payment for the private autopsies, (4) the identity of the decedents involved in private autopsies performed with the aid of county resources.

> 20 According to ACCO 11, Young was very rushed and upset about having to move the boxes quickly. According to ACCO 11, the materials he helped move consisted of approximately 20 boxes of files reflecting private autopsy work for the financial benefit of WECHT. The boxes are labeled on the outside with computer printed labels identifying the names of the decedents.

(Appl. and Affidavit for Search Warrant at ¶¶ 19-20, Doc. No. 1009-5 at pp. 13-14 of 42.)

After reviewing Agent Orsini's application and affidavit, a United States Magistrate Judge issued the warrant for the search of the Defendant's private office. In the designated area where the subject matter of the search is to be described, the warrant indicated "see Attachment "B." Attachment B, in turn, described the property to be seized as "Boxes (approximately twenty) and contents containing private autopsy files." (*See* Doc. No. 1009-5, p. 4 of 42.) It is undisputed that Agent Orsini's affidavit

was neither incorporated into the search warrant by reference nor attached to it. Instead, it was placed under seal in order to protect the integrity of the Government's investigation.

The Defendant has challenged the Penn Avenue search on numerous fronts. First, he claims that the search was conducted pursuant to an invalid warrant which failed, on its face, to satisfy the Fourth Amendment's particularity requirement. Second, he claims that the warrant was executed as if it was a general warrant. Third, he contends that Agent Orsini's Affidavit was facially lacking in probable cause and/or was infected with falsehoods which, when redacted, rendered the warrant unsupported by probable cause. Because I find the Defendant's first argument dispositive,[10] I need not address the other two.

The Fourth Amendment prohibits unreasonable searches and seizures and specifically provides that any warrant must "particularly described] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. This requirement is meant to prevent the issuance of general warrants, which "essentially authorize 'a general exploratory rummaging in a person's belongings.'" *ACEF*, 461 F.3d 374, 393 (3d Cir. 2006) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). It has been said that "[t]he particularity requirement 'makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *United States v. Christine*, 687 F.2d 749, 752-53 (3d Cir. 1982) (alteration in the original) (quoting *Macron v. United States*, 275 U.S. 192, 196 (1927)).

Here, the Defendant argues that the Penn Avenue Warrant is insufficiently

---

[10] A district court's determination regarding the specificity of a warrant, including whether it is overly broad or sufficiently particular, is a question of law which courts of appeal review on a *de novo* basis. *See United States v. Adjoin*, 452 F.3d 1140, 1143 (9th Cir. 2006); *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992); *United States v. Harris*, 903 F.2d 770, 774 (10th Cir. 1990).

particularized such that it constitutes a general warrant. The Government, on the other hand, contends that the warrant is, at most, overbroad and insists that any deficiency in the warrant's description can be cured by reference to Agent Orsini's affidavit. Alternatively, the Government contends that the fruits of the search should not be suppressed because the officers in question acted in good faith.

In determining whether a warrant is general, courts focus on the level of direction given to the executing officers and the level of discretion required of them in conducting the search. *See, e.g., United States v. Levito*, 540 F.3d 200, 211 (3d Cir. 2008) ("A warrant is not general unless it can be said to 'vest the executing officer with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence.") (alteration in the original) (quoting *United States v. Christine*, 687 F.2d at 753); *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57), 307 F.3d 137, 149 (3d Cir. 2002) (same); *Christine*, 687 F.2d at 753 (valid search warrant did not vest the executing officers with unbridled discretion to conduct an exploratory rummaging through the defendant's papers; rather, by directing the seizure of items described in specific and inclusive generic terms, the warrant ensured that "the magistrate, rather than the officer, determined what was to be seized"). *See also United States v. Sirmans*, No. 07-2370, 278 Fed. Appx. 171, 172, 2008 WL 2127448 at **1 (3d Cir. May 8, 2008) ("To be sufficiently particular, the Fourth Amendment requires the warrant to describe items to be seized in a way that the officer conducting the search can identify them with reasonable effort.") (citations omitted). Warrants have been struck down as general where, e.g., they have authorized the seizure of:

> (1) evidence of "smuggled goods," *Boyd v. United States*, 116 U.S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886); (2) evidence of "obscene materials," *Marcus v. Search Warrant*, 367 U.S. 717, 81 S. Ct. 1708, 6 L. Ed.2d 1127 (1961); (3) evidence of "books, records, pamphlets, cards, lists, memoranda, pictures, recordings, and other written instruments concerning the Communist Party of Texas," *Stanford v. Texas*, 379 U.S. 476, 85 S. Ct. 506, 13 L. Ed.2d 431 (1965); (4) evidence of "illegally obtained films," *United States v. Cook*, 657 F.2d 730 (5th Cir.1981); and (5) evidence of "stolen property," *United States v. Giresi*, 488 F. Supp.

445 (D.N.J.1980), *aff'd*, 642 F.2d 444 (3d Cir.1981).

*ACEF*, 461 F.3d at 393.

Fundamental to the parties' dispute is their disagreement as to whether reliance on Agent Orsini's unincorporated affidavit is appropriate. Thus, as an initial matter, I must determine which documents may properly inform my analysis of the Defendant's particularity challenge. The Supreme Court's recent decision in *Groh v. Ramirez*, 540 U.S. 551 (2004), is instructive on this point, as it makes clear that the requisite particularity must be found in the warrant itself:

> The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents. *See Massachusetts v. Sheppard*, 468 U.S. 981, 988, n. 5, 104 S. Ct. 3424, 82 L. Ed.2d 737 (1984) ("[A] warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional); *see also United States v. Stefonek*, 179 F.3d 1030, 1033 (C.A.7 1999) ("The Fourth Amendment requires that the warrant particularly describe the things to be seized, not the papers presented to the judicial officer ... asked to issue the warrant" (emphasis in original)). And for good reason: "The presence of a search warrant serves a high function," *McDonald v. United States*, 335 U.S. 451, 455, 69 S. Ct. 191, 93 L. Ed. 153 (1948), and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her inspection.

*Id*. at 557.

Like the Penn Avenue Warrant, the *Groh* warrant did not incorporate by reference the search warrant application or affidavit of probable cause, nor were such documents attached to the warrant or present at the time of the search. *Groh,* 540 U.S. at 558. Accordingly, the Court held that, where the warrant itself provided no description of the items to be seized, that facial deficiency could not be cured by the fact that the warrant *application* sufficiently described those items. *Id*. at 557.

Our Circuit Court of Appeals has similarly recognized that particularity is to be judged from the contents of the warrant alone and that resort to the supporting affidavit is inappropriate unless the affidavit is expressly incorporated by reference into the warrant and accompanies it. *See Doe v. Groody,* 361 F.3d 232, 239 (3d Cir. 2004) ("[I]t

is perfectly appropriate to construe a warrant in light of an accompanying affidavit or other document that is incorporated within the warrant.  But to take advantage of this principle of interpretation, the warrant must expressly incorporate the affidavit."); *United States v. Johnson*, 690 F.2d 60, 64-65 (3d Cir. 1982) ("When a warrant is accompanied by an affidavit that is incorporated by reference, the affidavit may be used in construing the scope of the warrant.") (citing cases).  *See also $92,422.57*, 307 F.3d at 158 (citing *Johnson*); *United States v. Dougherty*, 541 F. Supp. 2d 734, 736 n.1 (E.D. Pa. 2008) (same); *United States v. Knill*, Criminal No. 1:07-cr-29, 2007 WL 1892560 at *11 (M.D. Pa. June 29, 2007) (citing *$92,422.57*).

In light of this rule, our Circuit Court has cautioned that, "a problem at least potentially arises when much of the requisite information for a warrant is found in a document other than the warrant itself because, on the face of the warrant, the necessary particularity will be lacking."  *Bartholomew v. Commonwealth of PA*, 221 F.3d 425, 428 (3d Cir. 2000).  Thus,

> "[i]f the government wishes to keep an affidavit under seal" - in order to protect witnesses, for example - "it must list the items it seeks with particularity in the warrant itself.  It is the government's duty to serve the search warrant on the suspect, and the warrant must contain, either on its face or by attachment, a sufficiently particular description of what is to be seized."

*Id*. at 429 (quoting *United States v. McGrew*, 122 F.3d 847, 850 (9th Cir.1997)) (alteration in the original).  *See also Gagliardi v. Fisher*, 513 F. Supp. 2d 457, 476 (W.D. Pa. 2007) (particularity requirements of the Fourth Amendment apply to the warrant itself and where warrant does not specifically incorporate other documents by reference, a defect in the warrant itself cannot be excused merely because the application is sufficiently particularized) (citing *Groh*, *supra* at 557-58).

Because the Penn Avenue Warrant did not incorporate Agent Orsini's application or supporting affidavit, I must view in isolation its description of items to be seized, *i.e.*: "Boxes (approximately 20) and contents containing private autopsy files."  In considering the sufficiency of this description, I recognize that "'the Fourth

Amendment's commands ... are practical and not abstract'" and, therefore, the warrant's sufficiency "'must be tested ... in a commonsense and realistic fashion.'" *United States v. Christine*, 687 F.2d at 760 (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). Moreover, the level of specificity required is case-specific and depends upon the circumstances at hand. *See ACEF*, 461 F.3d at 395 (the breadth of items to be searched depends upon the particular factual context of each case and also the information available to the investigating agent that could limit the search). *Accord United States v. Adjoin*, 452 F.3d 1140, 1147 (9th Cir. 2006) ("[T]he level of detail necessary in a warrant is related to the particular circumstances and the nature of the evidence sought.").

Bearing all this in mind, I conclude that the Penn Avenue Warrant fails to satisfy the Fourth Amendment's particularity requirement.

The warrant's fundamental problem is that – unlike the supporting affidavit – it fails to make clear that the boxes of private autopsy files which the Government wanted to seize were *those which had been removed from the ACCO* as an alleged act of concealment of evidence. Establishing a link between the targeted files and the ACCO was critical because the heart of the Government's theory, as laid out in Agent Orsini's affidavit, concerned the Defendant's alleged misuse of county resources to perform private work for his own benefit, and the whole purpose of searching the Defendant's private office in the first place was to find evidence of that misconduct which had allegedly been moved there from the ACCO. It is important to recognize that the location to be searched – *i.e.*, the Defendant's private pathology business office – is the very place where one might naturally expect to find an abundance of boxes containing private autopsy files. Indeed, the Government conceded this point at oral argument. Yet the warrant on its face provided no meaningful guidance which would have allowed the officers executing the warrant to distinguish those items of evidentiary value (i.e, the private autopsy files removed from ACCO and bearing indicia of ACCO-related activity) from those items with no evidentiary value (private autopsy files generated in the

normal course of the Defendant's private business).

It is also important to recognize that there was nothing unlawful *per se* about the Defendant maintaining a private pathology practice on the side while serving as Allegheny County Coroner. Thus, the designated items to be seized – approximately twenty boxes and contents containing private autopsy files – could not be viewed as objects that are, by their very nature, contraband. Rather, since boxes of private autopsy files are the sort of perfectly lawful items which one might well expect to find in substantial numbers at a private pathology office, greater precision was required in order to ensure that only those items which could be considered fruits, instrumentalities, or evidence of a crime – i.e., the boxes removed from ACCO – were targeted for seizure. *See* 2 Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> §4.6(a) (4th ed. 2008) ("Greater care in description is ordinarily called for when the type of property sought is generally in lawful use in substantial quantities," and "[a] more particular description than otherwise might be necessary is required when other objects of the same general classification are likely to be found at the particular place to be searched.") (endnotes citing cases omitted). *Cf. id*, at §4.6(a) ("A less precise description is required of property which is, because of its particular character, contraband.") (citing cases). This is particularly true since the Government was possessed of information which could have substantially narrowed the warrant's description of items to be seized.

A case illustrative of this point is *United States v. Fuccillo*, 808 F.2d 173 (1st Cir.1987). In *Fuccillo*, agents executed three separate warrants at the defendant's warehouse, wholesale distributorship, and retail clothing store for the purpose of seizing merchandise that had been stolen in interstate commerce. Each warrant authorized the seizure of: "[C]artons of women's clothing, the contents of those cartons, lists identifying the contents of the cartons, and control slips identifying the stores intended to receive these cartons, such items being contraband and evidence of a violation of Title 18, United States Code, Section 659, Possession of Goods Stolen from Interstate

Shipments." *Id*. at 174 (alteration in the original). In affirming the district court's suppression of evidence seized pursuant to the searches, the First Circuit Court of Appeals held that "the warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." 808 F.2d at 176. With respect to the searches of the wholesale distributorship and the warehouse, the court found that "[t]he instant warrants contained no explanation as to how the executing agents were to differentiate cartons of stolen women's clothing from legitimate goods at either location." *Id*. The court cited other cases in which the same deficiency was found to be "fatal ... especially in view of the fact that the defects could have been cured had the warrants in both cases set forth information clearly available to the government for distinguishing the contraband." *Id*. (*citing United States v. Klein*, 565 F.2d 183 (1st Cir. 1977) and *Montilla Records of Puerto Rico v. Morales*, 575 F.2d 324, 326 (1st Cir. 1978)). Based on information available to the FBI, the warrant "could have directed the agents to [seize] 'cartons of women's clothing from Casual Corner stores' or 'cartons from Women's Specialty Retailing,'" rather than merely directing the seizure of "cartons of women's clothing." *Id*. at 177. Thus, "the executing agents in the instant case had no 'physical criteria or detailed description in the warrant to enable them to determine what they might lawfully seize...'" *Id*. (quoting *Montilla Records, supra*, 575 F.2d at 326-327). With respect to the search conducted at the Defendant's retail clothing store, the court found it:

> beyond cavil that the warrant ... could have been written with precision to assure that appellee's personal rights would remain inviolate. The Casual Corner store manager had given the FBI a very detailed list of articles she had observed at [the Defendant's retail clothing store]. They were manufactured exclusively for Casual Corner stores. Instead of identifying these articles of clothing with specificity, thus limiting the scope of the seizure, the warrant merely directed the agents to search, and seize, indiscriminately.

*Id*. at 177. Indeed, the court found this warrant so "glaringly deficient" that it declined to scrutinize it further. *Id*.

Here, a greater degree of precision in the warrant's description of items to be

seized was clearly possible, for the Penn Avenue Warrant not only failed to specify that the targeted boxes of files were those that had been removed from the ACCO, it also omitted several descriptive features that were known to Agent Orsini and set forth in his affidavit.  For example, the affidavit avers that the subject boxes had been taken to the Defendant's private office and placed in a records room located on the right-hand side of the office suite's hallway.  The affidavit further specifies that the targeted autopsy files would contain certain types of information, including (among other things) information showing the use of the ACCO specialty labs for the private autopsies and the fact that Eileen Young – a county employee – had prepared reports used in certain private autopsy cases.  (*See* Affidavit [1009-5] at ¶ 19.)  In addition, the affidavit described the boxes as "labeled on the outside with computer printed labels identifying the names of the decedents."  (*Id*. at ¶ 20.)

None of these limiting criteria were set forth in the search warrant.  Nor did the warrant place any other restrictions on the search, such as indicating the years for which evidence was being sought or limiting the seizure to those files which might constitute fruits, instrumentalities or evidence of the particular federal crimes at issue. *Cf. ACEF*, 461 F.3d at 395 (warrant seeking business records and cash from businesses suspected in complex money laundering scheme was sufficiently particular where warrants were limited by reference to several specifically enumerated federal crimes, warrant sought records only for certain years, and evidence was limited to records relating to specifically named corporations, principals and employees).

Our Circuit Court of Appeals has instructed that "the breadth of items to be searched depends upon the particular factual context of each case and also the information available to the investigating agent that could limit the search at the time the warrant application is given to the magistrate."  ACEF, 461 F.3d at 395 (interpreting the holdings of *United States v. Leary*, 846 F.2d 592 (10th Cir.1988); *United States v. American Investors of Pittsburgh*, 879 F.2d 1087 (3d Cir.1989); and *United States v. Kepner*, 843 F.2d 755 (3d Cir.1988)).  *Accord United States v. Adjoin*, 452 F.3d 1140,

1148 (9th Cir. 2006) (in determining whether a warrant is sufficiently particular, court will consider, among other things, whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued."). Accordingly, "the use of generic classifications in a warrant is acceptable when a more precise description is not feasible." *Christine*, 687 F.2d at 760 (citing cases).

Here, however, the Government was possessed of information which, had it been incorporated into the warrant, would have substantially clarified the description of items to be seized so as to focus the executing officers' attention on the actual target of the search – the boxes of private autopsy files that had been removed from the ACCO. The omission of this information resulted in a warrant whose description was simply too vague to meaningfully guide the officers' search.

Notwithstanding these problems, the Government vigorously disputes the Defendant's characterization of the Penn Avenue Warrant as a general warrant based on what the Government views as two important search criteria: content and number. That is, the face of the warrant informed the officers that they were looking only for boxes that held private autopsy files and, moreover, the officers could seize only "approximately twenty" such boxes. These limitations, the Government insists, are significant enough that the Penn Avenue Warrant should be considered, at most, overbroad, but not general, since the warrant did not allow the officers unlimited discretion to seize anything within the premised that they wished.

I do not find this theory persuasive, however. As I have discussed above, the requirement that the boxes had to contain private autopsy files is not a particularly meaningful limitation, given that the location of the search was the Defendant's private pathology office – a place where boxes of private autopsy files would likely exist in substantial numbers. *See United States v. Abrams*, 615 F.2d 541, 546 (1st Cir. 1980) (limitation in a warrant seeking the seizure of business records must be a meaningful one).

Furthermore, as I have observed, and as the Government candidly acknowledged at argument, the numerical caveat ("approximately twenty boxes") provides no basis for differentiating between those boxes removed from ACCO and other boxes of private autopsy files likely to be found on the premises.  At the end of the day, an officer executing this warrant would not be able to determine with reasonable certainty which items were being sought and would essentially have to guess which boxes (and how many, for that matter) to seize.[11]  The warrant thus facially authorized government agents to rummage through a substantial volume of the Defendant's work product and decide for themselves what to take.  The violation of the Defendant's Fourth Amendment rights in this respect is not mitigated by the mere fact that the governmental intrusion encompassed only the universe of boxes containing  the Defendant's private autopsy files rather than the entire content of his business office.  The scope of the search, as authorized by the warrant, was still unreasonable.

Moreover, the Government's attempt to characterize the Penn Avenue Warrant as merely overbroad does not jibe with the concept of overbroad warrants as they have been defined in this circuit.  Our Court of Appeals has observed that:

> [t]here is a legal distinction between a general warrant, which is invalid because it vests the "executing officers with unbridled discretion to conduct an exploratory rummaging through [the defendant's] papers in search of criminal evidence," and an overly broad warrant, which " '[describe[s] in both specific and inclusive general terms what is to be

---

[11] In fact, it appears that this is exactly what transpired because, when the officers entered the Wecht Pathology offices, they discovered 60 to 70 boxes present on the premises, many or most of which contained private autopsy files.  This situation caused FBI Agent Welsh, the on-site supervisor of the search, to telephone Agent Orsini for assistance in determining which boxes the agents were to seize.  As Agent Welsh later testified, he informed Agent Orsini that "there were numerous boxes here, all of them containing private autopsy files, or most of them. ... I indicated that, you know, we could almost use any box in this room because they were containing private autopsy files."  (Tr. 06/08/06 Supp. Hrg. [285] at pp. 25-26).  According to Agent Welsh, a discussion ensued as to how the executing agents could narrow the terms of the search parameters "to, let's say, those boxes that were recently moved."  (*Id.* at p. 26.)  Ultimately, 29 boxes (all of them believed by the agents to be ACCO-related) were taken.

seized,' but 'authorizes the seizure of items as to which there is no probable cause.' "

*ACEF*, 461 F.3d at 393 n. 19 (quoting *U.S. v. $92,422.57*, 307 F.3d at 149).  *See also*

*Christine*, 687 F.3d 753.  One Pennsylvania court has described the distinction between

*generality* and *overbreadth* as follows:

> These are two separate, though related, issues.  A warrant unconstitutional for its lack of particularity authorizes a search in terms so ambiguous as to allow the executing officers to pick and choose among an individual's possessions to find which items to seize.  This will result in the general "rummaging" banned by the fourth amendment.  *See Macron v. United States*, 275 U.S. 192, 195, 48 S. Ct. 74, 75, 72 L.Ed. 231 (1927).  A warrant unconstitutional for its overbreadth authorizes in clear or specific terms the seizure of an entire set of items, or documents, many of which will prove unrelated to the crime under investigation.  The officers executing such a warrant will not rummage, but will "cart away all documents."  *Application of Lafayette Academy*, 610 F.2d 1, 3 (1st Cir.1979).

*Commonwealth v. Santner*, 454 A.2d 24, 25 n.2 (Pa. Super. 1982).

Here, the defect in the Penn Avenue Warrant cannot properly be characterized as one of overbreadth, as we are not confronting a situation where officers, armed with a clear and specific warrant, seized all of the items within certain particularly described categories, only to discover that probable cause did not support such a broad seizure.  Rather, the fundamental problem with the Penn Avenue Warrant is that, by its terms, the warrant failed to give the executing officers sufficient direction as to which items were to be seized in the first place.  *See United States v. Sirmans*, No. 07-2370, 278 Fed. Appx. 171, 172, 2008 WL 2127448 at **1 (3d Cir. May 8, 2008) ("To be sufficiently particular, the Fourth Amendment requires the warrant to describe items to be seized in a way that the officer conducting the search can identify them with reasonable effort.") (citations omitted).

Just as important, the warrant failed to adequately inform the Defendant (or those representatives of his who were present) of the scope of the authorized search.  *See Groh*, 540 U.S. at 561 (A particular warrant also "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need

to search, and the limits of his power to search.") (citations omitted).  The problem here, in other words, is not one of over-inclusiveness but of ambiguity.

In sum, under the terms of the Penn Avenue Warrant, any limitations on the scope of the evidence seized were imposed not by particularized terms approved by the magistrate but by the officers' own judgment.  It is precisely this kind of "unbridled discretion" which the Fourth Amendment's particularity requirement was designed to prevent.  *See Groh*, 540 U.S. at 561 ("Even though petitioner acted with restraint in conducting the search, 'the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer.'") (*citing Katz v. United States*, 389 U.S. 347, 356 (1967)).  *See also United States v. Fleet Management*, 521 F. Supp. 2d 436, 447 (E.D. Pa. 2007) (warrant authorizing the seizure of "any and all data" from ship's computers was invalid general warrant in that it "manifested no judicial control over the search of the hard drives, but rather, left it entirely to the executing officers' discretion to determine what on the hard drives could and could not be seized.")  *Cf. Christine*, *supra*, at 753 (search warrant was valid where it directed the seizure of items described in specific and inclusive generic terms such that "the magistrate, rather than the officer, determined what was to be seized").

My conclusion that the Penn Avenue Warrant constitutes an invalid general warrant disposes of a number of other considerations bearing on whether the warrant can be salvaged.  For example, both sides appear to agree that this case does not present a situation where the deficiency in the warrant can be readily cured by *redaction.*  Pursuant to that process, courts

> strik[e] from a warrant those severable phrases and clauses that are invalid for lack of probable cause or generality and preserv[e] those severable phrases and clauses that satisfy the Fourth Amendment.  Each part of the search authorized by the warrant is examined separately to determine whether it is impermissibly general or unsupported by probable cause.  Materials seized under the authority of those parts of the warrant struck for invalidity must be suppressed, but the court need not suppress materials seized pursuant to the valid portions of the warrant.

*Christine*, 687 F.2d at 754.  Here, the description of items to be seized in the Penn

Avenue Warrant does not partake of discreet, severable clauses. *See Christine, supra*, at 754 ("Redaction is inappropriate when the valid portions of the warrant may not be meaningfully severable from the warrant as a whole.").

Similarly, the Penn Avenue Warrant cannot be saved by the possibility that the agents executing the search may have complied with the narrower terms contained in Agent Orsini's affidavit of probable cause[12] – a scenario addressed in *Doe v. Groody*, 361 F.3d 232 (3d Cir. 2004). *Groody* involved a situation wherein officers conducting a drug investigation obtained a warrant authorizing a search for narcotics at the home of John Doe. As in the case at bar, the search warrant failed to incorporate the officer's supporting affidavit. The *Groody* court held that, although the warrant itself facially authorized officers to search the person of John Doe, it did not authorize the search of other persons on the premises and, thus, the officers violated the clearly established rights John Doe's wife and child by strip-searching them. In arriving at this conclusion, the court recognized "two categories" of cases in which an unincorporated affidavit has been used to save a defective warrant. In relevant part, the Court explained:

> The second category of decisions in which an unincorporated affidavit has been read to modify a search warrant is constituted by cases in which the affidavit is particularized but the warrant is overbroad. *See, e.g., United States v. Bianco*, 998 F.2d 1112, 1116-17 (2d Cir.1993); *United States v. Towne*, 997 F.2d 537, 547 n. 5 (9th Cir.1993) (discussing cases). So long as the actual search is confined to the narrower scope of the affidavit, courts have sometimes allowed the unincorporated affidavit to "cure" the warrant, *id.*, or at least have treated the excessive elements of the warrant as harmless surplusage, *see United States v. Stefonek*, 179 F.3d 1030, 1033-34 (7th Cir.1999).

361 F.3d at 240 (footnote omitted). The *Groody* court concluded that this principle had no application in the case before it, where the officers were attempting to use the unincorporated affidavit to *broaden* the scope of the search, not narrow it.

The important point, however, is that the principle discussed in *Groody* – to the

---

[12] For present purposes, I have no occasion to revisit Judge Schwab's determination that the officers executing the Penn Avenue Warrant acted in compliance with the terms of Agent Orsini's affidavit, and I express no opinion on that point.

extent it represents binding authority[13] – applies to warrants that are overbroad, not general. *See United States v. Leveto*, 540 F.3d 200, 211 (3d Cir. 2008) (finding that, to the extent search warrant was "generic," it was merely overbroad and noting that "such a defect can be cured by an affidavit that is more particularized than the warrant.") (citing *Groody*). The Government appears to concede as much because, while it vigorously disputes the characterization of the Penn Avenue Warrant as a general warrant, the Government does not contend that *Groody* would save a warrant that is, indeed, general.

Finally, I must address the Government's contention that the fruits of the Penn Avenue search should not be suppressed because the officers in question acted in good faith.[14]  *See United States v. Leon*, 468 U.S. 897 (1984) (holding that the exclusionary rule does not require the suppression of evidence seized in violation of the Fourth Amendment where the officers acted with an objective, good faith belief that their conduct was lawful).

In determining the applicability of the good faith exception to the exclusionary rule, we are directed to ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Loy*, 191 F.3d 360, 367 (3d Cir.1999) (quoting *Leon*, 468 U.S. at 922 n. 23).  The fact that an officer executes a search pursuant to a warrant typically "suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57)*, 307 F.3d at 145-46 (quoting *United States v. Hodge*, 246 F.3d 301,

---

[13] The Defendant vigorously disputes the validity of the principle discussed in *Groody* and characterizes the *Groody* court's discussion of that point as non-binding precedent.  For present purposes, I need not weigh in on that debate.

[14] The issue of whether officers acted in good faith is a question of law which, on appeal, receives *de novo* review.  *See  United States v.* Williams, 3 F.3d 69, 71 n. 2 (3d Cir. 1993) (citing cases).  *Accord United States v. Merritt*, 361 F.3d 1005, 1010 (7th Cir. 2004); *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992).

308 (3d Cir.2001)).

Nevertheless, there are four well-recognized situations in which an officer's reliance on a warrant will not be considered reasonable:

> (1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;
>
> (3) when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or
>
> (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Id.* (citing *Hodge, supra*, at 308). *See also United States v. Williams*, 3 F.3d 69, 74 n. 4 (3d Cir. 1993) (citation omitted).

For present purposes we are concerned only with the fourth situation – a warrant that we have found to be facially deficient in that it fails to particularize the items to be seized. Courts in this circuit have consistently held that the good faith doctrine will not save a general warrant. *See, e.g., United States v. ACEF*, 461 F.3d at 393 n. 19 (whereas an overbroad warrant may be salvaged through redaction, "the only remedy for a general warrant is to suppress all evidence obtained thereby."); *Christine, supra*, at 758 ("It is beyond doubt that all evidence seized pursuant to a general warrant must be suppressed.") (footnote omitted); *U.S. v. Tracey*, Criminal No. 1:CR-08-126, 2008 WL 2622908 at *3 (M.D. Pa. June 30, 2008) ("It is beyond doubt that all evidence seized pursuant to a general warrant must be suppressed.") (citing *Christine*); *United States v. Fleet Management Ltd.*, 521 F. Supp. 2d 436, 445 (E.D. Pa. 2007) ("[W]e read Third Circuit precedent to prohibit the use of the good faith exception in connection with general warrants.") (citation omitted); *United States v. Kofsky*, Crim. Action No. 06-392, 2007 WL 2480971 at *15 (E.D. Pa. Aug. 28, 2007) ("[T]he only remedy for a general warrant is to suppress all evidence obtained thereby.")(alteration in the original)

29

(citations omitted); *U.S. v. Rankin*, 442 F. Supp. 2d 225, 229 (E.D. Pa. 2006) ("Evidence seized pursuant to a general warrant must be suppressed."). Thus, any reliance on the good faith doctrine would appear to be foreclosed in this case.

Nor is this a case in which the Penn Avenue Warrant can be saved under the principle espoused in *Massachusetts v. Sheppard*, 468 U.S. 981 (1984). In *Sheppard*, officers conducting a homicide investigation sought a warrant to search the defendant's home for a number of items particularized in the affiant's supporting affidavit. Because they had difficulty locating an appropriate warrant application form, the officers had to rely on a form previously used in connection with drug investigations. The affiant made certain changes to the form, but he did not delete a reference to "controlled substance" in the portion of the application that would eventually constitute the warrant itself. The affiant presented the affidavit to a judge, who indicated that he would approve the search as requested. Upon presenting the judge with the warrant form, the affiant acknowledged that form dealt with controlled substance and showed the judge where he had made certain changes. The judge advised that he would make the necessary changes to the warrant form and, after making certain changes, signed and dated the warrant and advised the officer that the warrant was sufficient. However, the judge did not change the substantive portion of the warrant authorizing a search for controlled substances, nor did he alter the form so as to expressly incorporate the attached affidavit.

Based on these facts, the Court found that the officers' mistaken belief in the warrant's validity was objectively reasonable. 468 U.S. 988. Noting that the officers had taken every step that could reasonably have been expected of them, the Court concluded that the officers were entitled to rely on the judge's assurance that the warrant was valid, particularly in light of the fact that the affiant had alerted the judge to the potential problem. *Id.* at 989-90. The Court reasoned that suppression was inappropriate because, while "[a]n error of constitutional dimensions may have been committed with respect to the issuance of the warrant, ... "it was the judge, not the

police officers, who made the critical mistake." *Id*. at 990.  As Court explained:
"Suppressing evidence because the judge failed to make all the necessary clerical
corrections despite his assurances that such changes would be made will not serve the
deterrent functions that the exclusionary rule was designed to achieve." *Id*. at 990-91.

Here, it appears the Magistrate Judge reviewed Agent Orsini's affidavit carefully,
as she inserted language into ¶ 3 indicating that the ACCO receives "in excess of
$10,000" in federal funding.  (*See* Affidavit at ¶ 3 ([1009-5] at p. 7 of 42).)  However,
there is no evidence, as far as I am aware, that any discussion was held between Agent
Orsini and the Magistrate Judge concerning the appropriateness of "Exhibit B's"
description, much less is there any suggestion that the Magistrate Judge affirmatively
assured Agent Orsini that such language would pass constitutional muster.  Moreover,
there is no dispute that the Government was responsible for drafting the language
contained in Exhibit B to the warrant.[15]  Under these circumstances, which are
distinguishable from those in *Sheppard*, it cannot be said that the Magistrate Judge,
rather than the Government agents, was responsible for the constitutional defect.  *See*
*Groh*, 540 U.S. at 561 n. 4 (where government agent did not alert the magistrate to the
defect in the warrant that the agent had drafted, the Court could not be certain whether
the magistrate was aware of the scope of the search he was authorizing, and therefore
it could not be said that the constitutional error was committed by the magistrate judge)
(distinguishing *Sheppard*).  Accordingly, the facts here do not support application of the
good faith doctrine pursuant to *Massachusetts v. Sheppard.*

_____

[15] The Government represents that there is a conflict in the record concerning
whether the warrant was drafted by the U.S. Attorney's office alone or with the
assistance of Agent Orsini.  (*See* Government's Response to Def.'s Supplement to the
Suppression Record on Matters *Sub Judice* ([1031] at p. 9 of 22) ("In the June 2006
suppression hearing SA Orsini testified that he and AUSA Stallings drafted the warrants
together ... However, the testimony of SA Orsini at the time of the September 2007
suppression hearing indicates that AUSA Stallings alone drafted the actual
warrants...")).  In either case, it appears that the Government drafted the language in
Exhibit B to the Penn Avenue Warrant.

In concluding that the Penn Avenue Warrant lacked sufficient particularity, I am not embracing a mere hyper-technicality or elevating form over substance. It must be remembered that, while a warrant is to be read in a "common-sense, non-technical fashion," *Groody*, 361 F.3d at 239 (citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965)), it may not be read in a way that violates its fundamental purposes." *Id*. A particular description, in writing, is the "touchstone" of a warrant and accomplishes three things:

> First, it memorializes precisely what search or seizure the issuing magistrate intended to permit. Second, it confines the discretion of the officers who are executing the warrant. *Macron v. United States*, 275 U.S. 192, 196, 48 S. Ct. 74, 72 L.Ed. 231 (1927). Third, it "inform[s] the subject of the search what can be seized." *Bartholomew*, 221 F.3d at 429. For these reasons, although a warrant should be interpreted practically, it must be sufficiently definite and clear so that the magistrate, police, and search subjects can objectively ascertain its scope. *See Groh*, 540 U.S. at ----, 124 S.Ct. at 1289, 2004 WL 330057.

*Id*. In light of the importance of this constitutional mandate, our Circuit Court of Appeals has recognized that "[t]he cost to society of sanctioning the use of general warrants - abhorrence for which gave birth to the Fourth Amendment - is intolerable by any measure. No criminal case exists even suggesting the contrary." *Christine, supra*, 687 F.2d at 758.

Nor does my invalidation of the Penn Avenue Warrant place upon law enforcement an impossible standard. The upshot of my ruling, consistent with this circuit's long-standing jurisprudence, is that law enforcement officers executing a search warrant must find the requisite particularity in the warrant itself and should not rely upon the supporting affidavit to particularize the scope of a search unless the affidavit it appended to the search warrant and incorporated into it by reference. Where the affidavit is not incorporated and attached but rather is placed under seal, as was the case here, the officers must be able to determine with reasonable certainty, and from the face of the warrant alone, the place to be searched and the particular items to be seized.

Unlike determinations of probable cause, determinations as to particularity are

not so inherently nuanced as to be beyond the expertise of a reasonably well-trained law enforcement officer.  As one court has explained:

> Determining whether certain facts constitute probable cause differs from ascertaining whether a warrant is so facially overbroad that it precludes reasonable reliance.  *Leon* teaches that inadequate probable cause does not necessarily render a warrant facially invalid nor prevent reasonable belief in the existence of probable cause.  The existence of probable cause may be difficult to determine.  Recognizing this, *Leon* and its progeny encourage officers to consult legal officers and rely on their opinions.  Once this is accomplished, " 'there is literally nothing more the policeman can do in seeking to comply with the law.' " *Id.* at 921, quoting *Stone v. Powell*, 428 U.S. 465, 498, 96 S. Ct. 3037, 3054, 49 L. Ed.2d 1067 (1976) (Burger, C.J., concurring).  *Leon* emphasizes that generally "an officer cannot be expected to question the magistrate's probable-cause determination."  In contrast, officers attempting to execute a warrant so facially overbroad that it precludes reasonable reliance will recognize, even after the warrant leaves the hands of the magistrate, that it fails to offer guidance.  *See Leon*, 468 U.S. at 923, 104 S.Ct. at 3420; *Center Art Galleries*, 875 F.2d at 753-54.

*Ortiz v. Van Auken*, 887 F.2d 1366, 1371 (9th Cir. 1989).

Here, the warrant on its face did not direct the searching officers to seize the boxes removed from ACCO; instead, it permitted the officers to rummage through any of the boxes of private autopsy files at the Defendant's private office, allowing the officers to determine for themselves which "approximately twenty" to take.  If this facial deficiency was not apparent to the officers in the abstract, it surely became apparent when they arrived at the premises and discovered 60 to 70 boxes on the premises, most of which contained private autopsy files; at that point, the officers sought further direction from Agent Orsini, who in turn attempted to direct the course of the search consistent with the more narrow criteria known to the Government and set forth in his sealed affidavit.  Although one can argue that the officers conducted the search in subjective good faith, the fact of the matter is that it was their own discretion, not the terms of the search warrant, which determined the scope of the search.  *See Groh*, 540 U.S. at 561 ("Even though petitioner acted with restraint in conducting the search, 'the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer.") (citing *Katz v. United States*, 389 U.S. 347, 356 (1967)).

Moreover, notwithstanding the agents' subjective awareness that they were

looking for ACCO-related boxes, the fact is that the Penn Avenue Warrant failed to fulfill one of the critical purposes of the particularity requirement:  "assur[ing] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search."  *Groh*, 540 U.S. at 561 (citing *United States v. Chadwick*, 433 U.S. 1, 9 (1977)).  *Accord United States v. McGrew*, 122 F.3d 847, 85 n. 5 (9th Cir. 1997) ("no matter how aware the officers are of the limits of their search, the person being searched ...is still completely unaided when agents fail to produce a document explaining the parameters of the search").

For all of the foregoing reasons, the Penn Avenue Warrant fails to satisfy the Fourth Amendment's particularity requirement and the good faith exception to the exclusionary rule does not apply.  The fruits of the Penn Avenue Warrant must therefore be suppressed.


2.    The Laptop Warrant

On April 7, 2005, the same day that Agent Orsini applied for the Penn Avenue Warrant, he applied for a warrant to search the home of Eileen Young for the purpose of seizing a laptop computer and associated storage devices ("the Laptop Warrant") on which agents believed Ms. Young had generated and stored work product pertaining to the Defendant's private business.[16]  The affidavit in support of this warrant was largely identical to the affidavit submitted in support of the Penn Avenue Warrant in terms of

---

[16] The record reflects that this warrant to search Ms. Young's home was not executed because the laptop was found not to be present there and, consequently, a second warrant was issued the next day authorizing a search of the Allegheny County Coroner's Office for the laptop computer.  (*See* Mem. Op. dated 5/31/06 [193] at p. 4 of 17 n. 1.)  The second warrant application was sworn out by a different agent but was based upon a virtually identical affidavit.  (*See* Def.'s Br. in Supp. of Mot. for Reconsideration at Ex. 31-32 [1009-10] pp. 37-57.)  Thus, for present purposes, there is no material distinction between the two warrants, other than the affiant's identification and the description of the *place* to be searched (which are not at issue).  I will therefore refer to Agent Orsini's original warrant and supporting affidavit in discussing issues relevant to the Laptop Warrant.

the description of probable cause and the averments concerning the Defendant's alleged abuses of ACCO resources. As it pertains specifically to the laptop computer, the affidavit alleged as follows:

> 15. According to ACCO 1, ACCO 3, ACCO 6, ACCO 7, ACCO 8, ACCO 10, and ACCO 16, WECHT caused the ACCO to employ Eileen Young, a secretary, at an annual salary of approximately $70,000 per year. Young spends all or nearly all of her time, however, doing private work for the financial benefit of WECHT and to the exclusion of work on behalf of the ACCO.[17] For example, Young typed an expert report for WECHT in the

---

[17] During the oral argument held on January 29, 2009, the defense challenged the accuracy of this allegation on the ground that it was merely a conclusion which Agent Orsini had arrived at on his own without support from any source at the ACCO. I interpret this challenge as an assertion by the defense that Agent Orsini's affidavit contained a deliberate or reckless falsehood to the extent that it asserts that Ms. Young "spen[t] all or nearly all of her time ... doing private work for the financial benefit of WECHT and to the exclusion of work on behalf of the ACCO." Alternatively, the defense may be understood as arguing that the statement is facially uncorroborated and, as such, facially undermines a finding of probable cause for the search of the laptop computer's contents. In either case, the Defendant's objection to the quoted language, if meritorious, could provide an independent basis for defeating the officers' good faith reliance on the warrant. *See United States v. Zimmerman*, 277 F.3d 426, 436-37 (3d Cir. 2002) (noting that an officer's reliance on an invalid warrant would not be reasonable where, *inter alia*, "the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit," or where "the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.")

The Defendant's objection to the averment that Ms. Young reportedly "spen[t] all or nearly of her time... doing private work for the financial benefit of WECHT and to the exclusion of work on behalf of the ACCO" is based on Agent Orsini's testimony at the suppression hearing held by Judge Schwab on September 18, 2007, where Agent Orsini was questioned by defense counsel on precisely that point. Upon review of the transcript, however, I am satisfied that the Defendant's challenges to this particular averment lack merit.

A review of the relevant testimony demonstrates that Agent Orsini represented, in unequivocal and uncontested fashion, that multiple ACCO sources had informed him that Ms. Young spent all or nearly all of her time at the ACCO doing work in furtherance of the Defendant's private business. Read in context, the testimony does not support the Defendant's claim that Orsini somehow admitted to having arrived at that conclusion on his own. Rather, the testimony clearly establishes that, while the relevant language did not purport to be a direct quote from any particular ACCO employee, it accurately summarized information that Agent Orsini had received from multiple ACCO sources. (*See Transcript*, 9/18/07 Supp. Hrg. [545] at pp. 140-42.)

Charles Dixon case, for which WECHT was paid $5,000.

16.   ACCO 1 is a computer technician at the ACCO, and he has personal knowledge of the contents of the laptop computer Young uses at work. According to ACCO 1, Young performs her private work for WECHT on a Dell laptop computer, saves the records relating to this private work on the laptop computer's hard drive, and takes the laptop computer to her home every night. ...

*** 

21.   According to ACCO 1, Eileen Young has used a Dell laptop computer in her ACCO office.  As discussed above, Young used this laptop to perform extensive private work for the personal financial benefit of WECHT.  Prior to February of 2005, she did not use a desktop computer in the ACCO office.  In early February of 2005, after disclosure of the criminal probe, WECHT's Chief Deputy Coroner Joseph Dominick ordered ACCO 1 to install a new desktop computer in Eileen Young's office.  ACCO 1 believed that this request was made in order to create the false appearance that Eileen Young did not do private autopsy work at the ACCO.

(See Laptop Affidavit [1009-6] at ¶¶ 15, 16, and 21.)

Like the Penn Avenue Warrant, the Laptop Warrant did not incorporate by reference or have attached to it Agent Orsini's supporting affidavit.  Rather, under the portion of the warrant calling for a description of the property to be seized, the warrant referred to "Attachment B," which in turn described the property to be seized as follows:

A laptop computer manufactured by Dell, and all information and data contained therein, including data stored on any associated data storage devices such as zip drives, discs (of any kind including cd and hard), and back-up tapes.

---

Moreover, while Orsini's affidavit does not cite directly to ACCO sources in support of the statement that "Young spends all or nearly all of her time ... doing private work for the financial benefit of WECHT and to the exclusion of work on behalf of the ACCO," a fair reading of the affidavit, particularly as clarified by Agent Orsini's testimony, supports the notion that this information was supplied by the multiple ACCO sources cited in the preceding sentence.  Stated differently, one could fairly and accurately read the affidavit as indicating that the ACCO sources cited in the first sentence of ¶ 15 also supported the assertion set forth in the second sentence of ¶ 15. (*See Transcript*, 9/18/07 Supp. Hrg. [factual 545] at p. 141; Affidavit [1009-6] at ¶ 15.) Consequently, I find no merit in the Defendant's challenges to this aspect of Agent Orsini's affidavit and, for present purposes, I will accept the averment at face value.

(See Doc. No. 1009-5 at p. 42 of 42.)

The Defendant claims that the Laptop Warrant, like the Penn Avenue Warrant, lacks sufficient particularity and that all evidence seized as a result of that search must be suppressed.  Because the Laptop Warrant, like the Penn Avenue Warrant, did not incorporate or attach the supporting affidavit, the warrant's description of items to be seized, as set forth in Attachment B, must be read in isolation.  The Defendant contends that, so viewed, the warrant plainly exceeded the scope of any probable cause determination and has "all the hallmarks of a general warrant" (Def.'s Br. [1009] at p. 119 of 134), because it facially authorized agents to rummage through every piece of information and data on the computer and associated storage devices without reference to any particular crime or any particular kind of material.  It is the functional equivalent, he claims, of authorizing the search of "a home and all of its contents" or a "place of business and all its files."  (*Id*. at p. 121 of 134.)  Hence, he argues, the good faith defense is not available and all evidence which the FBI obtained as a result of its search of the laptop must be suppressed.

The Government insists that the warrant is as specific as it could be under the circumstances in that, based on what was known to Agent Orsini, the computer was known to have played only one role – for Eileen Young to perform private work for the financial benefit of the Defendant.  Thus, the Government argues, the scope of its interest in the computer was coextensive with the computer itself.

Preliminarily, we can dispense with the Defendant's characterization of the Laptop Warrant as a general warrant.  As we have already seen, the law in this circuit distinguishes between, on one hand, general warrants – which involve primarily the problem of ambiguity and insufficient guidance as to the objects to be seized and, on the other, overbroad warrants – which provide the executing officer sufficient specificity but authorize the seizure of too many items.  *See ACEF*, 461 F.3d at 393 n. 19 (general warrants vest the executing officers with unbridled discretion to conduct an exploratory rummaging in search of criminal evidence, while overly broad warrants describe in

"'specific and inclusive general terms what is to be seized,'" but authorize the seizure of items as to which there is no probable cause) (quoting *U.S. v. $92,422.57*, 307 F.3d at 149).  *Accord United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999) ("The cases on "particularity" are actually concerned with at least two rather different problems:  one is whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take, ... and the other is whether the category as specified is too broad in the sense that it includes items that should not be seized..") (internal and end citations omitted).

Here, the Laptop Warrant authorized the seizure of the computer itself, as well as "all information and data contained therein, including data stored on any associated data storage devices such as zip drives, discs (of any kind including cd and hard), and back-up tapes."  The directive is notable not so much for its ambiguity as for its breadth. That is to say, agents executing this warrant did not need to execute any discretion at all because the warrant, by its terms, permitted them to seize every single piece of data contained in the computer and associated storage devices.  Accordingly, to the extent the Defendant challenges the adequacy of the Laptop Warrant's description of items to be seized, I view the problem as one of overbreadth rather than generality.  *Accord Upham*, 168 F.3d at 535 (warrant, which authorized the seizure of "[a]ny and all computer software and hardware, ... computer disks, [and] disk drives..." was "easily administered based on objective criteria (*i.e.,* whether the items seized are computer equipment) and, thus, the problem was "not imprecision but arguable overbreadth") (ellipsis in the original).

To determine whether a warrant is overbroad, we must examine the extent of probable cause established by its supporting affidavit.  *United States v. Fumo*, 565 F. Supp. 2d 638, 646 (E.D. Pa. 2008) ("To determine whether a warrant is overbroad, the reviewing court must 'measur[e] the scope of the search and seizure authorized by the warrant against the ambit of probable cause established by the affidavit upon which the warrant is issued.") (quoting *Christine*, 687 F.2d at 753) (alteration in the original);

38

*United States v. Slaey*, 433 F. Supp. 2d 494, 494 (E.D. Pa. 2006) ("[W]e must compare the wording of the warrant against the language of the probable cause affidavit on which the warrant is predicated.").

As recited above, the affidavit submitted in support of the Laptop Warrant alleged that the Defendant was under investigation for suspected embezzlement and theft, in violation of 18 U.S.C. §§ 666, and scheming to defraud others for the purpose of depriving them of the intangible right of honest services, in violation 1341, 1343, and 1346. According to the affidavit, it was believed that the Defendant had abused ACCO resources in a number of ways, such as using ACCO staff extensively for his own personal and business-related purposes and using ACCO funds for his own private business matters. More specifically as it pertains to the laptop, the affidavit alleged that the Defendant had caused the ACCO to employ Eileen Young in a secretarial capacity at a salary of approximately $70,000 per year, that Ms. Young reportedly spent "all or nearly all of her time... doing private work for the financial benefit of WECHT and to the exclusion of work on behalf of the ACCO" (Affidavit [1009-6] at ¶ 15), that Ms. Young used the laptop to perform work for the Defendant's private business, and that she saved records relating to that private work on the computer's hard drive. (*Id*. at ¶ 16.)

Under these circumstances, the scope of probable cause relative to the laptop computer was substantial. Agent Orsini's affidavit establishes that the laptop was the primary repository of information which would evidence the Defendant's misappropriation of a particular county employee's (i.e., Ms. Young's) time and services. Indeed, given the allegation that Ms. Young spent virtually all of her ACCO time working on behalf of Wecht Pathology, the investigating agents could reasonably expect to find an abundance of incriminating evidence stored on the laptop. Moreover, considering that the essence of the alleged wrongdoing, insofar as Ms. Young is concerned, was the theft of her time and services, the Government had a legitimate interest in knowing not only the extent of work which Ms. Young had generated for the Defendant's private benefit while acting in her capacity as an ACCO employee, but also

the extent of work, if any, which she had generated on behalf of Allegheny County.  As the Government points out, in attempting to prove a theft of at least $5,000 worth of ACCO "property," it would be relevant for the Government to determine the proportion of Ms. Young's workday time which was typically spent doing the Defendant's private work to the exclusion of county work.

Yet the fact that the affidavit established probable cause for a broad search of the computer's data does not definitively settle the issue of whether the warrant was valid because the question remains whether, as the Government contends, the probable cause was coextensive with *all* of the computer's contents.  I think not.

It must be noted in this regard that computers are unique devices in terms of their capacity to store immense amounts of data.  *See* Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations, Computer Crime and Intellectual Property Section, Criminal Division, United States Department of Justice (2002), published at "http://www.cybercrime.gov/s&smanual2002.htm," § II(B)(1)(b) (noting that computers sold in the year 2002 usually can store the equivalent of thirty million pages of information and networks can stored hundreds of times that (and these capabilities double nearly every year).  *See also United States v. Vilar*, No. S305CR621KMK, 2007 WL 1075041 at *35 (S.D.N.Y. April 4, 2007) (noting that "[c]omputer hard drives sold in 2005 generally have storage capacity of about eighty gigabytes, roughly the equivalent to forty million pages of text – about the amount of information contained in the books on one floor of a typical academic library.") (quoting Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 542 (2005)).  In addition, computers are capable of performing a variety of functions, such that "[i]ncreasingly, even office computers are used as 'postal services, playgrounds, jukeboxes, dating services, movie theaters, daily planners, shopping malls, personal secretaries, virtual diaries, and more.'"  *Vilar, supra*, at *35 (quoting *Kerr*, *supra*, at 569).

Given these realities, certain facts established by Agent Orsini's affidavit – and

40

the reasonable inferences which can be drawn from them – are significant.  For one, the affidavit demonstrates that the laptop was a mobile device and that Ms. Young typically took it home every night.  Thus, as the Government forthrightly acknowledged at argument, Ms. Young had personal access to the computer outside of normal work hours, and it would be entirely reasonable to expect that she would have information of a personal nature stored on the laptop.[18]  Indeed, because the affidavit is silent on the issue, it is not clear whether others besides Ms. Young might have had access to the computer during the hours when it was not at the ACCO.  This ambiguity is compounded by the fact that Agent Orsini's affidavit does not establish any basis for judging the origin of the computer.  One may infer from ¶ 21 of the affidavit that the computer was not issued by the ACCO,[19] leading to the further inference that the laptop was likely either issued to Ms. Young by the Defendant himself[20] or acquired by Ms.

---

[18] No record was ever developed as to the full extent of information recovered from the Government's seizure of the laptop computer; however, the trial record indicates that among the items stored on the laptop were photographs of Ms. Young's grandchild.  (*See* Trial Tr. 2/14/08 [897] at p. 85.)

Though it may be the case that the Defendant would lack standing to assert a Fourth Amendment challenge to the acquisition of information personal to Ms. Young, I note that this type of standing is a requirement which can be waived.  *See, e.g., United States v. Price*, 54 F.3d 342, 346 (7th Cir.1995).  Here, I am aware of no challenge to the Defendant's standing insofar as it pertains to the laptop computer.

[19] Paragraph 21 avers that, after news of the criminal probe broke, the Defendant's Chief Deputy Coroner ordered that a desktop computer be installed in Ms. Young's office, where none had existed before.  The confidential informant designated as "ACCO 1" interpreted this development as an effort to create the false appearance that Ms. Young was not performing private work for the Defendant during her normal ACCO work hours.  Based on this information, it is fair to infer that the laptop computer which Ms. Young used at her county job was not ACCO-owned or ACCO-issued; otherwise there would have been no need for the Chief Deputy Coroner to install a new desktop computer in her office.

[20] The Defendant represents in his brief that the laptop computer, in fact, belonged to Dr. Wecht and Wecht Pathology and that it was issued to Ms. Young for her use as a part-time employee of Wecht Pathology.  *(See* Def.'s Br. [1009] at p. 70 of 134 n. 33.)

Young on her own. In either event, the affidavit tells us nothing about the age of the laptop or when Ms. Young first came to possess it; the lack of such information is significant because it leaves the reader with no means of judging whether there were others who had used the laptop in the past or whether the hard drive might contain data unrelated to the Government's investigation. Nor does the affidavit indicate when Ms. Young began working for the Defendant in his capacity as Allegheny Coroner,[21] which is important because it is only the work which Ms. Young produced during her tenure as an ACCO employee that could constitute evidence of the theft or deprivation of her services.

The Government emphasized at oral argument that the only use of the laptop computer referenced in the affidavit is Ms. Young's use of it to perform the Defendant's private pathology work during all or most of her county work hours and, therefore, because the affidavit is silent as to any other use, the Government's interest in the laptop necessarily extends to every file or piece of data stored within the computer. But knowing that a computer has been utilized extensively for a specific illicit purpose is not the same as knowing that it has *never* been used for other, irrelevant purposes.[22] Here, the reasonable probability that the laptop would contain data or files irrelevant to the

---

[21] The trial testimony established that Ms. Young first began working for the Defendant in his capacity as Allegheny County Coroner in the latter part of 1997. (*See* Trial Tr. for 2/14/08 [897] at pp. 81, 86, 145.) For present purposes, however, we must consider only that information which was made available to the reviewing Magistrate Judge as reflected in Agent Orsini's supporting affidavit.

[22] According to Agent Orsini's affidavit, an ACCO computer technician who had personal knowledge of the contents of Ms. Young's laptop computer represented that Ms. Young "performs her private work for Wecht on [the laptop], saves the records relating to this private work on the laptop computer's hard drive, and takes the laptop computer to her home every night." (Laptop Affidavit [1009-6] at ¶ 16.) However, the information supplied by the Government's informant establishes only that the laptop would contain evidence of the private work generated by Ms. Young on the Defendant's behalf. Nowhere in the affidavit does the informant represent or suggest that the laptop computer's hard-drive or associated storage devices are devoid of other, irrelevant types of information.

Government's investigation is not unduly speculative or far-fetched – it arises naturally in light of the characteristics inherent to computers –  namely, their capacity to store tremendous amounts of information, spanning many years, in a variety of different formats and their capability of performing numerous functions, including functions which are not traditionally business-related.  Adding to this complexity is the ever-more common tendency for individual users to intermingle personal information with work-related information.  *See United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005) ("[O]fficers conducting searches (and the magistrates issuing warrants for those searches) cannot simply conduct a sweeping, comprehensive search of a computer's hard drive.  Because computers can hold so much information touching on many different areas of a person's life, there is a greater potential for the "intermingling" of documents and a consequent invasion of privacy when police execute a search for evidence on a computer...") (quoting *United States v. Walser*, 275 F.3d 981, 986 (10th Cir.2001)).

In sum, the affidavit does not provide sufficient information to justify a reasonable inference that *all* of the data on the laptop computer would likely be probative of the crimes under investigation.  I am therefore not persuaded by the Government's contention that its interest in the computer was as broad as all of the contents of the computer itself.  I am likewise unpersuaded by the Government's corollary argument that the Laptop Warrant could not have been drawn any more narrowly.  Among other possibilities, the warrant could have been drafted to reflect the fact that the Government was seeking evidence of the Defendant's misappropriation of Ms. Young's time and services while she was acting in her capacity as an ACCO employee, in violation of certain criminal statutes.  The warrant could also have specified that the targeted data was confined to a particular time frame encompassing, at most, the years during which the Defendant served as Allegheny County Coroner.  Alternatively, since the Government was interested in any files evidencing work product generated by Ms. Young, whether on behalf of Wecht Pathology or on behalf of ACCO, it could have

framed the search warrant consistent with this specific limitation.  At the very least, such tailoring would have precluded the seizure of items that were demonstrably personal to Ms. Young or other non-relevant users.[23]

The Government's contention that the warrant could not have been drawn any more narrowly is also inconsistent with another aspect of Agent Orsini's supporting affidavit.  Notably, after explaining in some detail why seizure of the laptop computer and peripheral devices is necessary and why an off-site search of the files must be conducted, the affidavit represents that an expert will conduct an off-site search of a mirror image of the computer's stored data "for the items described in the warrant." (Affidavit [1009-6] at ¶ 27.)  The affidavit goes on to explain how, in the event mirror-imaging cannot be accomplished successfully, the agents plan to seize those components of the system needed in order to locate "items described in the warrant" and how efforts will be made to separate out "any files not within the scope of the warrant."  (*Id*. at ¶ 28.)  However, based upon the face of the warrant, *all* data is subject to seizure, and, by definition, *no files* fall outside the scope of the warrant.  The affidavit goes on to request that agents be authorized to analyze all of the electronically stored data using any of a number of techniques, including, among others, "(a) surveying various file 'directories' and individual files they contain in order to locate evidence and instrumentalities authorized for seizure by the warrant" and "(d) performing electronic 'keyword' searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation."  (*Id*. at ¶ 31.)  Here again, it is difficult

---

[23] In fact, when pressed at oral argument, counsel for the Government forthrightly acknowledged that the warrant could have been drafted so as to preclude the seizure of items which were demonstrably personal to Ms. Young – although he did not concede that such tailoring was required by the Fourth Amendment.  (Tr. of Argument, 3/20/09 [1027] at p. 53 of 140.)  The Court appreciates the fact that, at all times throughout these proceedings, Government counsel conducted themselves professionally, in good faith, and with complete candor to the Court.

to understand why an expert would need to conduct this type of search when, according to the warrant, *all data* on the computer – every single piece –  pertains to the investigation and is subject to a carte blanche seizure.  Consistent with the face of the warrant, no subsequent filtering of the computer data should theoretically be necessary.[24]

At the March 20, 2009 oral argument, the Government suggested that, as a practical matter, once it is granted authorization to access a computer, it has the right to examine every file in order to find evidence that is relevant to the supporting affidavit.  This line of argument appears to be a reference to cases recognizing the principle that the Government need not accept the user's own file designations at face value, since incriminating evidence can easily be stored under an innocuous file name, and the Government therefore has the right to use appropriate search mechanisms in order to locate relevant evidence, even if it involves looking beneath the facade of an apparently innocuous document.  *See, e.g., Vilar*, *supra*, at *37 (noting that the "vast majority of courts to have considered the question" hold the view that "while the warrant must state with particularity the materials to be seized from a computer, the warrant need not specify *how* the computers will be searched") (citing cases).

However, the important point is that, while the Government may choose its own preferred search mechanism for obtaining relevant evidence, the search of computer files must be conducted *in accordance with limitations established in the warrant.  See United States v. Brooks*, 427 F.3d 1246, 1253 (10th Cir. 2005) (upholding warrant "that authorized officers to search through computer files for particular items specifically

---

[24] As noted, there is no factual record here, nor were any specific findings made by Judge Schwab, concerning the manner in which the off-site search of the laptop computer was executed; consequently, I express no opinion on the matter.  It is interesting to note, however, that the Defendant had previously presented evidence suggesting that the Government's off-site search of the laptop's data base initially focused on concepts such as expense accounts, the term "limousine," and the names of certain of the Defendant's family members.  (*See* Def.'s Br. in Supp. of Mot. for Reconsideration [210-1] and Affidavit of Phil Kossler [210-2].)

related to child pornography"); *United States v. Carey*, 172 F.3d 1268, 1275 (10th Cir. 1999) ("Officers [should] specify in a warrant which type of files are sought"); *United States v. Upham*, 168 F.3d at 535 (upholding the generic seizure of computer equipment so as to allow an off-site search for "[a]ny and all visual depictions, in any format or media, of minors engaging in sexually explicit conduct (as defined by the statute)"); *United States v. Fumo*, 565 F. Supp. 2d 638, 649 (E.D. Pa. 2008) ("'because of the nature of computer files, the government may legally open and briefly examine each file when searching a computer pursuant to a valid warrant' *in order to determine which files are described by the warrant*") (emphasis added) (citation omitted); *Vilar, supra*, at *37 (warrant must state with particularity the materials to be seized from a computer).

Moreover, the fact that the Government may have the right to conduct a controlled *search* of an entire computer base for incriminating evidence is a concept distinct from the idea that the Government may automatically *seize* every piece of data stored on the computer. Cases have recognized, for example, that when a law enforcement officer searching a computer for evidence of a particular type of crime inadvertently discovers evidence of other crimes, that officer must obtain a second search warrant in order to continue searching for evidence of the second crime. *See, e.g., United States v. Carey*, 172 F.3d at 1276 (where officer executing a warrant to search for evidence of narcotics trafficking discovered pornography, officer must acquire a second warrant to continue searching for pornographic material). *See also United States v. Riccardi*, 405 F.3d at 862 ("[O]fficers conducting searches (and the magistrates issuing warrants for those searches) cannot simply conduct a sweeping, comprehensive search of a computer's hard drive. .... Thus, when officers come across computer files intermingled with irrelevant computer files, they may seal or hold the computer pending approval by a magistrate of the conditions and limitations on a further search of the computer.") (quoting *United States v. Walser*, 275 F.3d 981, 986 (10th Cir.2001)). Here, the Laptop Warrant permitted agents to seize outright from the

computer every single file or piece of information contained within – whether a personal piece of correspondence, a personal photograph, a downloaded music file, or data reflecting non-relevant internet access – without any qualifying requirement that it relate to the investigation at hand.  This is a result materially distinguishable from the controlled *search* of a computer database pursuant to a particularized warrant.

The Government also contends that, where the computer itself is used as an instrumentality of the crime, courts have upheld seizures of computers and all files contained therein.  True enough, some courts have upheld the generic seizure of computer equipment where the computer is being used as an instrumentality of crime, as in cases involving the use of computers to transmit or store obscene pornography. *See, e.g., United States v. Upham*, 168 F.3d at 535 (upholding the "generic" seizure of computer equipment in case involving the possession and interstate transportation of child pornography images); *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (upholding blanket seizure of defendant's entire computer system in investigation relating to defendant's possession of child pornography); *Davis v. Gracey*, 111 F.3d 1472, 1480 (10th Cir. 1997) (upholding the seizure of computer "equipment" used to store obscene pornography).  The logic behind this result is that the investigating agents cannot know in advance which components of the system will contain the contraband and therefore, it is reasonable for agents to seize any components in which the contraband may reasonably be found.  *See, e.g., Upham*, 168 F.3d at 535 ("A sufficient chance of finding some needles in the computer haystack was established by the probable cause showing in the warrant application."); *Lacy*, 119 F.3d at 746 ("The government knew Lacy had downloaded computerized visual depictions of child pornography, but did not know whether the images were stored on the hard drive or on one or more of his many computer disks. ... there was no way to specify what hardware and software had to be seized in order to retrieve the images accurately).  *See also United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006) (noting that "it is impossible to tell what a computer storage medium contains just by looking at it.").

47

Critically, however, the law recognizes a distinction between the seizure of computer equipment on one hand and, on the other hand, the seizure of information stored *within* the computer equipment:

> The cases and commentary ... draw a distinction between the electronic storage device itself and the information which that device contains. Thus, when the government seeks to seize the information stored on a computer, as opposed to the computer itself, that underlying information must be identified with particularity and its seizure independently supported by probable cause.

*Vilar*, *supra*, at *36 (citing cases). In the case of *Davis v. Gracey*, for example, which is cited by the Government, the court upheld the seizure of the defendant's computer equipment where the probable cause related to the computer's function in distributing and displaying pornographic images, not to its function in holding stored files. 111 F.3d at 1480. The court ruled that the seizure of the equipment was not invalid merely because it resulted in the incidental temporary seizure of stored electronic materials within the equipment. *Id*. However, the court was quick to point out that "our conclusion that the seizure of the computer equipment pursuant to a warrant here allowed the incidental seizure of files stored therein *should not be read as approval of any subsequent efforts by the police to search or retain the stored files without a warrant*." *Id*. at 1480-81 (emphasis supplied).

Here, it is important to recognize that the Government's interest in the laptop was not so much in the equipment *per se* but, rather, in accessing *the files stored within* the computer which, the Government believed, would evidence the misappropriate of Ms. Young's time and services. That being the case, the warrant was required to state with reasonable particularity which files it was authorizing the Government to seize. *See United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (warrant authorizing the seizure of virtually every document and computer file at the target company was insufficiently particular where it "contained no limitations on which documents within each category could be seized or suggested how they related to specific criminal activity."). *Cf. United States v. Upham*, 168 F.3d at 535-36 and n. 1 (upholding warrant which authorized the

seizure of "[a]ny and all visual depictions, in any format or media, of minors engaging in sexually explicit conduct (as defined by the statute); defendant's challenge to this language on particularity grounds is rejected where he "treats the paragraph as if it authorized the seizure of *any* image and ignores the qualifying language limiting the seizure to images 'of minors engaging in sexually explicit conduct.'") (alteration and emphasis in the original)*; United States v. Lacy*, 119 F.3d at 746 (upholding, in child pornography case, warrant which authorized the seizure of computer equipment and records and documents relating to a Danish computer bulletin board system called BAMSE; court noting that, unlike the warrant in *Kow*, "the Lacy warrant contained objective limits to help officers determine which items they could seize – allowing seizure only of documents lined to BAMSE, for example.").

This requirement is consistent with the Government's own published procedures which advise that, "if the probable cause relates in whole or in part to information stored on the computer, the warrant should focus on the content of the relevant files rather than on the storage devices which may happen to contain them" and "should describe the information based on its content (e.g., evidence of a fraud scheme)... ." *See* Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations, Computer Crime and Intellectual Property Section, Criminal Division, United States Department of Justice (2002), published at "http://www.cybercrime.gov/s&smanual2002.htm" at § II(C).

Ultimately, in determining whether the Laptop Warrant was sufficiently particularized, the pertinent inquiry is whether Agent Orsini's affidavit established probable cause not only to search but to seize outright every single piece of information stored within the laptop and its associated storage devices. I conclude, for the reasons previously discussed, that the laptop warrant was overbroad in that the supporting affidavit did not support the *en masse* seizure of all information and data contained on the laptop computer and its peripheral storage devices.

As we have already seen, the law of this circuit allows an overbroad warrant to

be saved by redaction, but only when the warrant consists of severable phrases and clauses which, when preserved, satisfy the Fourth Amendment's particularity requirement. *See Christine*, 687 F.2d at 754 ("Redaction is inappropriate when the valid portions of the warrant may not be meaningfully severable from the warrant as a whole."). Here, the Defendant argues that the Laptop Warrant cannot be meaningfully redacted and the Government does not appear to contend otherwise. Even if we were to redact from the warrant the phrase "and all information and data contained therein," this would be of little help to the Government, for the Government was clearly interested in obtaining the contents of the laptop computer and made extensive use of those files at trial. Redaction, therefore, is not appropriate here.

I also have no occasion as matters presently stand to consider whether the Laptop Warrant is viable pursuant to the principle discussed in *Groody, supra*. To review, *Groody* acknowledged a line of cases whereby courts have sometimes allowed an unincorporated affidavit to cure a non-particularized warrant "so long as the search is confined to the narrower scope of the affidavit." 361 F.3d at 240. The Government has not specifically advanced this defense with respect to the Laptop Warrant, nor has any factual record been developed concerning the manner in which the laptop computer was searched, as no evidentiary hearing was held on that point.[25]

The only remaining inquiry for present consideration is whether the evidence seized as a result of the laptop search can be saved under the good faith exception to the exclusionary rule. *See $92,422.57*, 307 F.3d at 149 ("Evidence seized pursuant to an overly broad warrant need not be suppressed if the good faith exception applies.") As we have previously discussed, *United States v. Leon*, *supra*, teaches that suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *United States v. William*, 3

_____

[25] I note that, in his May 31, 2006 Memorandum Order, Judge Schwab found "no defect in the execution of [the Laptop Warrant]" without further elaboration. *(See Mem. Order* dated 5/31/06 [193] at p. 15 of 17.)

F.3d 69, 74 (3d Cir. 1993).

In determining whether the good faith exception applies, it is important to consider the principles underlying the Supreme Court's adoption of the exclusionary rule:

> The Supreme Court developed the exclusionary rule to deter unlawful police conduct. *Leon*, 468 U.S. at 906, 104 S.Ct. 3405. However, where law enforcement officers act in the "objectively reasonable belief that their conduct d[oes] not violate the Fourth Amendment," "the marginal or nonexistent [deterrent] benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 918, 922, 104 S.Ct. 3405. Therefore, if an officer has obtained a warrant and executed it in good faith, "there is no police illegality and thus nothing to deter." *Id.* at 921, 104 S.Ct. 3405.

*United States v. $92,422.57*, 307 F.3d at 145. *See also United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002) (noting that the deterrent purpose of the exclusionary rule assumes willful, or at the very least, negligent conduct which has resulted in a Fourth Amendment violation and, "[b]y excluding evidence seized as a result of an unconstitutional search and seizure, 'the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused.'") (quoting *United States v. Peltier*, 422 U.S. 531, 539 (1975)).

To review, the test for determining the applicability of the good faith doctrine is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Loy*, 191 F.3d at 367. As we have seen, notwithstanding the presumptive good faith that normally attaches when a search is conducted pursuant to a warrant, *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57)*, 307 F.3d at 146, the good faith doctrine is inapplicable when, *inter alia*, "the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized." *Zimmerman*, 277 F.3d 426, 437 (3d Cir. 2002) (citation omitted).

In the case at bar, the Laptop Warrant's directive to seize "all information and data" contained in the computer's hard-drive and associated storage devices was so

facially overbroad as to violate the Fourth Amendment's particularity requirement and render any reliance on the warrant objectively unreasonable. *Accord Lesoine v. County of Lackawanna*, 77 Fed. Appx. 74, 79, 2003 WL 21940916 at ** 4-5 (3d Cir. Aug. 14, 2003) (warrant authorizing the blanket seizure of, among other things, business records and computer records without any reference to the crime under investigation failed the particularity requirement); *United States v. Fleet Management*, 521 F. Supp. 2d 436, 442-46 (E.D. Pa. 2007) (invalidating a warrant which authorized the seizure of "any and all data" from three seized computers); *United States v. Slaey*, 433 F. Supp. 2d 494, 500-01 (E.D. Pa. 2006) (warrant authorizing the seizure of "[a]ny records, documents, materials and files maintained on a computer" found to be facially overbroad where it lacked any limitation as to subject matter and time, and thereby exceeded the scope of the probable cause affidavit). In light of the capabilities of the modern-day computer, a request to seize without limitation every single piece of data held therein is extraordinary in its breadth. For the reasons I have discussed, the affidavit established probable cause for a broad search of the computer's files, but it fell patently short of establishing probable cause for the seizure of every single file contained within the laptop's hard-drive and peripheral storage devices. To be sure, government agents can only be held to a degree of specificity that is consistent with the information known to them or which is reasonably ascertainable from the investigation at hand. I emphasize therefore, that in highlighting the important unknown facts about the laptop which remain unanswered by Agent Orsini's affidavit, I am not second-guessing the Government's investigatory methods, nor am I faulting Agent Orsini for his failure to possess information which may have been unavailable to him at the time he applied for the Laptop Warrant. I merely conclude that, because of the many unknown facts concerning Ms. Young's laptop computer, which are obvious from a reading of the affidavit, a reasonably well-trained agent would not have assumed that every single piece of data on that computer would be relevant to the Government's investigation in this case. Indeed, to the extent Agent Orsini's affidavit represents that certain

techniques would be used in order to differentiate between those files which are authorized for seizure under the warrant and those which are not, this representation is patently inconsistent with the language in the warrant which purports to authorize the automatic, wholesale seizure of every file contained within the laptop.

Because Agent Orsini's affidavit did not establish probable cause to seize all of the laptop's data, the search warrant needed to identify the targeted information with greater particularity, and I have previously offered some suggestions as to how the warrant might have done so.  This practice is in keeping with the DOJ's own manual, which advises that, "if the probable cause relates in whole or in part to information stored on the computer, the warrant should focus on the content of the relevant files rather than on the storage devices which may happen to contain them" and "should describe the information based on its content ... ." *See* Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations, Computer Crime and Intellectual Property Section, Criminal Division, United States Department of Justice (2002), *supra*, at § II(C).  As one court has recognized, "[t]his is not a new rule, but merely an application of the traditional Fourth Amendment requirement that the Government establish that there is probable cause that the material sought will contain evidence of crime, and then specify with reasonable particularity the materials to be seized."  *Vilar*, *supra*, at *37.

I recognize that suppression is a harsh remedy and should occur only when exclusion of the seized evidence will have some appreciable deterrent effect.  But it is also true that "[g]ood faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." *United States v. Zimmerman*, 277 F.3d 426, 437-38 (3d Cir.2002) (quoting *United States v. Reilly*, 76 F.3d 1271, 1280 (2nd Cir.1996).  Rather, the objective standard applied in good faith analysis "requires officers to have a reasonable knowledge of what the law prohibits."  *Id.* at 438 (quoting *Leon*, 468 U.S. at 919-20 n. 20).  Here, I do not consider the operative principles to be so esoteric or highly nuanced as to be beyond the ken of a reasonably well-trained law enforcement officer.

Because Agent Orsini's affidavit was neither incorporated into the Laptop Warrant by reference nor attached to it, the requisite particularity must be found in the warrant itself. Because the Laptop Warrant's description of items to be seized was so patently overbroad as to fail, on its face, to particularize the items to be seized, any reliance on that warrant was objectively unreasonable and the evidence obtained as a result of that search must be suppressed.

## III.  CONCLUSION

My ruling, which involves suppressing a substantial portion of the Government's evidence, is not undertaken lightly.  On the contrary, as is hopefully evident from a review of this opinion, the Court is granting the Defendant's request for suppression relief only after a careful and considered review of the issues and controlling legal principles.  It is also important to stress that the result reached here today is not based on what amounts to constitutional hair-splitting or what is sometimes referred to in common parlance as a mere "legal technicality."  Rather, these rulings are grounded in well-established Fourth Amendment principles which serve as a bulwark against unwarranted governmental intrusion into the private affairs of every citizen, not just this Defendant.  The importance of these principles transcends this particular case.

In conclusion, for the reasons previously discussed, I will grant the Defendant's motion to suppress with respect to the search of his private business offices and the laptop utilized by Ms. Young.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA          )
                                  )
                    v.            )          No. 2:06-cr-26
                                  )
CYRIL H. WECHT,                   )
                                  )
                    Defendant     )

## O R D E R

AND NOW, *to wit,* this 14th day of May, 2009, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's Motion [1008] for Reconsideration of Denial of Rule 29 Motions, Denial of Motion to Dismiss Under 18 U.S.C. Section 666 and Denial of Suppression Motions is GRANTED and his requests for substantive relief are granted in part and denied in part as follows:

1.      The Defendant's motion to suppress evidence seized as a result of the Penn Avenue Warrant and the Laptop Warrant is GRANTED; and

2.      The Defendant's motion for entry of a judgment of acquittal and motion to dismiss the indictment are DENIED as moot.

s/      Sean J. McLaughlin

Sean J. McLaughlin
United States District Judge

cm:     All counsel of record.